**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>VIRIDOS, INC.,[1]<br><br>    Debtor. | Chapter 11<br>Subchapter V<br><br>Case No. 25-10697 (CTG) |

**DEBTOR'S MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS(I) AUTHORIZING DEBTOR TO (A) OBTAIN
POSTPETITION FINANCING AND (B) USE OF CASH COLLATERAL, (II)
GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDER,
(III) SCHEDULING FINAL HEARING, AND (IV) GRANTING RELATED RELIEF**

Viridos, Inc., as debtor and debtor in possession in the above-captioned chapter 11 case

(the "Debtor"),[2] respectfully states the following in support of this motion (the "Motion"):

**RELIEF REQUESTED**

1.  The Debtor respectfully requests entry of an interim order, substantially in the form

attached hereto as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order" and,

together with the Interim Order, the "Proposed Orders"):

    i.  authorizing the Debtor to obtain postpetition financing ("DIP Financing")
pursuant to a senior, secured, superpriority, debtor in possession multi-draw
term loan facility (the "DIP Facility") subject to the terms and conditions set
forth in this Interim Order and that certain Debtor in Possession Senior Secured
Superpriority Credit Agreement, attached hereto in substantially final form as
**Exhibit 1** (as amended, restated, amended and restated, supplemented, or
otherwise modified from time to time, the "DIP Credit Agreement") by and
among the Debtor, and one or more affiliates of Breakthrough Energy Ventures
II, L.P. (together with successors and assigns, "BEV" or the "DIP Lender"),
consisting of (i) new money senior secured superpriority term loans in an

---

1 The Debtor in this Chapter 11 Case and the last four digits of its U.S. taxpayer identification number is: Viridos,
  Inc. (3940).  The Debtor's corporate headquarters is located at: 11149 N. Torrey Pines Road, La Jolla, CA
  92037.

2 A detailed description of the Debtor and its business, and the facts and circumstances supporting this Motion and
  the Debtor's chapter 11 case, are set forth in greater detail in the *Declaration of Eric Moellering in Support of
  Debtor's First Day Motions and Applications* (the "First Day Declaration"), filed contemporaneously with the
  Debtor's voluntary petition for relief filed under chapter 11 of title 11 of the Bankruptcy Code on the Petition
  Date.

aggregate principal amount of up to $4,250,000.00, of which up to $1,500,000.00 in the aggregate will be available prior to the entry of the Final Order (as defined below), and the remainder will be available upon the entry of the Final Order, in each case, subject to the Initial DIP Budget (as defined below), and (ii) the DIP Roll-Up Loans (as defined below), which will be deemed made in order to roll up and convert amounts outstanding under the Prepetition Loan Documents (as hereinafter defined) into DIP Obligations (as defined below) as provided in this Interim Order (the loans to be made available and/or deemed made under the foregoing clauses (i) and (ii), collectively, the "<u>DIP Loans</u>" and the commitments therefor, the "<u>DIP Commitments</u>");

ii.    authorizing the Debtor to incur the DIP Loans and all other obligations, fees, costs, expenses and other liabilities and obligations (including indemnities and similar obligations, whether contingent or absolute) under the DIP Documents (as defined below) (collectively, the "<u>DIP Obligations</u>");

iii.    authorizing the Debtor to execute, deliver and perform under the DIP Credit Agreement and all other documents and instruments that may be reasonably requested by the DIP Lender in connection with the DIP Facility (in each case, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof, together with the DIP Credit Agreement, the "<u>DIP Documents</u>");

iv.    subject to the Carve-Out (as defined below) and otherwise solely to the extent set forth herein, granting to the DIP Lender allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code;

v.    granting to the DIP Lender valid, enforceable, non-avoidable and automatically perfected first priority liens pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code on the DIP Collateral (as defined below), on the terms described herein;

vi.    upon entry of a Final Order, waiving (a) the Debtor's right to surcharge the Prepetition Collateral (as defined below) and the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

vii.    waiving the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral and the Prepetition Collateral (including Cash Collateral (as defined below)) for the benefit of any party other than the DIP Lender; *provided* that the foregoing waiver shall be without prejudice to any provisions of the Final Order;

viii.    authorizing the Debtor to use proceeds of the DIP Facility and Cash Collateral solely in accordance with the DIP Orders, the DIP Documents and the Approved Budget;

ix.    authorizing the Debtor to pay the DIP Obligations as they become due and

2

payable in accordance with the DIP Documents;

x.    subject to the restrictions set forth in the DIP Documents and the DIP Orders, authorizing the Debtor to use Prepetition Collateral and provide adequate protection to the Prepetition Secured Lender (as defined below) for any diminution in value of its interests in the Prepetition Collateral, for any reason provided for in the Bankruptcy Code;

xi.    authorizing the DIP Lender to take all commercially reasonable actions to implement the terms of this Interim Order and vacating and modifying the automatic stay to the extent necessary to permit the Debtor and the DIP Lender to implement and effectuate the terms and provisions of the DIP Orders and the DIP Documents;

xii.    waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order and, upon entry, the Final Order; and

xiii.    scheduling a final hearing (the "<u>Final Hearing</u>") to consider final approval of the DIP Facility and use of Cash Collateral on the terms of a proposed order (the "<u>Final Order</u>") to be posted to the docket prior to the Final Hearing.

## <u>JURISDICTION AND VENUE</u>

2.    The United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  The Debtor confirms its consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rules 4001-2 and 9013-1(m).

## GENERAL BACKGROUND

5.      On April 14, 2025 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") as a debtor defined in Bankruptcy Code section 1182(1), and the Debtor elected to proceed under Subchapter V of chapter 11 of the Bankruptcy Code pursuant to the Small Business Debtor Reorganization Act, as amended.

6.      Information about the Debtor's business and the events leading to the commencement of this Case can be found in the First Day Declaration, filed contemporaneously with the Debtor's voluntary petition for relief, which is incorporated herein by reference.

7.      In further support of this Motion, the Debtor submits the *Declaration of Brian Ayers in Support of the Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Obtain Postpetition Financing and (B) use of Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lender, (III) Scheduling Final Hearing, and (IV) Granting Related Relief* filed contemporaneously herewith.

## DEBTOR'S CAPITAL STRUCTURE

8.      On July 23, 2024, pursuant to that certain Secured Convertible Promissory Note dated as of July 23, 2024, made by the Debtor to the order of BEV (together with its successors and assigns, the "Prepetition Secured Lender") in the original principal amount of $2,000,000 (the "Initial Prepetition Note"), the Debtor incurred indebtedness and other obligations to the Prepetition Secured Lender.

4

9.      On or about April 8, 2025, the Prepetition Secured Lender agreed to make additional financing available to the Debtor and, in connection therewith, the Debtor executed in favor of the Prepetition Secured Lender that certain Amended and Restated Secured Convertible Promissory Note dated as of April 8, 2025 in the maximum principal amount of $2,750,000 (the Initial Prepetition Note, as so amended and restated and as otherwise amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition Bridge Note" and, collectively with the Note Purchase Agreement and the Security Agreement referenced in the Prepetition Bridge Note (such Security Agreement as amended, the "Prepetition Security Agreement"), and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "Prepetition Loan Documents"), and the Prepetition Secured Lender made an incremental advance in connection therewith of $250,000. The indebtedness and obligations of the Debtor owing to the Prepetition Secured Lender under the Prepetition Loan Documents is referred to herein as the "Prepetition Loan Obligations".

10.     As of the Petition Date, the Debtor is justly and lawfully indebted and liable to the Prepetition Secured Lender without defense, challenge, objection, claim, counterclaim, or offset of any kind, for the Prepetition Loan Obligations in the aggregate principal amount of not less than $2,250,000, plus accrued and unpaid interest thereon and any fees, expenses and disbursements (including attorneys' fees), costs, charges, indemnities, and any other Prepetition Loan Obligations incurred under the Prepetition Loan Documents.

## SUMMARY OF DIP FACILITY AND USE OF CASH COLLATERAL

11.     In accordance with Bankruptcy Rules 4001(b)(1) and 4001(c)(1), and Local Rule 4001-2(a)(i) and (ii), a summary of certain key terms of the proposed DIP Facility and the Interim

Order, as applicable, is set forth below.  In accordance with Local Rule 4001-2(a)(iii), the Initial

DIP Budget is attached as Exhibit 2 to the Interim Order.  The below summary is qualified in its

entirety by reference to the applicable provisions of the Interim Order and DIP Credit Agreement,

and the Interim Order and DIP Credit Agreement will control in the event of any inconsistency

between the below summary and the Interim Order and DIP Credit Agreement, as applicable.

| Summary of Material Terms of DIP Facility and Use of Cash Collateral[3] | |
|---|---|
| **DIP Facility Parties**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>DIP Credit Agreement, p. 1 | Borrower:  Viridos, Inc.,<br><br>DIP Lender: Breakthrough Energy Ventures II, L.P. |
| **DIP Facility Amount**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(A)<br><br>DIP Credit Agreement, Section 2.1<br><br>Interim Order, ¶ 2 | The DIP Lender will provide the Debtor with a multiple draw term loan facility in the aggregate principal amount of up to $6,650,000.00, consisting of:<br><br>(a) up to $1,500,000.00 in the aggregate will be available prior to the entry of the Final Order (as defined below), and the remaining $2,750,000.00 will be available upon the entry of the Final Order, in each case, subject to the Approved Budget (as defined below), and<br><br>(b) the DIP Roll-Up Loans (as defined in the Interim DIP Order), which will be deemed made in order to roll up and convert amounts outstanding under the Prepetition Loan Documents into DIP Obligations as provided in this Interim Order (the loans to be made available and/or deemed made under the foregoing clauses (i) and (ii), collectively, the "DIP Loans" and the commitments therefor, the "DIP Commitments"); a roll-up of the Prepetition Loan Obligations upon entry of the Interim Order (the "DIP Roll-Up Loan," and together with the DIP New Money Loans, the "DIP Loans"). |

---

[3] Capitalized terms used in this summary but not defined in this summary shall have the meanings ascribed to them in the DIP Credit Agreement.

| | |
|---|---|
| **Use of Cash Collateral**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(A)<br><br>Interim Order, ¶ 11 | The Debtor will use Cash Collateral subject to, and in accordance with the terms and conditions, set forth in the Interim Order, Approved Budget, and the DIP Documents. |
| **Liens and Priorities**<br><br>Bankruptcy Rule 4001(c)(l)(B)(i)<br><br>DIP Credit Agreement, Section 4.4<br>Interim Order, ¶¶ 5, 6 | The DIP Loans and other liabilities and obligations owed to the DIP Lender under or in connection with the DIP Credit Agreement, the DIP Documents, and the Interim Order (collectively, the "<u>DIP Obligations</u>"), in all cases subject to the Carve-Out, shall be:<br><br>(a) Pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claims status in the chapter 11 case of the Debtor with priority over any and all administrative expenses, whether heretofore or hereafter incurred, of the kind specified in sections 503(b) or 507(a) of the Bankruptcy Code (the "<u>DIP Superpriority Claim</u>");<br><br>(b) pursuant to sections 364(c)(2) of the Bankruptcy Code, secured by a perfected first-priority lien on the DIP Collateral (as defined below), to the extent that such DIP Collateral is unencumbered;<br><br>(c) pursuant to section 364(c)(3) of the Bankruptcy Code, secured by a second-priority lien on all DIP Collateral, to the extent that (i) valid, perfected and non-avoidable liens exist on such collateral as of the Petition Date or (ii) valid liens exist as of the Petition Date and are subsequently perfected as permitted under section 546(b) of the Bankruptcy Code ((i) and (ii) collectively, the "<u>Prepetition Permitted Liens</u>"); and<br><br>(d) pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected senior priming lien on all DIP Collateral and Prepetition Collateral that is subject only to the Carve-Out and the Prepetition Permitted Liens ((b) through (d) collectively, the "<u>DIP Liens</u>"). |

7

| | |
|---|---|
| **Parties with Interest in Cash Collateral**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i)<br><br>Interim Order, ¶ F | BEV, as the Prepetition Secured Lender, holds an interest in the Cash Collateral. |
| **Use of Proceeds and Cash Collateral**<br><br>Bankruptcy Rules 4001(b)(1)(B)(ii), 4001(c)(1)(B)<br><br>Local Rule 4001–2(a)(i)(D)<br><br>DIP Credit Agreement, Sections 6.9, 7.9<br><br>Interim Order, ¶ 11 | The DIP Facility proceeds and cash collateral shall be used for (a) payment of professional fees and other costs of administering this chapter 11 case, (b) payment of any Court approved prepetition obligations of the Debtor or otherwise approved by the DIP Lender, and (c) working capital and other general corporate purposes of the Debtor, in each case in accordance with the Approved Budget (subject to the Permitted Variance).<br><br>The DIP Facility proceeds and cash collateral will not be used to fund nondebtor affiliates. |
| **Adequate Protection**<br><br>Bankruptcy Rules 4001(b)(1)(B)(iv), 4001(b)(1)(C)(ii)<br><br>Interim Order, ¶ 12 | The Prepetition Secured Lender shall be granted the following adequate protection for, and equal in amount to, the diminution in the value of the prepetition security interests of the Prepetition Secured Lender securing the Prepetition Loan Obligations:<br><br>(a) <u>Adequate Protection Liens</u>. Effective and perfected as of the date of entry of the Interim Order, replacement security interests in and liens on the collateral securing the Prepetition Loan Obligations. The adequate protection liens shall be subordinated only to (i) the DIP Liens, (ii) the Prepetition Permitted Liens, if any, (iii) the Carve-Out;<br><br>(b) <u>Adequate Protection Super-Priority Claim</u>. To the extent of any diminution in value of the Prepetition Secured Lender's security interests, a superiority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code, which shall be subject and subordinate only to (i) the Carve-Out, (ii) the DIP Superpriority Claims, and (iii) the Prepetition Permitted Liens, if any; and<br><br>(c) <u>Prepetition Secured Lender Fees and Expenses</u>. The Debtor shall pay to the Prepetition Secured Lender, in cash, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the Prepetition Secured Lender's advisors, subject to the review procedures set forth in the Interim Order; and<br><br>(d) <u>Postpetition Interest Payments</u>. From and after the Petition |

8

| | |
|---|---|
| | Date, interest shall continue to accrue under the Prepetition Loan Document at the non-default rate and shall constitute Prepetition Loan Obligations and shall be included in the DIP Roll-Up Loans. |
| **Fees**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(B)<br><br><br>DIP Credit Agreement, Sections 3.1(a)(i) (Closing Fee), and (a)(ii) (Exit Fee) | In consideration of the DIP Lender making the DIP Facility available to the Debtor, the Debtor agrees to pay the following fees to the DIP Lender:<br><br>(i)     Closing Fee.   A closing fee (the "Closing Fee") in an amount equal to $133,000.  The entire amount of the Closing Fee shall be fully earned, due and owing on the Closing Date and shall be payable in cash on the Maturity Date.<br><br>(ii)     Exit Fee.  An exit fee (the "Exit Fee") in an amount equal to $133,000.  The entire amount of the Exit Fee shall be fully earned, due and owing on the Closing Date and shall be payable in cash on the earlier of (x) the date on which the Borrower repays the Obligations in full hereunder or (y) the Maturity Date. |
| **Interest Rate**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(B)<br><br><br>DIP Credit Agreement, Section 2.3 | The rate equal to 12% per annum, payable on the last day of each calendar month and on the Maturity Date. If an Event of Default (as defined below) occurs and is continuing, the interest rate shall increase to 15% per annum. |
| **Conditions of Closing and Borrowing**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(E)<br><br><br>DIP Credit Agreement, Article 8.1 | Each of the following conditions must be satisfied prior to the DIP Lender funding the initial DIP Loan:<br><br>(a) the Interim DIP Order, in form and substance satisfactory to the DIP Lender, shall have been entered by the Court, shall be in full force and effect and shall not have been vacated, reversed, modified, appealed stayed or subject to any motion to reconsider in any respect;<br><br>(b) all requisite corporate action and proceedings in connection with the DIP Credit Agreement and the other DIP Documents shall be satisfactory in form and substance to the DIP Lender, and the DIP Lender shall have received all information and copies of all documents, including records of requisite corporate action and proceedings which the DIP Lender may have requested in connection therewith, such documents where requested by the DIP Lender  or its counsel to be certified by appropriate |

corporate officers;

(c) the DIP Lender shall have received and approved the Initial DIP Budget;

(d) the DIP Lender shall have received the DIP Credit Agreement and all other DIP Documents and all instruments and documents to be delivered hereunder and thereunder by the date hereof, each of which shall have been duly executed by all respective parties thereto and each of which shall be in full force and effect and in form and substance satisfactory to DIP Lender;

(e) the Debtor shall pay all fees required to be paid to the DIP Lender on or before the Closing Date;

(f) the DIP Lender shall have (i) received such information (financial or otherwise) as requested from the Debtor, (ii) discussed the Initial DIP Budget with officers and representatives of the Debtor, and (iii) been satisfied with the nature and substance of such discussions;

(g) the Debtor shall have filed the Sale Motion (as defined in the DIP Credit Agreement) in form and substance satisfactory to the DIP Lender, and such motion shall have been approved by the Court pursuant to an order in form acceptable to the DIP Lender, such order shall be in full force and effect and shall not have been vacated, reversed, modified, appealed stayed or subject to any motion to reconsider in any respect.

| **Budget & Variances**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii)<br><br>Local Rule 4001-2(a)(i)(E)<br><br>DIP Credit Agreement, Sections 6.1 & 7.13<br><br>Interim Order, ¶ 7 | The Debtor has prepared and delivered to the DIP Lender an initial debtor-in-possession cash flow budget (the "Initial DIP Budget"), in the form attached as Exhibit 2 to the Interim Order. The Initial DIP Budget reflects, among other things, the Debtor's anticipated operating disbursements, non-operating disbursements, and liquidity for each calendar week covered thereby. The Initial DIP Budget may be modified, amended, extended, and updated from time to time in accordance with the DIP Credit Agreement and this Interim Order. Each subsequent budget, once approved by the DIP Lender in accordance with the DIP Credit Agreement, shall modify, replace, supplement or supersede, as applicable, the Initial DIP Budget for the periods covered thereby (the Initial DIP Budget and each subsequent approved budget, an "Approved Budget").<br><br>The Debtor shall at all times comply with the Approved Budget, subject to the Permitted Variance (as defined below). |

| | |
|---|---|
| | Commencing on the second Wednesday after the date of entry of the Interim Order, and on a bi-weekly basis thereafter on each second Wednesday (or the immediately following business day if any such Wednesday is not a business day), the Debtor shall deliver by email to the DIP Lender a variance report for the immediately preceding two-week period, comparing actual aggregate cash disbursements for such period to the projected disbursements for such period as set forth in the Approved Budget.  In the event that the Debtor's actual aggregate cash disbursements for such period exceed the aggregate projected disbursements for such period by an amount in excess of 10%, it shall constitute an Event of Default under the DIP Credit Agreement and this Interim Order (any such variance in an amount less than 10% shall be referred to herein as a "<u>Permitted Variance</u>"); *provided*, *however*, no variances shall be permitted for the line items in the Approved Budget for Professional Persons (as defined in the Interim DIP Order).  For clarity, the Permitted Variance do not increase in any way the DIP Lender's obligation to increase the amount of the DIP Facility or the amounts to be allocated to the Cave-Out Reserves as set forth in the Approved Budget and the Interim Order. |
| **Carve Out**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(F)<br><br>Interim Order, ¶ 4 | The Carve-Out shall comprise (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not exceeding $25,000 (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses solely to the extent set forth in the Approved Budget on a line item basis (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtor pursuant to section 327, 328, or 363 of the Bankruptcy Code, including counsel of the Debtor, and the subchapter V trustee, at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice (as defined in the Interim Order), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (these clauses (i) through (iii), the "<u>Pre-Carve Out Amounts</u>") and (iv) Allowed Professional Fees in an amount not to exceed $50,000, incurred after the first business day following delivery by the DIP Lender of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise. |
| **DIP Liens on Unencumbered Assets** | The DIP Facility shall be secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a perfected first-priority lien on the DIP |

WBD (US) 4916-6361-6822V2

| | |
|---|---|
| Local Rule 4001-1(a)(i)(G)<br><br>Interim Order, ¶¶ G(v), 6(a) | Collateral, to the extent that such DIP Collateral is unencumbered or subject to invalid, unperfected, unenforceable, or avoidable liens, including funds in the Debtor's bank account which are not subject to a properly perfected lien. |
| **Chapter 11 Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi)<br>Local Rule 4001-2(a)(i)(H)<br><br><br>DIP Credit Agreement, Section 6.14<br>Interim Order, ¶ 17(b) | Unless waived by the DIP Lender, the failure of the Debtor to meet the following milestones by the applicable specified deadlines set forth therefor shall constitute an Event of Default:<br><br>(a)  No later than four (4) business days after the Petition Date, entry by the Court of this Interim Order;<br><br>(b)  No later than twenty-five (25) calendar days after the Petition Date, entry by the Court of the Bidding Procedures Order (as defined in the DIP Credit Agreement) establishing the bidding procedures for sale of the Debtor's assets;<br><br>(c)  No later than thirty-five (35) calendar days after the Petition Date, entry by the Court of the Final Order;<br><br>(d)  No later than forty-five (45) calendar days after the Petition Date, the submission deadline for all bids for the sale of the Debtor's assets as set forth in the Bidding Procedures;<br><br>(e)  No later than fifty (50) calendar days after the Petition Date, holding an auction (if necessary) for the sale of the Debtor's assets as set forth in the Bidding Procedures;<br><br>(f)  No later than fifty-two (52) calendar days after the Petition Date, entry by the Court of the Sale Order (as defined in the DIP Credit Agreement); and<br><br>(g)  No later than fifty-five (55) calendar days after the Petition Date, consummation of the sale of the Debtor's assets in accordance with the Bidding Procedures Order. |
| **Prepayment Premium**<br><br>Local Rule 4001-2(a)(i)(I) | The DIP Loan Documents do not require payment of a premium in the event of prepayment. |
| **No Joint Liability**<br><br>Local Rule 4001-2(a)(i)(J) | The case is not jointly administered.  There are no obligors under the DIP Loan Documents other than the Debtor. |

WBD (US) 4916-6361-6822V2

| | |
|---|---|
| **Payment of Lender Expenses**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix)<br><br>Local Rule 4001-2(a)(i)(K)<br><br><br>DIP Credit Agreement, Section 3.1<br>Interim Order, ¶¶ 2(c)(iv) & 12(c) | All reasonable and documented expenses of the DIP Lender and Prepetition Secured Lender relating to this chapter 11 case (including, without limitation, prepetition and post-petition reasonable and documented fees and disbursements of counsel and advisors) shall be payable by the Debtor. A copy of the summary invoice (without detailed time entries) shall be provided by the DIP Lender to the Debtor, the U.S. Trustee, and subchapter V trustee. |
| **Limitations on Investigations of Liens**<br><br>Local Rule 4001–2(a)(i)(L)<br><br>Interim Order, ¶ 23 | Up to $20,000 in the aggregate of the DIP Loans, DIP Collateral, Prepetition Collateral and Carve-Out may be used by during the Challenge Period to investigate, but not pursue, the validity and enforceability of the liens and obligations under the Prepetition Loan Documents (as defined in the Interim Order). |
| **Events of Default**<br><br><br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(i)(M)<br><br><br>DIP Credit Agreement, Article 9.1<br><br>Interim Order, ¶ 17(a) | Until the DIP Obligations are indefeasibly paid in full and all commitments thereunder are terminated, the occurrence of any of the following events, unless waived by the DIP Lender in writing and in accordance with the terms of the DIP Documents, shall constitute an event of default (collectively, the "<u>Events of Default</u>"):<br><br>(a)  the failure of the Debtor to perform, in any material respect, any of the terms, provisions, conditions, covenants or obligations under this Interim Order, including, without limitation, failure to make any payment under this Interim Order when due or comply with any Milestones;<br><br>(b)  the occurrence of any Event of Default under, and as defined in, the DIP Credit Agreement or any other DIP Documents;<br><br>(c)  the Debtor proposes or supports any plan of reorganization or sale of all or substantially all of the Debtor's assets, or order confirming such plan or approving such sale, that is not conditioned upon the indefeasible payment (including by credit bid) of the DIP Obligations, the Prepetition Loan Obligations, and the payment of the Adequate Protection, in each case, in full in cash (other than by credit bid), within a commercially reasonable period of time (and in no event later than the effective date of such plan of |

|  | reorganization or sale) without the prior written consent of the DIP Lender and, to the extent any portion of the Prepetition Loans then remains outstanding, the Prepetition Secured Lender;<br><br>(d) a motion is filed seeking the conversion or dismissal of the Chapter 11 Case or seeking the appointment of a trustee, examiner or any other fiduciary appointed as a legal representative of any of the Debtor or with respect to the property of the estate of the Debtor; and<br><br>(e) an order is entered converting or dismissing the Chapter 11 Case or appointing a trustee, examiner or any other fiduciary appointed as a legal representative of any of the Debtor or with respect to the property of the estate of the Debtor. |
|---|---|
| **Remedies Notice Period and Emergency Hearing**<br><br>Local Rule 4001-2(a)(i)(S) and (T)<br><br>Interim Order, ¶¶ 18, 19 | The Interim Order provides for a five (5) day Remedies Notice Period (as defined in the Interim Order) following written notice of an Event of Default to the Debtor, the Subchapter V Trustee and the U.S. Trustee.<br><br>During the Remedies Notice Period, the parties consent to a hearing on an emergency basis regarding whether the Termination Date (as defined in the Interim Order) has occurred. |
| **Roll-Up**<br><br>Local Rule 4001– 2(a)(i)(N) and (O)<br><br>DIP Credit Agreement, Section 2.1(c).<br><br>Interim Order, ¶ 2(b) | The DIP Facility includes a roll-up of the Prepetition Loan Obligations. |
| **Debtor's Stipulations**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br><br>Local Rule 4001–2(a)(i)(Q)<br><br>Interim Order, ¶¶ G, 22 | Pursuant to the Interim Order, the Debtor for itself and its estate, make the stipulations set forth in paragraph G of the Interim Order. The Challenge Period during which parties in interest other than the Debtor may file a challenge terminates seventy-five (75) days after entry of the Interim Order. |
| **Liens on Chapter 5 Causes of Action**<br><br>Bankruptcy Rule | Upon entry of a Final Order, the DIP Lender will be granted liens on the Debtor's claims and causes of action under chapter 5 of the Bankruptcy Code and proceeds thereof. |

14

| 4001(c)(1)(B)(xi) | |
|---|---|
| Local Rule 4001– 2(a)(i)(U) | |
| Interim Order, ¶ 6(a) | |
| **506(c) Waiver** Bankruptcy Rule 4001(c)(1)(B)(x) Local Rule 4001– 2(a)(i)(V) Interim Order, ¶ 8 | Subject to entry of the Final Order, the DIP Lender and Prepetition Secured Lender shall be entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code. |
| **Section 552(b)(1) "Equities of the Case" and Marshalling Waiver** Local Rule 4001–2(a)(i)(W) and (X) Interim Order, ¶ 9 | The DIP Lender and the Prepetition Secured Lender shall not be subject to the equitable doctrine of marshaling with respect to the DIP Collateral, the DIP Obligations, the Prepetition Loan Obligations, or the Prepetition Collateral, as applicable and the Prepetition Secured Lender shall be entitled to a waiver of the exceptions provided in section 552(b) of the Bankruptcy Code. |
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) Interim Order, ¶ 13(a) | The automatic stay is modified solely to permit the Debtor to grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens. |
| **Release, Waiver, or Limitation on Any Claim or Cause of Action Belonging to the Estate** Bankruptcy Rule 4001-2(c)(1)(B)(viii) Interim Order, ¶ G(viii) | The Interim Order includes a release of the DIP Lender and Prepetition Secured Lender, each in their capacity as such, with respect to any and all claims and causes of action that exist on the date of entry of the Interim Order with respect to and relating to the Prepetition Loan Documents, the DIP Facility, the DIP Documents and the DIP Roll-Up Loans. |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) DIP Credit Agreement, | The Debtor agrees to indemnify, save and hold harmless the DIP Lender and its officers, directors, members, managers, agents, attorneys, employees and designees from and against: (i) the use or contemplated use of the proceeds of any of the DIP Loans, any transaction contemplated by the DIP Credit Agreement or the other DIP Documents; (ii) any administrative or investigative proceeding by any governmental agency arising out of or related |

| Section 10.3 | to a claim, demand, action or cause of action described in clause (i) above; and (iii) any and all liabilities, losses, costs or expenses (including reasonable attorneys' fees and disbursements and other professional services) that any party indemnified hereunder suffers or incurs as a result of any foregoing claim, demand, action or cause of action; provided, however, that no such indemnitee shall be entitled to indemnification for any loss caused by its own willful misconduct. Any obligation or liability of the Debtor to any such indemnitee under this Section shall survive the expiration or termination of the DIP Credit Agreement and the repayment of the DIP Loans and performance of all DIP Obligations. |
| --- | --- |
| **Future Orders**<br><br>Local Rule 4001–2(a)(i)(C)<br><br>Interim Order, ¶¶ 16(b) | Except as provided in the Interim Order or the DIP Documents, the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Superpriority Claims, Carve-Out, and rights and remedies of the DIP Lender and the Prepetition Secured Lender shall survive and shall not be modified, impair or discharged by any order of conversion or dismissal, approval of any sale of DIP Collateral, or confirming a chapter 11 plan. |

## BASIS FOR RELIEF

## I.    The Court Should Approve the DIP Facility.

12.    The Debtor's ability to maximize the value of its estate and successfully market and sell its assets hinges on the Debtor's ability to access postpetition financing. Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business, and (c) obtaining credit with specialized priority or on a secured basis. Pursuant to section 364(c) of the Bankruptcy Code, if a debtor cannot obtain postpetition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to super-priority administrative expense status, secured by a senior lien on unencumbered property, or secured by a junior lien on encumbered property. *See* 11 U.S.C. § 364(c). Further, under section 364(d) of the Bankruptcy Code, courts also may authorize postpetition credit secured by a senior or equal lien on encumbered

property if the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected. *See* 11 U.S.C. § 364(d)(1).

> **A.    Entry into the DIP Documents is an Exercise of the Debtor's Sound Business Judgment.**

13.    The Court should authorize the Debtor to enter into the DIP Documents, obtain postpetition financing under the DIP Facility, and continue using the Cash Collateral of the Prepetition Secured Lender as a sound exercise of its business judgment.  Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit so long as the agreement to obtain such credit does not run afoul of the provisions and underlying policy considerations of the Bankruptcy Code. *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del.1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

14.    To determine whether a debtor has met the business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment

made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

15.     Courts generally will not second-guess a debtor's business decisions when those decisions involve a minimum level of care in arriving at the decision on an informed basis, in good faith, and in the honest belief that the action was taken in the best interest of the debtor. *See In re Los Angeles Dodgers LLC*, 457 B.R. at 313. To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted). Further, in considering whether the terms of postpetition financings are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization); *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

16.     The Debtor's entry into the DIP Facility represents a sound exercise of its business judgment. The Debtor requires access to the DIP Facility because access to the proceeds thereof will permit the Debtor to continue to operate its business, navigate a process to pursue a sale transaction in this chapter 11 case to maximize value for all of its stakeholders, and to ensure that the Debtor has adequate liquidity to satisfy its obligations in this chapter 11 case.  The terms of the DIP Facility were negotiated in good faith and at arm's length, resulting in the most favorable

terms the Debtor could obtain under the circumstances. Accordingly, the Court should authorize the Debtor's entry into the DIP Facility as a reasonable exercise of the Debtor's business judgment.

**B.     No Comparable Alternative to the DIP Facility Is Reasonably Available.**

17.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by section 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *Sky Valley, Inc.*, 100 B.R. at 113; *see also In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

18.     As discussed above, the Debtor worked diligently to identify a lender willing to provide postpetition financing to the Debtor. Only the DIP Lender was willing to extend postpetition financing to the Debtor on the terms and conditions set forth in the DIP Credit Agreement.  At this juncture, the Debtor has no material cash on hand to fund its operations and does not have the ability to engage in a further search for financing.  Moreover, the Debtor does not believe that it could obtain postpetition financing on terms more favorable than the proposed DIP Facility even if it had sufficient liquidity to explore other financing options.  Indeed, after the

DIP Lender had agreed in principle to provide the DIP Facility, the Debtor, through its professionals, approached no less than three (3) parties that regularly provide postpetition financing in the middle market and lower middle market spaces. None of those parties were willing to match or better the terms provided by the DIP Facility.

19.     As such, when considering all of the factors, the Debtor concluded that the DIP Facility was its best financing alternative to achieve its goals - the sale of its assets at the highest price in order to provide the best possible recoveries to its stakeholders. The Debtor's efforts to seek necessary postpetition financing satisfy the statutory requirements of section 364 of the Bankruptcy Code. *See, e.g., In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (debtor seeking financing under section 364(c) of the Bankruptcy Code made acceptable attempt to obtain less onerous financing by speaking to several lenders that denied the loan request); *Ames*, 115 B.R. at 40.

### C.     The Milestones under the DIP Credit Agreement are Reasonable.

20.     The DIP Facility contemplates, as a product of negotiation with and as required by the DIP Lender as a condition to providing the DIP Facility, certain milestones the Debtor must meet throughout this chapter 11 case, the failure of which would constitute an Event of Default under the DIP Credit Agreement. These milestones were heavily negotiated and required by the DIP Lender as a condition to providing the DIP Facility.

21.     The DIP Facility, including the milestones, serves as an important component of this chapter 11 case because it will provide the Debtor with the stability and certainty it needs to operate in the ordinary course of business while consummating the proposed sale, subject to identifying higher or better offers.  The continued and viable operation of the Debtor's business would not be possible absent access to the DIP Facility. The DIP Facility, and the Debtor's ability

to achieve the milestones contemplated therein, will prevent interruptions to the Debtor's operations, satisfy working capital needs in the ordinary course, and enable the Debtor to facilitate the proposed sale to maximize the value of its estate.

**D.    The Proposed Roll-Up of the Prepetition Loan Obligations is Appropriate.**

22.    Repayment of the Prepetition Loan Obligations held by the Prepetition Secured Lender in accordance with the DIP Credit Agreement is necessary, as the Prepetition Secured Lender is not otherwise willing to enter into the DIP Facility unless the Prepetition Loan Obligations are paid consistent with the roll-up set forth in the DIP Credit Agreement.  In addition, the Interim Order preserves the rights of other parties in interest, including the subchapter V trustee, to investigate the validity, enforceability, perfection, and priority of the Prepetition Loan Obligations and the liens and security interests granted in connection therewith.  This Court has previously approved similar debtor-in-possession financing agreements where the debtor was not able to obtain postpetition financing under other conditions. *See, e.g.*, *I Media Brands, Inc., et al.*, Case No. 23-10852 (KBO) [D.I. 116] (Bankr. D. Del. July 6, 2023); *In re Indep. Pet Partners Holdings, LLC, et al.*, Case No. 23-10153 (LSS) [D.I. 242] (Bankr. D. Del. Mar. 3, 2023); *In re EYP Grp. Holdings, Inc.*, Case No. 22-10367 (MFW) [D.I. 149] (Bankr. D. Del. May 25, 2022). Accordingly, the requested roll-up is reasonable and appropriate under the circumstances of this chapter 11 case and should be approved.

**II.    The Use of Prepetition Collateral Is Warranted and Should Be Approved.**

23.     In addition to the DIP Facility, the Debtor requires use of Prepetition Collateral to continue its operation. Accordingly, the Prepetition Secured Lender has consented to the Debtor's use of Prepetition Collateral in exchange for the adequate protection detailed in the proposed order.

24.     A debtor's use of property of the estate, including cash collateral, is governed by section 363 of the Bankruptcy Code, which provides, in pertinent part, as follows:

> If the business of the debtor is authorized to be operated under section… 1108… of [the Bankruptcy Code] and unless the court orders otherwise, the [debtor] may … use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).  A debtor may use cash collateral (a) with the consent of the secured party or (b) without the consent of the secured party if the court, after notice and a hearing, authorizes the debtor to use cash collateral in accordance with the provisions of section 363 of the Bankruptcy Code.  *See* 11 U.S.C. § 363(c)(2).

25.     Section 363 of the Bankruptcy Code further provides that a debtor must "provide adequate protection" of the secured party's interest in the property against any diminution in value of such interest resulting from the debtor's use of the property. *See* 11 U.S.C. § 363(e). Notably, the Bankruptcy Code does not define "adequate protection."  Instead, section 361 of the Bankruptcy Code provides a non-exhaustive list of examples of adequate protection, including cash payments, additional or replacement liens and other relief that will "result in the realization by such [secured party] of the indubitable equivalent of such entity's interest in such property." *See* 11 U.S.C. § 361; *see also Resolution Tr. Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("The Code does not expressly define adequate protection, but section 361 states that it may be provided by (1) periodic cash payments; (2) additional or replacement liens; or (3) other relief resulting in the 'indubitable equivalent' of the secured creditor's interest in such property.").

26.     Thus, determining what constitutes adequate protection is necessarily a fact-specific inquiry. *See Swedeland Dev. Grp.*, 16 F.3d at 564 ("[A] determination of whether there is adequate protection is made on a case by case basis") (citing *In re O'Connor*, 808 F.2d 1393, 1397 (10th Cir. 1987)). The focus of the adequate protection requirement is to preserve the secured party's position at the time of the bankruptcy filing and protect the secured party from diminution in the value of its collateral during the reorganization process. *Id.* ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy") (quoting *In re O'Connor*, 808 F.2d at 1396); *see also In re WorldCom, Inc.*, 304 B.R. 611, 618–19 (Bankr. S.D.N.Y. 2004) ("The legislative history for section 361 of the Bankruptcy Code, which sets forth how adequate protection may be provided under section 363, makes clear that the purpose . . . is to ensure that the secured creditor receives the value for which the creditor bargained for prior to the debtor's bankruptcy.").  However, neither the legislative history nor the Bankruptcy Code require the Court to protect a creditor beyond what was bargained for by the parties.  *WorldCom*, 304 B.R. at 619.

27.     Furthermore, the Bankruptcy Code mandates that a secured party be protected against diminution in the value of its interest in cash collateral only during the period of use.  *See In re Cont'l Airlines, Inc.*, 146 B.R. 536, 539–40 (Bankr. D. Del. 1992) (noting that a secured party is only entitled to adequate protection to the extent the collateral declined in value); *In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716 (Bankr. D. Del. 1996) (holding that if there is no diminution in the value of the secured party's collateral and the debtor can operate profitably postpetition, then the secured creditor is adequately protected against the use of cash collateral); *see also In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its

interest during the Chapter 11 reorganization."). The preservation of a debtor's business as a going concern itself provides "adequate protection" under the Bankruptcy Code. *See id.* (noting that whether the value of a debtor's property will increase as a result of the use of collateral is part of considering whether a party is adequately protected).

28.    In connection with the DIP Facility, the Prepetition Secured Lender has consented to the Debtor's use of Prepetition Collateral <u>only</u> with the adequate protection described in this Motion. As set forth above, the Debtor urgently needs to use Prepetition Collateral to continue to fund the continued operation of its business. Failure to obtain authority to use Prepetition Collateral would cause irreparable harm to the Debtor and its creditors. Accordingly, to ensure its continued access to the Cash Collateral during this case, the Debtor proposes to provide the Prepetition Secured Lender with adequate protection to the extent of any actual diminution in value of its interest in the Prepetition Collateral during the pendency of this chapter 11 case.

29.    Specifically, the Debtor proposes to provide the Prepetition Secured Lender with the following primary forms of adequate protection against the postpetition diminution in value of its interest in the Prepetition Collateral resulting from the Debtor's use of such property: (a) fully perfected, first priority senior replacement liens on and security interests in all of the DIP Collateral (as defined in the Interim Order); (b) superpriority claims to the extent of any diminution; and (c) payment of the Prepetition Secured Lender's fees and expenses in connection with this chapter 11 case, including the reasonable prepetition and postpetition fees and expenses of legal counsel.

30.    Courts have held that granting replacement liens on assets generated by the debtor postpetition is an appropriate form of adequate protection. *See Swedeland Dev. Grp.*, 16 F.3d at 564, 566; *In re Conference of African Union First Colored Methodist Protestant Church*, 184 B.R. 207, 220 n.9 (Bankr. D. Del. 1995) ("[P]ursuant to Code § 361, 'adequate protection' to a secured

24

creditor may be provided in the form of an additional or replacement lien."). In addition, considered in the context of the Debtor's current and projected cash—and because the Debtor will use the Prepetition Collateral to preserve the value of the Debtor's business—the proposed adequate protection is more than sufficient to protect the Prepetition Secured Lender against any actual diminution in value of its interests in the Prepetition Collateral. As such, the Debtor asserts that its proposal to provide the Prepetition Secured Lender with replacement liens and superpriority administrative expense claims adequately protects the Prepetition Secured Lender, and supports the Debtor's use of Cash Collateral during this chapter 11 case. Further, under the circumstances of this case, the Debtor submits that the adequate protection provided in the Interim Order is fair and reasonable under the circumstances, satisfies the requirements of sections 363(c)(2) and 363(e) of the Bankruptcy Code, and is in the best interests of the Debtor, its estate, and all parties in interest.

## III.    The 506(c) Surcharge Waiver, and Protections Afforded to the Lender with Regard to the Equities of the Case Doctrine and Marshalling, Should be Approved.

31.    Section 506(c) of the Bankruptcy Code provides that the debtor in possession may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim. 11 U.S.C. § 506(c). It is customary for a debtor to waive its ability to surcharge against its prepetition collateral or collateral securing a DIP financing in exchange for the DIP lender's agreement that its liens and superpriority claims shall be subject to payment of a carve-out and permitted liens, subject to entry of a final order, and courts in this district routinely grant such relief. Similarly, it is customary to protect a DIP lender with respect to the equities of the case doctrine and marshalling. Here, in light of the DIP Lender's agreement that its DIP Superpriority

Claims shall be subject to the Carve-Out in all respects, which paves way for a competitive bidding process that could benefit all the Debtor's creditors and stakeholders, the Debtor submits that the section 506(c) surcharge waiver and other protections afforded to the DIP Lender should be approved.

**IV.    The DIP Lender Should be Deemed a Good Faith Lender**

32.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

33.    Here, the Debtor believes that the DIP Facility embodies the most favorable terms on which the Debtor could obtain postpetition financing and, as noted above, negotiations of the terms of the DIP Credit Agreement with the DIP Lender were conducted in good faith and at arm's length.  The terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, and in accordance with the DIP Orders and the DIP Documents, including, for the avoidance of doubt, any Approved Budget, as applicable, in each case subject to any Permitted Variance. Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning

of section 364(e) of the Bankruptcy Code, and is entitled to all of the protections afforded by that section.

**V.      Modification of the Automatic Stay is Warranted.**

34.      The relief requested in this Motion contemplates a modification of the automatic stay to permit the Debtor and the DIP Lender, as applicable, to grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens.

35.      Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtor's business judgment, are reasonable and fair under the circumstances of this chapter 11 case.   Accordingly, the Court should modify the automatic stay to the extent contemplated under the DIP Documents and the proposed DIP Orders.

**REQUEST FOR A FINAL HEARING**

36.      Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court set a date for the final hearing that is as soon as practicable, to allow entry of a Final Order no more than thirty-five (35) days from the Petition Date in accordance with the Milestones, and fix the time and date prior to the final hearing for parties to file objections to this Motion.

**IMMEDIATE AND UNSTAYED RELIEF IS NECESSARY**

37.      Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, authorizing the Debtor to borrow under the DIP Facility and use of Prepetition Collateral are essential and the relief requested is narrowly tailored to prevent immediate and irreparable damage to the Debtor's business.   Failure to receive such authorization and other relief during the first 21 days of this chapter 11 case would severely disrupt the Debtor's

27

ability to administer its estate at this critical juncture. For the reasons discussed herein, the relief requested is necessary in order for the Debtor to preserve and maximize the value of the Debtor's estates for the benefit of all stakeholders. Accordingly, the Debtor submits that it has satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## WAIVER OF BANKRUPTCY RULES 6004 AND 4001

38.     To implement the foregoing successfully, the Debtor requests that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtor has established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## NOTICE

39.     The Debtor will provide notice of this Motion to: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 20 largest unsecured claims against the Debtor; (c) counsel to the DIP Lender; (d) the subchapter V trustee (once appointed); (e) the United States Attorney's Office for the District of Delaware; (f) the Internal Revenue Service; (g) the state attorneys general for all states in which the Debtor conducts business; and (h) any party that requests service pursuant to Bankruptcy Rule 2002. As the Motion is seeking "first day" relief, within two business days after the hearing on the Motion, the Debtor will serve copies of the Motion and any order entered respecting the Motion as required by Local Rule 9013-1(m). Under the circumstances, notice was sent under Bankruptcy Rules 4001(b), 4001(c) and 4001(d), Local Bankruptcy Rule 4001-2 and section 102(1) of the Bankruptcy Code in light of the emergency nature of the interim relief requested in the Motion, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

## NO PRIOR REQUEST

40.     No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests entry of the Proposed Orders granting the relief requested herein and such other and further relief as the Court may deem just and equitable.

Dated: April 15, 2025          **WOMBLE BOND DICKINSON (US) LLP**
      Wilmington, Delaware

*/s/ Morgan L. Patterson*
Matthew P. Ward (DE Bar No. 4471)
Morgan L. Patterson (DE Bar No. 5388)
Marcy J.  McLaughlin Smith (DE Bar No. 6184)
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone:  (302) 252-4320
Facsimile:  (302) 252-4330
Email:  matthew.ward@wbd-us.com
Email:  morgan.patterson@wbd-us.com
Email: marcy.smith@wbd-us.com

*Proposed Counsel to the Debtor*

**EXHIBIT A**
**INTERIM ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| | Subchapter V |
| VIRIDOS, INC.,[1] | |
| | Case No. 25-10697 (CTG) |
| Debtor. | |

**INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO (A) OBTAIN
POSTPETITION FINANCING AND (B) USE OF CASH COLLATERAL,
(II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION LENDER,
(III) SCHEDULING A FINAL HEARING, AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of Viridos, Inc., as debtor and debtor-in-possession (the

"Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case"), pursuant to sections

105, 361, 362, 363(b), 363(c)(2), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503,

506(c) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the

"Bankruptcy Code"), rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), rules 2002-1, 4001-2, 7007-1, 9013-4, and 9014-2 of the

Local Bankruptcy Rules for the District of Delaware (the "Local Rules"), seeking entry of this

interim order (this "Interim Order") and the Final Order (as defined herein and, together with this

Interim Order, the "DIP Orders") among other things:

    i.    authorizing the Debtor to obtain postpetition financing ("DIP Financing") pursuant to a
senior, secured, superpriority, debtor in possession multi-draw term loan facility (the "DIP
Facility") subject to the terms and conditions set forth in this Interim Order and that certain
Debtor in Possession Senior Secured Superpriority Credit Agreement, attached hereto in
substantially final form as **Exhibit 1** (as amended, restated, amended and restated,
supplemented, or otherwise modified from time to time, the "DIP Credit Agreement") by
and among the Debtor, and one or more affiliates of Breakthrough Energy Ventures II, L.P.
(together with successors and assigns, "BEV" or the "DIP Lender"), consisting of (i) new

---

[1]    The Debtor in this Chapter 11 Case and the last four digits of its U.S. taxpayer identification number is: Viridos,
Inc. (3940).  The Debtor's corporate headquarters is located at: 11149 N. Torrey Pines Road, La Jolla, CA 92037.

[2]    Unless stated otherwise, capitalized terms used but not otherwise defined herein shall have the meanings ascribed
to them in the Motion or the DIP Credit Agreement (as defined below), as applicable.

money senior secured superpriority term loans in an aggregate principal amount of up to $4,250,000.00, of which up to $1,500,000.00 in the aggregate will be available prior to the entry of the Final Order (as defined below), and the remainder will be available upon the entry of the Final Order, in each case, subject to the Initial DIP Budget (as defined below), and (ii) the DIP Roll-Up Loans (as defined below), which will be deemed made in order to roll up and convert amounts outstanding under the Prepetition Loan Documents (as hereinafter defined) into DIP Obligations (as defined below) as provided in this Interim Order (the loans to be made available and/or deemed made under the foregoing clauses (i) and (ii), collectively, the "<u>DIP Loans</u>" and the commitments therefor, the "<u>DIP Commitments</u>");

ii.    authorizing the Debtor to incur the DIP Loans and all other obligations, fees, costs, expenses and other liabilities and obligations (including indemnities and similar obligations, whether contingent or absolute) under the DIP Documents (as defined below) (collectively, the "<u>DIP Obligations</u>");

iii.    authorizing the Debtor to execute, deliver and perform under the DIP Credit Agreement and all other documents and instruments that may be reasonably requested by the DIP Lender in connection with the DIP Facility (in each case, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof, together with the DIP Credit Agreement, the "<u>DIP Documents</u>");

iv.    subject to the Carve-Out (as defined below) and otherwise solely to the extent set forth herein, granting to the DIP Lender allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code;

v.    granting to the DIP Lender valid, enforceable, non-avoidable and automatically perfected first priority liens pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code on the DIP Collateral (as defined below), on the terms described herein;

vi.    upon entry of a Final Order, waiving (a) the Debtor's right to surcharge the Prepetition Collateral (as defined below) and the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

vii.    waiving the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral and the Prepetition Collateral (including Cash Collateral (as defined below)) for the benefit of any party other than the DIP Lender for the benefit of any party other than the DIP Lender; *provided* that the foregoing waiver shall be without prejudice to any provisions of the Final Order;

viii.    authorizing the Debtor to use proceeds of the DIP Facility and Cash Collateral solely in accordance with the DIP Orders, the DIP Documents and the Approved Budget;

ix.    authorizing the Debtor to pay the DIP Obligations as they become due and payable in accordance with the DIP Documents;

x.    subject to the restrictions set forth in the DIP Documents and the DIP Orders, authorizing

the Debtor to use Prepetition Collateral and provide adequate protection to the Prepetition Secured Lender (as defined below) for any diminution in value of its interests in the Prepetition Collateral, for any reason provided for in the Bankruptcy Code;

xi.    authorizing the DIP Lender to take all commercially reasonable actions to implement the terms of this Interim Order and vacating and modifying the automatic stay to the extent necessary to permit the Debtor and the DIP Lender to implement and effectuate the terms and provisions of the DIP Orders and the DIP Documents;

xii.   waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order and, upon entry, the Final Order; and

xiii.  scheduling a final hearing (the "Final Hearing") to consider final approval of the DIP Facility and use of Cash Collateral on the terms of a proposed order (the "Final Order") to be posted to the docket prior to the Final Hearing.

The Court having considered the interim relief requested in the DIP Motion, the exhibits attached thereto, the *Declaration of Eric Moellering in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), *Declaration of Brian Ayers in Support of the Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Obtain Postpetition Financing and (B) Use of Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lender, (III) Scheduling Final Hearing, and (IV) Granting Related Relief*, *Declaration of Brian Ayers in Support of the Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Obtain Postpetition Financing and (B) use of Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lender, (III) Scheduling Final Hearing, and (IV) Granting Related Relief* (the "Ayers Declaration"), the available DIP Documents, and the evidence submitted and arguments made at the interim hearing held on April [●], 2025 (the "Interim Hearing"); and due and sufficient notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to

avoid immediate and irreparable harm to the Debtor and its estate pending the Final Hearing, otherwise is fair and reasonable, in the best interests of the Debtor and its estate, and essential for the continued operation of the Debtor's businesses and the preservation of the value of the Debtor's assets; and it appearing that the Debtor's entry into the DIP Documents is a sound and prudent exercise of the Debtor's business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor,

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.      **Petition Date**.  On April 14, 2025 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11, subchapter V of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court") commencing this Chapter 11 Case.

B.      **Debtor in Possession**.  The Debtor has continued in the management and operation of its businesses and properties as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.      **Subchapter V Trustee.**  On April __, 2025, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed [_____] to serve as the trustee under section 1183(a) of the Bankruptcy Code (the "Subchapter V Trustee") for the Debtor.

D.      **Jurisdiction and Venue**.  This Court has core jurisdiction over this Chapter 11 Case, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a)–(b) and the *Amended Standing Order of Reference* from the United States District Court for the

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

District of Delaware, dated February 29, 2012.  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order approving the relief sought in the Motion consistent with Article III of the United States Constitution. Venue for these cases and proceedings on the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief sought herein are sections 105, 361, 362, 363(b), 363(c), 363(e), 364(c), 364(d)(1), 364(e), 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014, and the Local Rules.

E.    **Notice**.  The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Proper, timely, adequate and sufficient notice of the Motion and the Interim Hearing has been provided to (a) the U.S. Trustee; (b) the Subchapter V Trustee; (c) entities listed as holding the 20 largest unsecured claims against the Debtor (on a consolidated basis); (d) counsel to the DIP Lender and Prepetition Secured Lender, Greenberg Traurig, LLP, One Vanderbilt Ave., New York, NY 10017, Attn: Jeffrey M. Wolf, Brian E. Greer, and T. Charlie Liu; (e) the United States Attorney's Office for the District of Delaware; (f) the Internal Revenue Service; (g) the state attorneys general for the state in which the Debtor conducts business; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002, (collectively, the "Notice Parties"), in accordance with the Bankruptcy Code, Bankruptcy Rules and Local Rules.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtor and its estate pending the Final Hearing.

F.    **Cash Collateral**.  As used herein, the term "**Cash Collateral**" shall mean all of the Debtor's cash, wherever located and held, including cash in deposit accounts, that constitutes or will constitute "cash collateral" of the DIP Lender and the Prepetition Secured Lender within the meaning of section 363(a) of the Bankruptcy Code.

G.    **Debtor's Stipulations**.  Subject to the provisions and limitations contained in paragraph 22 hereof, and after consultation with its attorneys, the Debtor admits, stipulates and agrees that:

(i)    *Initial Prepetition Loan.* Pursuant to that certain Secured Convertible Promissory Note dated as of July 23, 2024, made by the Debtor to the order of BEV (together with its successors and assigns, the "Prepetition Secured Lender") in the original principal amount of $2,000,000 (the "Initial Prepetition Note"), the Debtor incurred indebtedness and other obligations to the Prepetition Secured Lender.

(ii)    *Prepetition Bridge Loan*.  On or about April 8, 2025, the Prepetition Lender agreed to make additional financing available to the Debtor and, in connection therewith, the Debtor executed in favor of the Prepetition Lender that certain Amended and Restated Secured Convertible Promissory Note dated as of April 8, 2025 in the maximum principal amount of $2,750,000 (the Initial Prepetition Note, as so amended and restated and as otherwise amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition Bridge Note" and, collectively with the Note Purchase Agreement and the Security Agreement referenced in the Prepetition Bridge Note (such Security Agreement as amended, the "Prepetition Security Agreement"), and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "Prepetition Loan Documents"), and the Prepetition Lender made an incremental advance in connection therewith of $250,000.  The indebtedness and obligations of the Debtor owing to the Prepetition Secured Lender under the Prepetition Loan Documents is referred to herein as the "Prepetition Loan Obligations".

(iii)     *Prepetition Loan Obligations*.  As of the Petition Date, the Debtor was justly and lawfully indebted and liable to the Prepetition Secured Lender without defense, challenge, objection, claim, counterclaim, or offset of any kind, in respect of the Prepetition Loan Obligations in the aggregate outstanding principal amount of $2,250,000, plus accrued and unpaid interest thereon and any fees, expenses and disbursements (including attorneys' fees), costs, charges, indemnities, and any other Prepetition Loan Obligations incurred under the Prepetition Loan Documents.

(iv)     *Validity of Prepetition Loan Obligations*.  The Prepetition Loan Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtor, enforceable in accordance with the terms of the Prepetition Loan Documents, and no portion of the Prepetition Loan Obligations or any payment made to the Prepetition Secured Lender or applied to or paid on account of the Prepetition Loan Obligations prior to the Petition Date is subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim (as such term is defined in the Bankruptcy Code), cause of action (including any avoidance actions under Chapter 5 of the Bankruptcy Code), choses in action or other challenge of any nature under the Bankruptcy Code or any applicable non-bankruptcy law.

(v)     *Validity, Perfection and Priority of Prepetition Liens*.  As of the Petition Date, pursuant to the Prepetition Loan Documents, the Debtor granted to the Prepetition Secured Lender, a security interest in and continuing lien on (the "Prepetition Liens") substantially all of its assets and property, including (i) a valid, binding, properly perfected, enforceable, non-avoidable first priority security interest in and continuing lien on the Collateral (as defined in the Prepetition Security Agreement), and all proceeds, products, accessions, rents, and profits thereof, in each case

whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition Collateral"), junior, subject and subordinate only to certain liens permitted by the Security Agreement, solely to the extent such permitted liens are (a) valid, perfected and non-avoidable on the Petition Date, or (b) valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date in accordance with section 546(b) of the Bankruptcy Code (collectively, the "Prepetition Permitted Liens"); "); *provided*, that the cash in the Debtor's bank account as of the Petition Date (the "Prepetition Cash") is not subject to a properly perfected lien.

(vi)  *Waiver of Challenge*.  None of the Prepetition Liens (other than the lien on Prepetition Cash) are subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, subordination, recharacterization, avoidance or other cause of action (including any avoidance actions under Chapter 5 of the Bankruptcy Code), choses in action or other challenge of any nature under the Bankruptcy Code or any applicable non-bankruptcy law;

(vii)  *No Claims or Causes of Action*.  No claims or causes of action held by the Debtor or its estate exists against, or with respect to, the Prepetition Secured Lender, the DIP Lender or any of their respective predecessors, principals, parents, affiliates, subsidiaries, ventures, partners, insurers, investors, attorneys, officers, shareholders, members, directors, managers, equity holders, agents, representatives, employees, vendors, subcontractors, clients, administrators, professionals, executors and personal representatives, successors, assigns or heirs (the "Representatives") under or relating to any agreements by and among the Debtor and the Prepetition Secured Lender that is in existence as of the Petition Date.

(viii)  *Release*.  Subject to the provisions and limitations contained in paragraph 22 hereof, effective as of the date of entry of this Interim Order, the Debtor and its estate, on its own behalf and on behalf of its respective predecessors, successors, heirs, and past, present and

future subsidiaries and assigns, each hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the Prepetition Secured Lender, the DIP Lender, and each of their respective Representatives (collectively, the "Released Parties"), from any and all liability to the Debtor (and its successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action of any kind, nature and description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, in contract or tort, in each case arising out of or related to the Prepetition Loan Documents, the DIP Facility, the DIP Documents, the DIP Roll-Up Loans, the negotiation thereof and the transactions and agreements reflected thereby, that the Debtor at any time had, now has or may have, or that its predecessors, successors or assigns at any time had or hereafter may have against any of the Released Parties for or by reason of any act, omission, matter, or cause arising at any time on or prior to the date of this Interim Order; *provided* that the release set forth in this section shall not release (i) any claims against or liabilities of a Released Party that a court of competent jurisdiction determines has resulted from such Released Party's fraud or willful misconduct or (ii) the DIP Lender from honoring its obligations to the Debtor under the DIP Documents.

H.     **Findings Regarding DIP Financing and Use of Cash Collateral.**

(i)     Good and sufficient cause has been shown for the entry of this Interim Order and for authorization of the Debtor to obtain financing pursuant to the DIP Documents.

(ii)     The Debtor has demonstrated an immediate and critical need to obtain the DIP Financing and to use Prepetition Collateral in accordance with the Approved Budget to permit, among other things, the orderly continuation of the operation of its business, to maintain business

relationships with vendors and suppliers, to make payroll, to satisfy other working capital and operational needs, and to fund administrative expenses of this Chapter 11 Case. Access to sufficient working capital and liquidity provided by the DIP Financing, as well as through the use of Prepetition Collateral, is necessary for the avoidance of immediate irreparable harm to the Debtor's estate and for the preservation and maintenance of its going concern value.

(iii)    The Debtor is unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured financing on more favorable terms from sources other than the DIP Lender under the DIP Financing. The Debtor is also unable to obtain secured credit without granting to the DIP Lender the DIP Liens and the DIP Superpriority Claims (each as defined below) and granting adequate protection to the Prepetition Secured Lender as provided in paragraph 12 of this Interim Order (the "Adequate Protection") on the terms and subject to the conditions set forth in this Interim Order and in the DIP Documents.

(iv)    Based on the Motion, the First Day Declaration, the Ayers Declaration and the record and argument presented to the Court at the Interim Hearing, the terms of the DIP Financing, the terms of the Adequate Protection, and the terms on which the Debtor may continue to use Prepetition Collateral pursuant to this Interim Order and the DIP Documents are consistent with the Bankruptcy Code, including section 506(b) thereof, are fair and reasonable, and reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties under the circumstances.

(v)    This Interim Order, the DIP Financing, the Adequate Protection, and the use of the Prepetition Collateral have been negotiated in good faith and at arm's length among the Debtor, the DIP Lender and the Prepetition Secured Lender (each of whom acted in good faith in

negotiating such documents), and all of the loans and other financial accommodations extended by the DIP Lender to the Debtor under, in respect of, or in connection with, the DIP Financing and the DIP Documents (including the granting of Adequate Protection provided herein), shall be deemed to have been extended by the DIP Lender in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Lender shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(vi)     The Prepetition Secured Lender and the DIP Lender have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of this Interim Order, the DIP Facility and the use of Prepetition Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens (defined below), any challenges or objections to the DIP Facility or the use of Prepetition Collateral, the DIP Documents, and all other documents related to, and all transactions contemplated by, the foregoing. Accordingly, without limiting any other right to indemnification, the Prepetition Secured Lender and the DIP Lender shall be and hereby are indemnified as provided in the Prepetition Loan Documents and the DIP Documents, as applicable, including, without limitation, Section 10.3 of the DIP Credit Agreement.

(vii)     The Prepetition Secured Lender is entitled to the Adequate Protection as set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the Motion and on the record presented to the Court, the terms of the proposed Adequate Protection are fair and reasonable, reflect the Debtor's prudent exercise of business judgment and constitute

reasonably equivalent value and fair consideration for the use of Prepetition Collateral.

(viii)    To the extent its consent is required, the Prepetition Secured Lender has consented to the use of, as applicable, the Prepetition Collateral, the imposition of the Carve-Out, and the priming of the Prepetition Liens on the Prepetition Collateral by the DIP Liens (subject to the Prepetition Permitted Liens), on the terms set forth in this Interim Order and the DIP Documents; *provided* that nothing in this Interim Order or the DIP Documents shall (x) be construed as the affirmative consent by the Prepetition Secured Lender for the use of Prepetition Collateral other than on the terms set forth in this Interim Order, (y) be construed as a consent by any party to the terms of any other financing or the granting of any lien on the Prepetition Collateral (whether senior or junior) other than as contemplated by this Interim Order, or (z) prejudice, limit or otherwise impair the rights of the Prepetition Secured Lender to seek new, different or additional adequate protection or assert any other right, and the rights of any other party in interest, including the Debtor, to object to such relief are hereby preserved.

(ix)    The Debtor has prepared and delivered to the DIP Lender an initial debtor-in-possession cash flow budget (the "Initial DIP Budget"), in the form attached hereto as **Exhibit 2**. The Initial DIP Budget reflects, among other things, the Debtor's anticipated operating disbursements, non-operating disbursements, and liquidity for each calendar week covered thereby. The Initial DIP Budget may be modified, amended, extended, and updated from time to time in accordance with the DIP Credit Agreement and this Interim Order. Each subsequent budget, once approved by the DIP Lender in accordance with the DIP Credit Agreement, shall modify, replace, supplement or supersede, as applicable, the Initial DIP Budget for the periods covered thereby (the Initial DIP Budget and each subsequent approved budget,  an "Approved Budget"); provided, however, that to the extent funds are used in accordance with an Approved

Budget prior to approval of a subsequent budget, the use of such funds shall continue to be authorized notwithstanding the approval of a subsequent budget by the DIP Lender that does not provide for such use of funds unless expressly set forth on such subsequent budget.

(x)     The Prepetition Secured Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Lender with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral; *provided* that the foregoing shall be without prejudice to the terms of the Final Order with respect to the period from and after the entry of the Final Order.

I.     **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and the applicable Local Rules.  Absent the relief granted in this Interim Order, the Debtor's estate will be immediately and irreparably harmed.  Consummation of the DIP Financing and continued use of Prepetition Collateral, in accordance with this Interim Order and the DIP Documents, are therefore in the best interests of the Debtor's estate and consistent with the Debtor's exercise of its fiduciary duties.  The Motion and this Interim Order comply with the requirements of Bankruptcy Rules 4001(b)(2) and 4001(c)(2), and the applicable Local Rule.

J.     **Prepetition Permitted Liens; Continuation of Prepetition Liens**.  Nothing herein constitutes a finding or ruling by this Court that any alleged Prepetition Permitted Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to, the Debtor, the DIP Lender, or the Prepetition Secured Lender to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Prepetition Permitted Lien.  The Prepetition Liens

and the DIP Liens are continuing liens and the DIP Collateral is and will continue to be encumbered by such liens.

K.    **DIP Roll-Up Loans**. Upon entry of this Interim Order and initial funding under the DIP Facility (the "Initial Advance"), but subject to the provisions of paragraph 22 of this Interim Order, a portion of the principal of the outstanding Prepetition Loan Obligations in an amount equal to the amount of the Initial Advance, shall be rolled up, and converted into DIP Obligations, and upon entry of the Final Order, the entire remaining balance of the outstanding Prepetition Loan Obligations shall be rolled up, and converted into DIP Obligations (collectively, the "DIP Roll-Up Loans"). The Prepetition Secured Lender (who is also the DIP Lender) would not have consented to extend the DIP Financing or other financial accommodations to the Debtor without the inclusion of the DIP Roll-Up Loans in the DIP Obligations. Thus, the roll-up of the Prepetition Obligations is consideration for, and solely on account of, the agreement of the DIP Lender to extend the DIP Loans and not on account of the Prepetition Loan Obligations.

Based upon the Motion, the foregoing findings and conclusions, and the overall record before the Court, and after due consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.    **Motion Granted**. The Motion is granted on an interim basis on the terms and conditions set forth in this Interim Order. All objections to the Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby overruled on the merits.

2.    **Authorization of the DIP Financing and the DIP Documents**.

(a)    The Debtor is hereby authorized to execute, deliver, enter into and perform all of its obligations under the DIP Documents and perform such other acts as may be necessary, appropriate or desirable in connection therewith. Pending entry of the Final Order, the Debtor is

hereby authorized to borrow up to $6,650,000.00 in the aggregate pursuant to the DIP Credit Agreement and Approved Budget. The proceeds of the DIP Loans shall be used for all purposes permitted under the DIP Documents and the Interim Order, subject to and in accordance with the Approved Budget (subject to any permitted variances).

(b)     Upon entry of this Interim Order and the making of the Initial Advance under the DIP Financing, $1,500,000.00 in principal amount of the outstanding Prepetition Loan Obligations shall be deemed rolled up and converted into DIP Obligations, subject to the provisions of paragraph 22 hereof. The Debtor is authorized to take such actions as shall be necessary or desirable to effect the roll-up and conversion of the Prepetition Loan Obligations to DIP Obligations.

(c)     In furtherance of the foregoing and without further approval of this Court, the Debtor is authorized and directed to perform all acts, to make, execute and deliver all instruments, certificates, agreements, charges, deeds and documents, execute or record pledge and security agreements, mortgages, financing statements and other similar documents, if any, and to pay all fees, expenses and indemnities in connection with or that may be reasonably required, necessary, or desirable in connection with the DIP Financing, including, without limitation:

(i)     the execution and delivery of, and performance under, each of the DIP Documents;

(ii)     the execution and delivery of, and performance under, any amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the DIP Lender may accept; it being understood that no further approval of this Court shall be required for any such amendments, waivers, consents or other modifications or the payment of any fees, including attorneys', accountants', appraisers' and financial advisors'

fees, and other expenses, charges, costs, indemnities and other like obligations in connection

therewith, that do not shorten the maturity of the DIP Facility, increase the DIP Commitment or

increase the rate of interest or fees payable thereunder; nor shall updates, modifications, and

supplements to the Approved Budget require any further approval of this Court;

(iii)    the non-refundable payment to the DIP Lender of any fees in

connection with the DIP Facility, including any amendment fees, premiums, servicing fees, audit

fees, structuring fees, upfront fees, closing fees, commitment premiums, exit fees, closing date

fees, prepayment fees or agency fees, and any amounts due in respect of any indemnification and

expense reimbursement obligations, in each case, as provided in the DIP Documents shall be

deemed to have been approved upon entry of this Interim Order, whether any such obligations

arose before or after the Petition Date, and whether or not the transactions contemplated hereby

are consummated; and upon payment thereof, all such amounts shall be irrevocable and shall not

be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset,

subordination, recharacterization, avoidance, disallowance, impairment, or other claim, cause of

action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy

law;  and

(iv)    the non-refundable payment or reimbursement to the DIP Lender for

fees and expenses incurred by its professionals, whether any such fees and expense arose before or

after the Petition Date, as provided under the terms of the DIP Credit Agreement.  Any such DIP

Lender professional shall not be required to comply with the U.S. Trustee fee guidelines or file

applications or motions with, or obtain approval of, this Court for compensation and

reimbursement of fees and expenses but shall submit copies of summary invoices to the Debtor,

the U.S. Trustee and the Subchapter V Trustee.  The summary invoices shall be required only to

provide the total aggregate number of hours billed and a summary description of services provided and the expenses incurred by the applicable professional, and shall be subject to all applicable privilege and work product doctrines.   If the Debtor, the U.S. Trustee or the Subchapter V Trustee objects to the reasonableness of the fees and expenses of any such professional under any such invoice and the parties cannot resolve such objection within ten (10) days after receipt of such invoice, then the Debtor, U.S. Trustee or the Subchapter V Trustee, as the case may be, shall file with this Court and serve on such professional an objection (the "Fee Objection"), and any failure by any such party to file a Fee Objection within such ten (10) day period (or such longer period as may be agreed by the affected professional) shall constitute a waiver of any right of such party to object to the applicable invoice.   Notwithstanding any provision herein to the contrary, any objection to, and any hearing on an objection to, payment of any fees, costs, and expenses set forth in a DIP Lender professional fee invoice shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses that are the subject of such objection.   The Debtor shall timely pay in accordance with the terms and conditions of this Interim Order (a)  the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed and (b) all fees, costs and expenses on any invoice to which no Fee Objection has been timely filed.

3.      **DIP Obligations**.  Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute legal, valid, binding and non-avoidable obligations of the Debtor, enforceable against the Debtor and its estate in accordance with their respective terms and this Interim Order, and any successor thereto, including any trustee appointed in this Chapter 11 Case, or in any case under chapter 7 of the Bankruptcy Code upon conversion of this case, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases").

Upon execution and delivery of the DIP Documents, the DIP Obligations shall include all loans and any other indebtedness or obligations, contingent or absolute, which may from time to time be owing by the Debtor to the DIP Lender, in each case, under the DIP Documents and this Interim Order, including all principal, interest, costs, fees, expenses, premiums, indemnities and other amounts and further including all DIP Roll-Up Loans. Except as permitted hereby, no obligation, payment, transfer, or grant of security hereunder or under the DIP Documents to the DIP Lender shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

4.    **Carve-Out**.

(a)    As used herein, "**Carve-Out**" means the following expenses: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not exceeding $25,000 (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses solely to the extent set forth in the Approved Budget on a line item basis (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtor pursuant to section 327,

328, or 363 of the Bankruptcy Code or section 156(c) of title 28 of the United States Code, including counsel of the Debtor, and the Subchapter V Trustee (together, the "Professional Persons"), at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice (these clauses (i) through (iii), the "Pre-Carve Out Amounts") and (iv) Allowed Professional Fees in an amount not to exceed $50,000, incurred after the first business day following delivery by the DIP Lender of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender to the Debtor, its restructuring counsel, the U.S. Trustee, and the Sub V Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined below), stating that the Post-Carve Out Trigger Notice Cap has been invoked (the date of delivery of the Carve Out Trigger Notice, the "Termination Declaration Date"). For the avoidance of doubt, the DIP Lender shall not be required to fund any Allowed Professional Fees in excess of amounts permitted under the Approved Budget, the DIP Credit Agreement and this Interim Order.

(b)    *Carve Out Reserves*.  Upon entry of the Interim Order, the Debtor shall be permitted to reserve the amounts allocated for Allowed Professional Fees in accordance with the Approved Budget for amounts allocated for the weeks preceding entry of the Final Order and thereafter, the Debtor shall be permitted to reserve the amounts allocated for Allowed Professional Fees in accordance with the Approved Budget on a weekly basis on the first day of each week, all amounts allocated for that week and all prior weeks, solely to pay Allowed Professional Fees (the

"Carve Out Reserves").    On the Termination Declaration Date, the Debtor shall no longer be permitted to utilize any DIP Collateral or Prepetition Collateral to fund the Carve Out Reserves other than funds for the Post-Carve Out Trigger Notice Cap.    The Debtor may, at its option, open a segregated account to hold the Carve Out Reserves but a segregated account shall not be required to effectuate the reserve provisions of this Interim Order.  To the extent the funds allocated to the Carve Out Reserves exceed the amounts necessary to pay accrued fees and expenses for which an application has not yet been filed, fees and expenses subject to a pending application, Allowed Professional Fees and the Post-Carve Out Trigger Notice Cap in accordance with the terms of this Interim Order and the Approved Budget, such excess funds shall be returned to the DIP Lender unless the DIP Obligations (including the  DIP Roll-Up Loans) have been indefeasibly paid in full, in cash and all DIP Commitments have been terminated.  If the DIP Obligations, including the DIP Roll-Up Loans have been paid in full, in cash, any such excess proceeds shall go to the Debtor's estate.   For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility, or in any Prepetition Loan Document, the Carve-Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Loan Obligations.

(c)    *No Direct Obligation to Pay Allowed Professional Fees*.  Without limiting the obligations of the DIP Lender and the Prepetition Secured Lender with respect to the Carve-Out, neither the DIP Lender nor the Prepetition Secured Lender shall be responsible for the payment  or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Case or any Successor Cases under any chapter of the Bankruptcy Code, and nothing in this Interim Order or otherwise shall be construed to obligate the

DIP Lender or the Prepetition Secured Lender, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtor has sufficient funds to pay such compensation or reimbursement.

(d)     *Payment of Carve-Out on or After the Termination Declaration Date*.   Any payment or reimbursement in respect of any Allowed Professional Fees made on or after the occurrence of the Termination Declaration Date shall be in accordance with the Approved Budget and shall permanently reduce the Carve Out Reserves on a dollar- for-dollar basis.  The Carve Out Reserves shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the Protection granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

5.     **DIP Superpriority Claims**.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations (including the DIP Roll-Up Loans) shall constitute allowed superpriority administrative expense claims (the "DIP Superpriority Claims") against the Debtor (without the need to file any proof of claim) with priority over any and all claims against the Debtor (but for the avoidance of doubt, junior to the Carve-Out), now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code (including the Adequate Protection), whether or not such expenses or claims may become secured by a judgment lien or other non- consensual lien, levy or attachment. Subject only to the Carve-Out, the DIP Superpriority Claims shall be payable from, and have recourse to, all prepetition and postpetition property of the Debtor and all proceeds thereof (including upon entry of a Final Order proceeds or

property recovered, whether by judgment, settlement or otherwise as a result of any claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, the "Avoidance Actions," and any such proceeds and/or recoveries thereof, the "Avoidance Proceeds"), but excluding the Carve-Out Reserves and amounts held therein other than the Debtor's reversionary interest therein.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

6.    **DIP Liens**.  As security for the DIP Obligations, effective and automatically properly perfected on the date this Interim Order is entered, and without the necessity of execution, recordation or filing of any perfection document or instrument, or the possession or control by the DIP Lender of, or over, any Collateral (as defined under the DIP Credit Agreement), without any further action by the DIP Lender, the following valid, binding, continuing, fully perfected, enforceable and non-avoidable security interests and liens (the "DIP Liens") are hereby granted to the DIP Lender (all property identified in clauses (a) through (c) below being collectively referred to as the "DIP Collateral," and, together with the Prepetition Collateral, the "Collateral"):

(a)    Liens on Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on and security interest in (subject only to the Carve-Out) all tangible and intangible prepetition and postpetition property of the Debtor, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, including upon entry of a

Final Order Avoidance Actions and Avoidance Proceeds, but excluding the Carve Out Reserves (and any amounts held therein) (collectively, the "Unencumbered Property").

(b)     <u>Liens Priming the Prepetition Secured Lender's Liens</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest (subject to the Carve-Out) in, and lien upon, all tangible and intangible prepetition and postpetition property of the Debtor of the same nature, scope, and type as the Prepetition Collateral, regardless of where located (the "<u>DIP Priming Liens</u>"). Notwithstanding anything herein to the contrary, the DIP Priming Liens shall be (A) senior in all respects to the Prepetition Liens on the Prepetition Collateral, (B) senior to any Adequate Protection Liens on the Prepetition Collateral and (C) not subordinate to any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of the Bankruptcy Code.  The Prepetition Liens with respect to the Prepetition Collateral shall be primed by and made subject and subordinate to the DIP Priming Liens.

(c)     <u>Liens Junior to Certain Other Liens</u>.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of the Debtor that, on or as of the Petition Date, is subject to any Prepetition Permitted Liens, which liens shall be junior and subordinate to any such Prepetition Permitted Liens.

(d)     <u>No Senior Liens</u>.  The DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtor or its estate under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents or in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any

federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtor, or (C) any intercompany liens; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code.

       7.    **Approved Budget; Variance Testing.**

       (a)    The Debtor shall at all times comply with the Approved Budget, subject to the Permitted Variance (as defined below). Commencing on the second Wednesday after the date of entry of the Interim Order, and on a bi-weekly basis thereafter on each second Wednesday (or the immediately following business day if any such Wednesday is not a business day), the Debtor shall deliver by email to the DIP Lender a variance report for the immediately preceding two-week period, comparing actual aggregate cash disbursements for such period to the projected disbursements for such period as set forth in the Approved Budget. In the event that the Debtor's actual aggregate cash disbursements for such period exceed the aggregate projected disbursements for such period by an amount in excess of 10% without the DIP Lender's consent, it shall constitute an Event of Default under the DIP Loan Agreement and this Interim Order (any such variance in an amount less than 10% shall be referred to herein as a "Permitted Variance"); provided, however, no variances shall be permitted for the line items in the Approved Budget for Professional Persons. For clarity, the Permitted Variances do not increase in any way the DIP Lender's obligation to increase the amount of the DIP Facility or the amounts to be allocated to the Cave-Out Reserves as set forth in the Approved Budget and this Interim Order.

       (b)    The Debtor shall provide the Sub V Trustee with all reporting and other information required to be provided to the DIP Lender under the DIP Documents.

       8.    **Section 506(c) Waiver**. Subject to entry of a Final Order, no costs or expenses of

administration of this case or any Successor Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceeding under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender and the Prepetition Secured Lender, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Lender or Prepetition Secured Lender to any charge, lien, assessment or claims against the Collateral under section 506(c) of the Bankruptcy Code or otherwise (and no consent shall be implied from any action, inaction or acquiescence by any of the DIP Lender or the Prepetition Secured Lender).

9.      **No Marshaling**.  Subject to entry of the Final Order, in no event shall the DIP Lender or the Prepetition Secured Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Loan Obligations, or the Prepetition Collateral, as applicable. Further, subject to entry of the Final Order, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Lender.

10.      **Payments Free and Clear**.  Subject to entry of the Final Order,  any and all payments or proceeds remitted to the DIP Lender or Prepetition Secured Lender pursuant to the provisions of this Interim Order, the DIP Documents or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability in favor of the Debtor, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code, whether asserted or assessed by through or on behalf of the Debtor.

11.      **Use of Cash Collateral and DIP Facility**.  The Debtor is hereby authorized, solely

on the terms and conditions of this Interim Order, to use all Cash Collateral solely in accordance with the DIP Documents and Approved Budget (subject to the Permitted Variance). The Debtor is directed to, and shall be deemed to, fund all cash disbursements on and after the Petition Date, *first*, using all Prepetition Cash held in the Debtor's deposit accounts on the Petition Date and *second*, using proceeds of the DIP Facility, with any amounts funded under the DIP Facility deemed Cash Collateral of the DIP Lender under the DIP Loan Documents and the DIP Orders for all purposes.

12.    **Adequate Protection of Prepetition Secured Lender**. Pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, as adequate protection of the Prepetition Secured Lender's interests in the Prepetition Collateral for the imposition of the automatic stay, for the aggregate diminution in value of the Prepetition Collateral ("Diminution in Value") and as an inducement to the Prepetition Secured Lender to consent to the priming of the Prepetition Liens, the use of its Prepetition Collateral and the imposition of the Carve-Out, the Prepetition Secured Lender is granted the following Adequate Protection:

(a)    Adequate Protection Liens. To the extent of the Diminution in Value, the Prepetition Secured Lender is hereby granted a replacement security interest in and lien on all of the DIP Collateral (the "Adequate Protection Liens"), which liens are (i) effective and perfected upon the date of this Interim Order, without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements, and (ii) subject and subordinate only to (A) the DIP Liens, (B) the Prepetition Permitted Liens, if any, and (C) the Carve-Out.

(b)    Prepetition Secured Lender's Adequate Protection Superpriority Claim. The Prepetition Secured Lender is hereby granted an allowed superpriority administrative expense

claim against the Debtor (without the need to file any proof of claim) under section 507(b) of the Bankruptcy Code on account of the Diminution in Value (the "Adequate Protection Superpriority Claim"), which Adequate Protection Superpriority Claim (i) shall be payable from and have recourse to all of the DIP Collateral, and (ii) shall be subject and subordinate only to (A) the DIP Liens, (B) the Adequate Protection Liens, (C) the Prepetition Liens (D) the DIP Superpriority Claims, (E) the Carve-Out and (F) the Prepetition Permitted Liens, if any.

(c)     Prepetition Secured Lender Fees and Expenses.  As further adequate protection, the Debtor shall pay to the Prepetition Secured Lender, in cash, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the Prepetition Secured Lender's advisors, including, without limitation, those of Greenberg Traurig, LLP and local legal counsel (if any) (collectively, the "Adequate Protection Fees and Expenses"), subject to the review procedures set forth in paragraph 2(c)(iv) of this Interim Order;

(d)     Postpetition Interest.  From and after the Petition Date, interest shall continue to accrue under the Prepetition Loan Document at the non-default rate and shall constitute Prepetition Loan Obligations and shall be included in the DIP Roll-Up Loans.

13.   **Perfection of DIP Liens and Adequate Protection Liens**.

(a)     Without in any way limiting the validity of the automatic perfection of the DIP Liens and the Adequate Protection Liens under the terms of this Interim Order, the DIP Lender and the Prepetition Secured Lender are hereby authorized (but not required) to execute in the name of the Debtor, as its true and lawful attorneys (with full power of substitution, to the maximum extent permitted by law) and to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar perfection instruments in any jurisdiction, or take possession of certificated securities, or take any other similar action in a manner not inconsistent

herewith to document, validate or perfect the liens and security interests granted to them hereunder (the "Perfection Actions").  All such Perfection Actions shall be deemed to have been taken on the date of entry of this Interim Order.  The automatic stay shall be modified to the extent necessary to permit the DIP Lender and the Prepetition Secured Lender to take any Perfection Action.  For the avoidance of doubt, the DIP Liens and the Adequate Protection Liens shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Interim Order, whether or not the DIP Lender or the Prepetition Secured Lender take such Perfection Actions.

(b)     A certified copy of this Interim Order may, in the discretion of the DIP Lender and the Prepetition Secured Lender, be filed or recorded in the filing or recording offices in addition to or in lieu of any financing statements, mortgages, notices of lien or similar instruments, and all filing and recording offices are hereby authorized and directed to accept a certified copy of this Interim Order for filing and/or recording, as applicable.

14.    **Preservation of Rights Under this Interim Order.**

(a)     Other than the claims and liens expressly granted or permitted by this Interim Order, including the Carve-Out, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order shall be permitted while any of the DIP Obligations, the Adequate Protection and Prepetition Loan Obligations remain outstanding, and, except as otherwise expressly provided in or permitted under this Interim Order, the DIP Liens and the Adequate Protection Liens shall not be: (i) junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu* with any liens

arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtor; or (iv) junior to any intercompany liens or security interests of the Debtor.

(b)     No rights, protection or remedies of the DIP Lender or the Prepetition Secured Lender granted by this Interim Order or the DIP Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent to the Debtor's authority to continue to use Cash Collateral; (ii) any actual or purported termination of the Debtor's authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the Debtor's continued use of Cash Collateral or the provision of adequate protection to any party.

15.     **Maintenance of Collateral**.  Until the indefeasible payment in full in cash of all DIP Obligations, all Prepetition Loan Obligations, the Adequate Protection and the termination of the DIP Commitment, the Debtor shall insure the DIP Collateral as required under the DIP Documents and/or the Prepetition Loan Documents, as applicable.

16.     **Survival**.  Notwithstanding any order that may be entered dismissing the Chapter 11 Case under section 1112 of the Bankruptcy Code or converting these cases to a Successor Case: (A) the DIP Superpriority Claims, the Adequate Protection Superpriority Claims, the DIP Liens, the Adequate Protection Liens, and the Prepetition Liens shall continue in full force and effect, shall maintain their priorities as provided in this Interim Order, and shall remain binding on all parties in interest until all DIP Obligations, Adequate Protection and Prepetition Loan Obligations shall have been indefeasibly paid in full in cash; (B) the other rights granted by this Interim Order, including with respect to the Carve-Out, shall not be affected; and (C) this Court shall retain

jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

(a)    If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, such reversal, modification, vacatur, or stay shall not affect (i) the validity, priority, or enforceability of any DIP Obligations (including the DIP Roll-Up Loans) or Adequate Protection incurred prior to the actual receipt of written notice by the DIP Lender or Prepetition Secured Lender, as applicable, of the effective date of such reversal, modification, vacatur, or stay; or (ii) the validity, priority, and enforceability of the DIP Liens, the Prepetition Liens, the Adequate Protection Liens, and the Carve-Out, each to the fullest extent provided under section 364(e) of the Bankruptcy Code. Notwithstanding any such reversal, modification, vacatur or stay, the DIP Obligations, DIP Liens, Adequate Protection, Adequate Protection Liens, DIP Superpriority Claims, and the Adequate Protection Superpriority Claims incurred prior to the actual receipt of written notice by the DIP Lender or the Prepetition Secured Lender, as applicable, of the effective date of such reversal, modification, vacatur, or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender and the Prepetition Secured Lender shall be entitled to, and are hereby granted, all the rights, remedies, privileges and benefits arising under section 364(e) of the Bankruptcy Code.

(b)    Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and all other rights and remedies of the DIP Lender and the Prepetition Secured Lender granted by this Interim Order and the DIP Documents, as well as the Carve-Out, shall survive, and shall not be modified, impaired or discharged by the entry of an order (i) converting or dismissing the Chapter 11 Case; (ii) approving the sale of any DIP Collateral

pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents); or (iii) confirming a chapter 11 plan in the Chapter 11 Case. The terms and provisions of this Interim Order and the DIP Documents shall continue in full force and effect in this Chapter 11 Case and in any Successor Cases until all DIP Obligations and Adequate Protection are indefeasibly paid in full in cash, the DIP Commitments have been terminated, and all Prepetition Loan Obligations have been indefeasibly paid in full in cash.

17.     **Termination Event**. On the Termination Date (as defined below), all DIP Obligations shall be immediate due and payable and any remaining portion of the DIP Commitment will terminate.

(a)     Until the DIP Obligations are indefeasibly paid in full and the DIP Commitment is terminated, the occurrence of any of the following events, unless waived by the DIP Lender in writing (which may be by electronic mail) and in accordance with the terms of the DIP Documents, shall constitute an event of default under this Interim Order and under the DIP Credit Agreement (collectively, the "Events of Default"):

(i)     the failure of the Debtor to perform, in any material respect, any of the terms, provisions, conditions, covenants or obligations under this Interim Order, including, without limitation, failure to make any payment under this Interim Order when due or comply with any Milestones;

(ii)     the occurrence of any Event of Default under, and as defined in, the DIP Credit Agreement or any other DIP Documents;

(iii)     the Debtor proposes or supports any plan of reorganization or sale of all or substantially all of the Debtor's assets, or order confirming such plan or approving such sale, that is not conditioned upon the indefeasible payment (including by credit bid) of the DIP

Obligations, the Prepetition Loan Obligations, and the payment of the Adequate Protection, in each case, in full in cash (other than by credit bid), within a commercially reasonable period of time (and in no event later than the effective date of such plan of reorganization or sale) without the prior written consent of the DIP Lender and, to the extent any portion of the Prepetition Loans then remains outstanding, the Prepetition Secured Lender;

(iv)   a motion is filed by the Debtor, the Subchapter V Trustee or any committee appointed in the Chapter 11 Case seeking the conversion or dismissal of the Chapter 11 Case or seeking the appointment of a trustee, examiner or any other fiduciary appointed as a legal representative of any of the Debtor or with respect to the property of the estate of the Debtor;

(v)   an order is entered converting or dismissing the Chapter 11 Case or appointing a trustee, examiner or any other fiduciary appointed as a legal representative of any of the Debtor or with respect to the property of the estate of the Debtor.

(b)   As a condition to the DIP Facility and the use of Cash Collateral, the Debtor has agreed to the following milestones (the "Milestone**s**"):

(i)   No later than four (4) business days after the Petition Date, entry by the Court of this Interim Order;

(ii)   Subject to the Court's availability, no later than twenty-five (25) calendar days after the Petition Date, entry by the Court of an order approving the Bidding Procedures (as defined in the DIP Credit Agreement) for the sale of the Debtor's assets;

(iii)   Subject to the Court's availability, no later than thirty-five (35) calendar days after the Petition Date, entry by the Court of the Final Order;

(iv)   No later than forty-five (45) calendar days after the Petition Date, the submission deadline for all bids for the sale of the Debtor's assets as set forth in the Bidding

Procedures;

(v)     No later than fifty (50) calendar days after the Petition Date, holding an auction (if necessary) for the sale of the Debtor's assets as set forth in the Bidding Procedures;

(vi)    Subject to the Court's availability, no later than fifty-two (52) calendar days after the Petition Date, entry by the Court of the Sale Order (as defined in the DIP Credit Agreement); and

(vii)   No later than fifty-five (55) calendar days after the Petition Date, consummation of the sale of the Debtor's assets in accordance with the Bidding Procedures.

For the avoidance of doubt, unless waived in writing by the DIP Lender in its sole discretion, the failure of the Debtor to meet the Milestones by the applicable specified deadlines set forth herein shall constitute an Event of Default under the DIP Documents and this Interim Order.

18.     **Rights and Remedies Upon Event of Default**. Upon the occurrence and during the continuation of an Event of Default, notwithstanding section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Court, and subject only to the terms of this Interim Order: (a) the DIP Lender may send a written notice to the Debtor, the Subchapter V Trustee, and the U.S. Trustee (any such notice shall be referred to herein as a "Termination Declaration"), which shall be filed on the docket of the Chapter 11 Case, declaring (1) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (2) any remaining portion of the DIP Commitment of the DIP Lender to be terminated, (3) the termination of the DIP Facility and the DIP Documents as to any future liability or obligation of the DIP Lender, but without affecting any of the DIP Liens or the DIP Obligations, and (4) the application of the Carve-Out has occurred following the delivery of the Carve Out Trigger Notice to the Debtor; (b) interest, including, where applicable, default interest, shall accrue and be paid as

33

set forth in the DIP Documents; and (c) upon delivery of the Termination Declaration, the DIP Lender shall be deemed, absent further order of the Court, to have declared a termination of the ability of the Debtor to use Cash Collateral.   The date on which a Termination Declaration is delivered by the DIP Lender and filed on the docket shall be referred to herein as the "Termination Date."  Following the Termination Date, neither the DIP Lender nor the Prepetition Secured Lender shall be required to consent to the use of any Cash Collateral or provide any loans or other financial accommodations under the DIP Facility, except as expressly provided in this Interim Order or further order of the Court.  The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtor, the Subchapter V Trustee and the U.S. Trustee.

19.    **Emergency Hearing**. Upon the delivery of a Termination Declaration, the Debtor, the Subchapter V Trustee, the DIP Lender, and the Prepetition Secured Lender consent to a hearing on an emergency basis regarding whether the Termination Date has occurred. During the five (5) business days following the date that a Termination Declaration is delivered (such five (5) business day period, the "Remedies Notice Period"), the Debtor shall continue to have the right to use Cash Collateral in accordance with the terms of the Interim Order, solely to pay necessary expenses set forth in the Approved Budget to avoid immediate and irreparable harm to the Estate. At the end of the Remedies Notice Period, unless the Court has entered an order to the contrary, the Debtor's right to use Cash Collateral shall immediately cease, unless otherwise provided herein and the DIP Lender shall have the rights set forth immediately below.

20.    **Certain Rights and Remedies Following Termination Date**. Following the Termination Date and upon either the expiration of the Remedies Notice Period or pursuant to an order of the Court (the "Termination Enforcement Order"), the DIP Lender shall be entitled to

exercise all rights and remedies in accordance with the DIP Documents, the DIP Orders and applicable law. Following the expiration of the Remedies Notice Period or entry of the Termination Enforcement Order, except as otherwise ordered by the Court (including in any Termination Enforcement Order): (a) the Debtor is hereby authorized and directed to, with the exclusion of the Carve-Out, remit to the DIP Lender one- hundred percent (100%) of all collections, remittances, and proceeds of the DIP Collateral in accordance with the DIP Documents; (b) the DIP Lender may compel the Debtor to seek authority from the Court to, (i) sell or otherwise dispose of all or any portion of the DIP Collateral (or any other property of the Debtor to the extent a lien is not permitted by law to attach to such property, the proceeds of which are DIP Collateral) pursuant to section 363 of the Bankruptcy Code (or any other applicable provision) on terms and conditions pursuant to sections 363, 365, and other applicable provisions of the Bankruptcy Code, and (ii) assume and assign any lease or executory contract included in the DIP Collateral to the DIP Lender's designees in accordance with and subject to section 365 of the Bankruptcy Code, (c) the DIP Lender may direct the Debtor to (and the Debtor shall comply with such direction to) dispose of or liquidate the DIP Collateral (or any other property of the Debtor to the extent a lien is not permitted by law to attach to such property, the proceeds of which are DIP Collateral) via one or more sales of such DIP Collateral or property and/or the monetization of other DIP Collateral or property, (d) the DIP Lender may, or may direct the Debtor to (and the Debtor shall comply with such direction to), collect accounts receivable, without setoff by any account debtor, (e) the DIP Lender shall be authorized to succeed to any of the Debtor's rights and interests under any licenses for the use of any intellectual property in order to complete the production and sale of any inventory with respect to the DIP Collateral, and (f) the Debtor shall take all action that is reasonably necessary to cooperate with the DIP Lender in the exercise of its rights

and remedies and to facilitate the realization of the DIP Collateral by the DIP Lender as set forth in the DIP Documents.

21.    **Discharge**. Except as otherwise agreed in writing by the DIP Lender and the Prepetition Secured Lender, the DIP Obligations and the Adequate Protection of the Debtor shall not be discharged by the entry of an order confirming any plan of reorganization in this Chapter 11 Case, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan of reorganization.

22.    **Effect of Stipulations on Third Parties**. The Debtor's stipulations, admissions, agreements and releases contained in Paragraph G of this Interim Order shall be binding upon the Debtor in all circumstances and for all purposes. The Debtor's stipulations, admissions, agreements and releases contained in Paragraph G of this Interim Order shall be binding upon all other parties in interest, including, without limitation, the Subchapter V Trustee and any other person or entity acting or seeking to act on behalf of the Debtor's estate, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtor, in all circumstances and for all purposes unless: (a) such party in interest with requisite standing has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein) by no later than seventy-five (75) calendar days following entry of the Interim Order (the "Challenge Period"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Loan Obligations or the Prepetition Liens, or (B) asserting or prosecuting any Avoidance Action or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Challenges") against the Prepetition Secured Lender or its respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial

advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (collectively, the "Representatives") in connection with or related to the Prepetition Loan Documents, the Prepetition Loan Obligations, the Prepetition Liens and the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge; *provided*, *however*, that any pleadings filed in connection with a Challenge shall set forth with specificity the basis for such Challenge and any Challenges not so specified prior to the expiration of the Challenge Period shall be deemed forever waived, released and barred. If no Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such Challenge then: (1) the Debtor's stipulations, admissions, agreements and releases contained in this Interim Order shall be binding on all parties in interest; (2) the obligations of the Debtor under the Prepetition Loan Documents shall constitute allowed claims not subject to defense avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for all purposes in these cases and any Successor Case(s); (3) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity, including the Subchapter V Trustee or any other party in interest acting or seeking to act on behalf of the Debtor's estate, including, without limitation, any chapter 7 or chapter 11 trustee or examiner, and any defense,

avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by the Subchapter V Trustee or any other party acting or seeking to act on behalf of the Debtor's estate, including, without limitation, any chapter 7 or chapter 11 trustee or examiner, whether arising under the Bankruptcy Code or otherwise, against the Prepetition Secured Lender and its Representatives shall be deemed forever waived, released and barred. If any Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in Paragraph G of this Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on each person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction. Nothing in this Interim Order vests or confers on any person or entity (each as defined in the Bankruptcy Code), including any statutory or non statutory committees or trustee appointed or formed in this Chapter 11 Case, standing or authority to pursue any claim or cause of action belonging to the Debtor or its estate, including, without limitation, any Challenges with respect to the Prepetition Loan Documents, Prepetition Loan Obligations or Prepetition Liens, and any ruling on standing, if appealed, shall not stay or to otherwise delay confirmation of any plan of reorganization or sale of the Debtor's assets in this Chapter 11 Case. The filing of a motion seeking standing to file a Challenge before the termination of the Challenge Period, which attaches a proposed Challenge, shall extend the Challenge Period with respect to that party until two (2) business days after the Court rules on the standing motion, or such other time period ordered by the Court in approving the standing motion.

23.     **Limitation on Use of DIP Financing Proceeds and Collateral**. Notwithstanding any other provision of this Interim Order or any other order entered by the Court, no DIP Loans, DIP Collateral, Prepetition Collateral or any portion of the Carve-Out, may be used directly or indirectly, including without limitation through reimbursement of professional fees of any non-Debtor party, in connection with (a) the investigation, threatened initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against the DIP Lender, or the Prepetition Secured Lender, or their respective Representatives (in their capacities as such), or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens, DIP Superpriority Claims, Prepetition Loan Obligations, Adequate Protection Liens, or Adequate Protection Superpriority Claims or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to the DIP Obligations, the Prepetition Loan Obligations and/or liens, claims, rights, or security interests securing or supporting the DIP Obligations granted under the DIP Orders, the DIP Documents or the Prepetition Loan Documents in respect of the Prepetition Loan Obligations, including, in the case of each (i) and (ii), without limitation, for lender liability or pursuant to sections 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise (provided that, notwithstanding anything to the contrary herein, the proceeds of the DIP Loans and DIP Collateral may be used by the Subchapter V Trustee to investigate, but not to prosecute, (A) the claims and liens of the Prepetition Secured Lender and (B) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Lender, up to an aggregate cap of no more than $20,000 (the "Investigation Cap"), (b) attempts to prevent, hinder, or otherwise delay or interfere with the Prepetition Secured Lender's or the DIP Lender's, as applicable, enforcement or realization on the Prepetition Loan Obligations, Prepetition Collateral, DIP Obligations, DIP

Collateral, as applicable, and the liens, claims and rights granted to such parties under the DIP Orders; (c) attempts to seek to modify any of the rights and remedies granted to the Prepetition Secured Lender or the DIP Lender under this Interim Order, the Prepetition Loan Documents or the DIP Documents, as applicable, other than in accordance with this Interim Order; (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens and claims permitted by the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and Adequate Protection Superpriority Claims; or (e) to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are authorized by the Court, agreed to in writing by the DIP Lender, expressly permitted under this Interim Order or under the DIP Documents (including the Approved Budget, subject to the Permitted Variance), in each case unless all DIP Obligations, Prepetition Loan Obligations, Adequate Protection, and claims granted to the DIP Lender and Prepetition Secured Lender under this Interim Order, have been paid in full in cash or otherwise agreed to in writing by the DIP Lender and the Prepetition Secured Lender, as applicable.

24.     **Interim Order Governs**.  In the event of any inconsistency between the provisions of this Interim Order, the DIP Documents or Prepetition Loan Documents, the provisions of this Interim Order shall govern.  Any authorization contained in any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Interim Order and the DIP Documents, including, without limitation, the Approved Budget (subject to the Permitted Variance).

25.     **Binding Effect; Successors and Assigns**.  Subject to paragraph 22 of this Interim Order where applicable, the DIP Documents and the provisions of this Interim Order, including all

findings herein, shall be binding upon all parties in interest in these cases, including, without limitation, the DIP Lender, the Prepetition Secured Lender, the Subchapter V Trustee, the Debtor and its respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtor, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtor or with respect to the property of the estate of the Debtor) and shall inure to the benefit of the DIP Lender, the Prepetition Secured Lender, the Debtor, and its respective successors and assigns; *provided* that the DIP Lender and the Prepetition Secured Lender shall have no obligation to permit the use of the DIP Collateral or the Prepetition Collateral by, or to extend any financing to, any chapter 7 trustee or chapter 11 trustee or similar responsible person appointed for the estate of the Debtor.

26.     Nothing in this Interim Order, the DIP Documents, the Prepetition Loan Documents or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender or the Prepetition Secured Lender any liability for any claims arising from the prepetition or postpetition activities of the Debtor in the operation of its business, or in connection with its restructuring efforts. The DIP Lender and Prepetition Secured Lender shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral or Prepetition Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and all risk of loss, damage or destruction of the DIP Collateral or Prepetition Collateral shall be borne by the Debtor.

27.     **Limitation of Liability**.  In determining to make any loan or other extension of credit

under the DIP Documents, to permit the use of the DIP Collateral or Prepetition Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents or Prepetition Loan Documents, as applicable, none of the DIP Lender or Prepetition Secured Lender shall (a) have any liability to any third party or be deemed to be in "control" of the operations of the Debtor; (b) owe any fiduciary duty to the Debtor, its creditors, shareholders or estate; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" or "managing agent" with respect to the operation or management of the Debtor (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, as amended, or any other federal or state statute, including the Internal Revenue Code). Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Lender or Prepetition Secured Lender of any liability for any claims arising from the prepetition or postpetition activities of the Debtor and its respective Representatives.

28.     **Proofs of Claim**.  Notwithstanding any order entered by this Court in relation to the establishment of a bar date in this Chapter 11 Case or any Successor Case, the Prepetition Secured Lender shall not be required to file proofs of claim in these cases or any Successor Case in order to assert claims for payment of any of the Prepetition Loan Obligations, including, without limitation, any principal, unpaid interest, fees, expenses and other amounts payable under the Prepetition Loan Documents or this Interim Order.  The Debtor's stipulations, admissions and acknowledgments of the claim and liens in respect of the Prepetition Loan Obligations set forth in this Interim Order is deemed to constitute timely proofs of claim in respect of all indebtedness, secured status and claims arising under the Prepetition Loan Documents and this Interim Order.  The provisions of this paragraph 30 are intended solely for the purpose of administrative convenience and shall not

affect the right of the Prepetition Secured Lender (or its successors in interest) to vote on any plan filed in this Chapter 11 Case.  The DIP Lender shall not be required to file proofs of claim with respect to the DIP Obligations.

29.     **Insurance**.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtor that in any way relates to the DIP Collateral.

30.     **Allocation and Payment of All Sale Proceeds to Pay DIP Obligations and Prepetition Loan Obligations**.  In connection with any sale or other disposition of the Debtor's or its estate's assets, including any sales occurring under or pursuant to section 363 of the Bankruptcy Code, any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or a sale or disposition by a chapter 7 trustee for the Debtor under section 725 of the Bankruptcy Code (any of the foregoing sales or dispositions, a "Sale"), all proceeds from any such Sale shall be paid over to BEV first to repay the DIP Obligations in full and thereafter to pay the Prepetition Loan Obligations (if such obligations have not been converted to DIP Roll-Up Loans) after which the residual sale proceeds, if any, shall be held by the Debtor or the chapter 7 trustee (if appointed) until further order of the Court.

31.     **Preservation of 363(k) Rights**.  The DIP Lender and Prepetition Lender are expressly authorized and permitted to credit bid up to the full amount of the DIP Obligations, inclusive of the DIP Roll-Up Loans (and to the extent applicable, the Prepetition Loan Obligations), pursuant to section 363(k) of the Bankruptcy Code.  BEV shall be considered a "Qualified Bidder" under the Bidding Procedures and shall not be required to post a good faith deposit in connection with such sale.  BEV also shall have the right, but not the obligation, to supplement its credit bid

with additional cash consideration at any auction for the sale of the Debtor's assets.    BEV shall

have the absolute right to assign, transfer, sell, or otherwise dispose of its rights to credit bid as set

forth in this paragraph to any acquisition vehicle formed in connection with such credit bid or other

designee.

32.    **Effectiveness**.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d),

7062, or 9014 of the Bankruptcy Rules or any Local Rule, or Rule 62(a) of the Federal Rules of

Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry

and there shall be no stay of execution or effectiveness of this Interim Order.

33.    **Headings**.  Paragraph headings used herein are for convenience only and shall not

affect the construction of, or to be taken into consideration in interpreting, this Interim Order.

34.    **Bankruptcy Rules**.  The requirements of Bankruptcy Rules 4001, 6003 and 6004,

in each case to the extent applicable, are satisfied by the contents of the Motion.

35.    **No Third Party Rights**.  Except as explicitly provided for herein, this Interim Order

does not create any rights for the benefit of any third party, creditor, equity holder or any direct,

indirect or incidental beneficiary.

36.    **Necessary Action**.  The Debtor, the DIP Lender and the Prepetition Secured Lender

are authorized to take all reasonable actions as are necessary or appropriate to implement the terms

of this Interim Order.

37.    **Retention of Jurisdiction**.  This Court shall retain jurisdiction to enforce the

provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation

and consummation of any chapter 11 plan for the Debtor notwithstanding the terms or provisions

of any such chapter 11 plan or any order confirming any such chapter 11 plan.

38.    **Final Hearing**.  A final hearing to consider the relief requested in the Motion on a

final basis shall be held on May __, 2025 at _:___p.m. (Prevailing Eastern Time).

39.    **Objections**.  Any objections or responses to the Motion shall be filed on or prior to April __, 2025 at 4:00 p.m. (Prevailing Eastern Time).  Any party objecting to the relief sought at the Final Hearing shall file and serve (via mail and e-mail) written objections, which objections shall be served upon (a) the Debtor, (b) counsel to the Debtor; (c) the Subchapter V Trustee; (d) counsel to the DIP Lender and Prepetition Secured Lender, Greenberg Traurig, LLP, One Vanderbilt Ave., New York, NY 10017, Attn: Jeffrey M. Wolf, Brian E. Greer, and T. Charlie Liu; and (e) the Office of the United States Trustee for the District of Delaware.

40.    The Debtor shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) on the Notice Parties and to any other party that has filed with this Court a request for notices in these cases.

**Exhibit 1**

DIP Credit Agreement

**SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT**

**between**

**VIRIDOS, INC.**

**as Borrower**

**and**

**BREAKTHROUGH ENERGY VENTURES II, L.P.,**

**as Lender**

**Dated as of  April [__], 2025**

## SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

THIS SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT (this "Agreement"), dated as of April [___], 2025, is entered into by and between VIRIDOS, INC., a Delaware corporation and a debtor and debtor-in-possession in the Chapter 11 Case referred to below (the "Borrower" or the "Debtor") and BREAKTHROUGH ENERGY VENTURES II, L.P., a Delaware limited partnership (the "Lender").

### PRELIMINARY STATEMENTS

A.      On April 14, 2025 (the "Petition Date"), the Borrower commenced chapter 11 Case No. 25-BK-10697 (CTG) (the "Chapter 11 Case"), with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  The Debtor continues to operate its business and manage its properties as debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.      Prior to the Petition Date, the Lender provided financing to the Borrower pursuant to that certain Amended and Restated Secured Promissory Note, dated as of April 7, 2025, executed by the Borrower in favor of the Lender in the maximum original principal amount of $2,750,000 (which note amended and restated in its entirety that certain Secured Promissory Note dated as of July 23, 2024, executed by the Borrower in favor of the Lender in the original principal amount of $2,000,000) (as further amended, restated, amended and restated, supplemented or otherwise modified from time to time through the Petition Date, the "Prepetition Secured Note"), which note was issued pursuant to that certain Note Purchase Agreement, dated as of June 23, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time through the Petition Date, the "Prepetition Note Purchase Agreement"), by and between the Borrower and the Lender.

C.      As of the Petition Date, the Lender is owed Prepetition Obligations (as hereinafter defined) under the Prepetition Secured Note Documents (as hereinafter defined) in the aggregate amount of $2,402,000, consisting of outstanding principal in the amount of $2,250,000, and interest, fees, costs and expenses owing thereunder.

D.      The Prepetition Obligations are secured by a security intertest in substantially all existing and after-acquired assets of the Borrower, granted pursuant to the terms of the Prepetition Security Documents (as hereinafter defined) and, subject only to certain exceptions permitted under the Prepetition Security Documents, such security interest is a perfected first priority security interest in all of the Prepetition Collateral (as hereinafter defined).

E.      The Borrower has requested, and upon the terms and conditions set forth in this Agreement, the Lender has agreed to make available to the Borrower, a senior-secured, super-priority term loan facility in an amount of up to $6,650,000 to fund (i) the working capital requirements of the Borrower during the pendency of the Chapter 11 Case, (ii) the payment of accrued professional fees and other costs and expenses incurred by the Borrower in connection with the Chapter 11 Case (as hereinafter defined), and (iii) to refinance the Prepetition Obligations through the making of DIP Rollup Loans (as hereinafter defined).

F.      The Borrower has agreed to secure all of the Obligations under the Loan Documents by granting the Lender a security interest in and lien upon substantially all of its existing and after acquired property (subject to the limitations and priorities contained in the Loan Documents and the DIP Orders).

1

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows.

## ARTICLE I DEFINITIONS

1.1    <u>Defined Terms</u>. All terms defined in the UCC and used herein shall have the same definitions herein as specified therein.  If, however, a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9.  As used in this Agreement, the following terms shall have the meanings set forth below:

"<u>Additional Documents</u>" has the meaning specified in <u>Section 4.2(d)</u>.

"<u>Adequate Protection Liens</u>" has the meaning specified in the DIP Orders.

"<u>Agreement</u>" has the meaning specified in the preamble hereto.

"<u>Applicable Law</u>" means all applicable provisions of constitutions, statutes, rules, regulations and orders of governmental bodies and orders and decrees of courts and arbitrators.

"<u>Approved Budget</u>" means, initially, the Borrower's initial Budget attached hereto as <u>Exhibit A</u> which Budget has been approved by the Lender as of the date of this Agreement; and thereafter, each roll forward of such Budget or each additional Budget delivered by the Borrower pursuant to <u>Section 5.1</u> of this Agreement and approved by the Lender, in its discretion, in each case, as any such Approved Budget may be amended from time to time with the written consent of the Lender.

"<u>Asset Disposition</u>" means the sale, lease, assignment or other disposition of any asset or property of the Borrower.

"<u>Automatic Stay</u>" means the automatic stay imposed under Section 362 of the Bankruptcy Code.

"<u>Availability Period</u>" means, the period from and including the Closing Date to the earliest of (a) the Maturity Date, (b) the date of termination of the Commitments pursuant to <u>Section 2.7</u> and (c) the date of termination of the Commitments pursuant to <u>Section 9.2</u>.

"<u>Bankruptcy Code</u>" means 11 U.S.C. §101 *et seq.*

"<u>Bankruptcy Court</u>" has the meaning specified in the preliminary statements hereto.

"<u>Bidding Procedures Order</u>" means an order in form and substance satisfactory to the Lender approving the Sale Process and setting forth bidding procedures for the sale of all or substantially all of the Borrower's assets through the Sale Process.

"<u>Borrower</u>" has the meaning specified in the preamble hereto.

"<u>Borrowing</u>" means a borrowing of a Loan pursuant to <u>Section 2.1</u> hereof.

"<u>Budget</u>" means, for any applicable period, the Borrower's thirteen-week cash flow forecast setting forth all sources and uses of cash and beginning and ending cash balances, prepared on a line item basis and including reasonable disclosure of the key assumptions and drivers with respect to such forecast.  The Borrower's initial Budget which has been approved by the Lender as the Approved Budget is attached to this Agreement as <u>Exhibit A</u>.

2

"Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York are authorized or required to close.

"Carve-Out" shall have the meaning assigned to it in the Interim DIP Order or, upon entry of the Final DIP Order, in the Final DIP Order, as applicable.

"Cash Balance Report" has the meaning specified in Section 6.1(b).

"Chapter 11 Case" has the meaning specified in the preliminary statements hereto.

"Closing Date" means the first date all the conditions precedent in Section 8.1 are satisfied or waived by the Lender.

"Closing Fee" has the meaning specified in Section 3.1(a)(i).

"Collateral" means all of the Borrower's assets, including, without limitation, all of the following property and interests in property of the Borrower, wherever located and whether now or hereafter existing or now owned or hereafter acquired or arising, and whether constituting pre-petition property or post-petition property: (i) all Receivables; (ii) all Inventory; (iii) all Equipment; (iv) all Contract Rights; (v) all General Intangibles; (vi) all Investment Property; (vii) each Deposit Account and all certificates of deposit maintained with any bank, savings and loan association, credit union or like organization; (viii) all goods and other property, whether or not delivered, (a) the sale or lease of which gives or purports to give rise to any Receivable, including, but not limited to, all merchandise returned or rejected by or repossessed from customers, or (b) securing any Receivable, including, without limitation, all rights as an unpaid vendor or lienor (including, without limitation, stoppage in transit, replevin and reclamation) with respect to such goods and other property; (ix) all mortgages, deeds to secure debt and deeds of trust on real or personal property, guaranties, leases, security agreements, and other agreements and property which secure or relate to any Receivable or other Collateral, or are acquired for the purpose of securing and enforcing any item thereof; (x) all documents of title, policies and certificates of insurance, securities, Chattel Paper (including electronic chattel paper and tangible chattel paper) and other Documents and Instruments; (xi) all other goods and personal property, whether tangible or intangible, wherever located, including money, supporting obligations, letters of credit, and each Letter-of-Credit right; (xii) all files, correspondence, computer programs, tapes, discs and related data processing software which contain information identifying or pertaining to any of the Receivables, or any Account Debtor, or showing the amounts thereof or payments thereon or otherwise necessary or helpful in the realization thereon or the collection thereof; (xiii) any "commercial tort claims" as that term is defined in the UCC, as set forth on Schedule 1 attached hereto; (xiv) all Intellectual Property; (xv) upon entry of the Final DIP Order, if applicable, any and all proceeds of claims and/or causes of action existing under the Bankruptcy Code, including, but not limited to, proceeds of claims and/or causes of action existing under Sections 542, 544, 547, 548, 549, and/or 550 of the Bankruptcy Code (collectively the "Avoidance Actions"), and (xvi) any and all products and proceeds of the foregoing (including, but not limited to, any claim to any item referred to in this definition, and any claim against any third party for loss of, damage to or destruction of any or all of, the Collateral or for proceeds payable under, or unearned premiums with respect to, policies of insurance) in whatever form, including, but not limited to, cash, negotiable instruments and other instruments for the payment of money, Chattel Paper, security agreements and other documents.

"Commitment" means the Lender's obligation to make Loans to the Borrower pursuant to Section 2.1(a) of this Agreement in an aggregate principal amount at any time outstanding not to exceed $6,650,000, or such lesser amount as may be approved by the Bankruptcy Court, provided, however, prior to the Final Order Entry Date, the amount shall not exceed the Interim Commitment Amount.

"Committee" means an official committee of creditors holdings unsecured claims, if appointed by the Office of the United States Trustee in respect of the Chapter 11 Case pursuant to Section 1102(a) of the Bankruptcy Code.

"Contract Rights" means any rights under contracts not yet earned by performance and not evidenced by an instrument or chattel paper.

"Controlled Account" means each deposit account and securities account that is subject to a Lien and the Borrower shall in good faith seek entry into a "springing" account control agreement with the applicable depository bank or investment institution, in favor of the Lender and in form and substance satisfactory to the Lender].

"Default" shall mean an event or condition the occurrence of which would, with the lapse of time or the giving of notice, or both, become an Event of Default.

"DIP Liens" has the meaning specified in the DIP Orders.

"DIP Orders" shall mean the Interim DIP Order and the Final DIP Order and any amendment, modification or supplement thereto in form and substance acceptable to the Lender in its sole discretion.

"Dollar" and "$" means lawful money of the United States.

"Equipment" means and includes, all machinery, apparatus, equipment, motor vehicles, tractors, trailers, rolling stock, fittings, fixtures and other tangible personal property (other than Inventory) of every kind and description used in the Borrower's business operations or owned by the Borrower or in which the Borrower has an interest, and all parts, accessories and special tools and all increases and accessions thereto and substitutions and replacements therefor.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, including (unless the context otherwise requires) any rules or regulations promulgated thereunder.

"ERISA Event" means (a) the occurrence of a reportable event, within the meaning of Section 4043 of ERISA, unless the 30-day notice requirement with respect thereto has been waived by the PBGC; (b) the provision by the administrator of any ERISA Plan of a notice of intent to terminate such ERISA Plan, pursuant to Section 4041(a)(2) of ERISA (including any such notice with respect to a plan amendment referred to in Section 4041(e) of ERISA); (c) the cessation of operations at a facility in the circumstances described in Section 4068(f) of ERISA; (d) the withdrawal by any Borrower or any ERISA Affiliate from a Multiple Employer Plan (as defined in ERISA) during a plan year for which it was a substantial employer, as defined in 4001(a)(2) of ERISA; (e) the failure by any Borrower or any ERISA Affiliate to make a material payment to an ERISA Plan required under Section 302(f)(1) of ERISA; (f) the adoption of an amendment to an ERISA Plan requiring the provision of initial or additional security to such ERISA Plan, pursuant to Section 307 of ERISA; or (g) the institution by the PBGC of proceedings to terminate an ERISA Plan, pursuant to Section 4042 of ERISA, or the occurrence of any event or condition which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, an ERISA Plan.

"ERISA Plan" means any employee benefit or other plan established or maintained, or to which contributions have been made, by any Borrower or any Subsidiary and covered by Title IV of ERISA or to which Section 412 of the IRC applies.

"Exit Fee" has the meaning specified in Section 3.1(a)(ii).

"<u>Extraordinary Receipt</u>" means any payments received by the Borrower in respect of (a) proceeds of judgments, proceeds of settlements, or other consideration of any kind received in connection with any cause of action or claim, (b) indemnity payments, (c) tax refunds, and (d) any other transaction outside of the ordinary course of business.

"<u>Event of Default</u>" means an event described in <u>Section 9.1</u> of this Agreement provided that any requirement for notice or lapse of time or any other condition has been satisfied.

"<u>Facility</u>" means, at any time, (a) the amount of the Commitment at such time, and (b) the aggregate principal amount of the Loans outstanding at such time.

"<u>Final DIP Order</u>" shall mean the final order entered by the Bankruptcy Court, in form and substance satisfactory to the Lender in its sole discretion, entered in the Chapter 11 Case pursuant to Section 364 of the Bankruptcy Code approving this Agreement and the other Loan Documents on a final basis, confirming the Interim DIP Order and authorizing (a) the Borrower to obtain credit as contemplated hereunder, (b) to incur the Obligations and grant Liens under the Loan Documents and (c) the Borrower to use cash collateral.

"<u>Final Order Entry Date</u>" means the date on which the Final DIP Order is entered on the docket of the Bankruptcy Court.

"<u>Final Roll-Up Loans</u>" has the meaning specified in <u>Section 2.1(c)</u>.

"<u>Financing Statements</u>" means any and all UCC financing statements, in form and substance satisfactory to Lender, naming the Lender as secured party, and the Borrower as debtor, whether executed and delivered by the Borrower or the Lender or otherwise authorized by the Borrower.

"<u>GAAP</u>" means generally accepted accounting principles consistently applied and maintained throughout the period indicated, consistent with the prior financial practices of Borrower.

"<u>Governmental Approvals</u>" means all authorizations, consents, approvals, licenses and exemptions of, registrations and filings with, and reports to, all governmental bodies, whether federal, state, local or foreign national or provincial and all agencies thereof.

"<u>Governmental Authority</u>" means any federal, state or local government, any subdivision thereof, and any agency, entity, instrumentality or authority owned or controlled thereby.

"<u>Guaranty Obligation</u>" means as to any Person, any obligation of such Person guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "<u>Primary Obligations</u>") of any other person (the "<u>Primary Obligor</u>") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent (a) to purchase any such Primary Obligation or any Property constituting direct or indirect security therefore, (b) to advance or supply funds (i) for the purchase or payment of any such Primary Obligation or (ii) to maintain working capital or equity capital of the Primary Obligor or otherwise to maintain the net worth or solvency of the Primary Obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such Primary Obligation of the ability of the Primary Obligor to make payment of such Primary Obligation, or (d) otherwise to assure or hold harmless the owner of any such Primary Obligation against loss in respect thereof; provided, that, notwithstanding the foregoing, the term Guaranty Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guaranty Obligation shall be deemed to be an amount equal to the stated or determinable amount of the Primary Obligation in respect of which such Guaranty Obligation is made or, if not stated or

5

determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith.

"Indebtedness" means at any time and with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all indebtedness of such Person for the deferred purchase price of property or services (other than property, including Inventory, and services purchased, and trade payables, other expense accruals and deferred compensation items arising, in the ordinary course of business, including negotiated trade terms and Chapter 11 expense accruals), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (other than performance, surety and appeal bonds arising in the ordinary course of business), (d) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all capital lease obligations of such Person, (f) all reimbursement, payment or similar obligations of such Person, contingent or otherwise, under acceptance, letter of credit or similar facilities, (g) all Guaranty Obligations of such Person in respect of indebtedness of others referred to in clauses (a) through (f) above, and (h) all indebtedness referred to in clauses (a) through (g) above secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness.

"Intellectual Property" means all now owned or hereafter acquired right, title and interest in trade names, trademarks, trade secrets, service marks, data bases, software and software systems, including the source and object codes, information systems, discs, tapes, customer lists, telephone numbers, credit memoranda, goodwill, patents, patent applications, patents pending, copyrights, royalties, literary rights, licenses, and franchises, together with (a) all income, royalties, damages, claims and payments now or hereafter due and/or payable under and with respect thereto, including, without limitation, damages and payments for past and future infringements thereof, (b) rights to sue for past, present and future infringements thereof, and (c) all rights corresponding to any of the foregoing throughout the world.

"Interest Rate" means a fixed rate of twelve percent (12%) per annum, or after the occurrence and during the continuance of an Event of Default, a fixed rate of fifteen percent (15%) per annum.

"Interest Payment Date" means, the last day of each calendar month (or, if such day is not a Business Day, the next succeeding Business Day) and the Maturity Date.

"Interim Commitment Amount" means an aggregate principal amount equal to $3,000,000, or such lesser amount as may be approved by the Bankruptcy Court.

"Interim DIP Order" means an interim order of the Bankruptcy Court, substantially in the form attached hereto as Annex II (or in the form and substance satisfactory to the Lender in its sole discretion), entered in the Chapter 11 Case pursuant to Section 364 of the Bankruptcy Code, approving this Agreement and the other Loan Documents on an interim basis and authorizing, among other things, (a) the Borrower to obtain credit as contemplated hereunder, (b) the Borrower to incur the Obligations and grant Liens under the Loan Documents, and (c) the Loan Parties to use cash collateral.

"Interim Order Entry Date" means the date on which the Interim DIP Order is entered on the docket of the Bankruptcy Court.

"Interim Roll-Up Loans" has the meaning specified in Section 2.1(c).

"Internal Revenue Code" means the Internal Revenue Code of 1986, as in effect from time to time.

6

"Investment" has the meaning specified in Section 7.4.

"Inventory" means all "inventory" as such term is defined in the UCC and shall include, without limitation, all documents evidencing and General Intangibles relating to any of the foregoing.

"Lender" has the meaning specified in the preamble hereto.

"Lien" means:  (a) any mortgage, deed to secure debt, deed of trust, lien, pledge, charge, lease, conditional sale or other title retention agreement, or other security interest, security title or encumbrance of any kind in respect of any property of such Person, or upon the income or profits therefrom, (b) any arrangement, express or implied, under which any property is transferred, sequestered or otherwise identified for the purpose of subjecting the same to the payment of debt or performance of any other obligation in priority to the payment of general, unsecured creditors, and (c) the filing of, or any agreement to give, any financing statement under the Uniform Commercial Code or its equivalent in any jurisdiction, excluding informational financing statements relating to leased property.

"Loan(s)" means each advance of funds by the Lender to the Borrower pursuant to Section 2.1(a).

"Loan Documents" means collectively this (a) Agreement, (b) the Security Documents, (c) the DIP Orders and (d) each other instrument, agreement or document executed by the Borrower, and any and all amendments, restatements, modifications and/or supplements to all such documents.

"Material Adverse Effect" means a material adverse effect on one or more of the following:  (a) the business, operations or condition (financial or otherwise) of the Borrower; (b) the ability of the Borrower to perform its obligations under any of the Loan Documents; (c) the rights or remedies of the Lender; or (d) the validity, enforceability or priority of the Liens granted to the Lender to secure the Obligations; provided that, the filing of the Chapter 11 Case, the events leading to the filing of the Chapter 11 Case, the events that typically result from the filing of a case under Chapter 11 of the Bankruptcy Code shall not constitute a Material Adverse Effect.

"Material Contract" means any contractual obligation of the Borrower pursuant to which the aggregate payments to be made by the Borrower or the aggregate liabilities to incurred by the Borrower thereunder exceed $50,000 in any year or $250,000 during the term hereof.

"Material Indebtedness" means Indebtedness (other than the Loans) of the Borrower in aggregate principal amount exceeding $50,000.

"Maturity Date" means, the earliest of (a) [_____, 2025], (b) the date the Borrower enters into (or files a motion with the Bankruptcy Court or otherwise supports another Person taking action to pursue the Bankruptcy Court for approval of) a purchase agreement relative to any assets of the Borrower, unless such purchase agreement is entered into in connection with the Sale Process or expressly consented to in writing by the Lender, (c) the consummation of a sale of all or substantially all of the assets of the Borrower pursuant to Section 363 of the Bankruptcy Code or otherwise, (d) the effective date of a Plan of Reorganization or plan of liquidation in the Chapter 11 Case, or (e) the date of filing or support by the Borrower of a Plan of Reorganization that (i) does not provide for indefeasible payment in full in cash of all Obligations in connection with the Facility and all outstanding obligations in connection with the Prepetition Note Documents or (ii) is not otherwise acceptable to the Lender in its sole discretion.  **[NOTE: STATED MATURITY TO BE 180 DAYS AFTER CLOSING DATE.]**

"Maximum Lawful Rate of Interest" means a rate of interest equal to the highest rate of interest that may be charged under applicable laws or regulations in effect from time to time.

7

"Milestones" means each of the covenants set forth on Schedule 5.14.

"Net Proceeds" means (a) with respect to any Asset Disposition or any Extraordinary Receipt, proceeds received by the Borrower in cash (including, without limitation, payments under notes or other debt securities received in connection therewith), net of (i) the reasonable out of pocket transaction costs of such sale, lease, transfer or other disposition payable to Persons who are not affiliates of the Borrower, and/or (ii) any tax liability arising from such transaction, and (b) with respect to the sale or issuance of any equity interests by Borrower or any incurrence of any Indebtedness by the Borrower, proceeds received by the Borrower in cash, net of (i) reasonable and documented underwriting discounts and commissions, and (ii) reasonable and customary out of pocket expenses incurred by the Borrower in connection therewith and not payable to an affiliate of the Borrower.

"Notice of Borrowing" means a written notice in substantially the form of Exhibit A executed by an authorized officer of the Borrower requesting a Borrowing, which is given in accordance with the applicable provisions of this Agreement and which specifies (a) the amount of the requested Borrowing, and (b) the date of the requested Borrowing.

"Obligations" means, in each case whether now in existence or hereafter arising, (a) the principal of, and interest and premium, if any, on, the Loans, and (b) all other indebtedness, liabilities, obligations, covenants and duties of the Borrower to the Lender of every kind, nature and description arising under this Agreement, or any of the other Loan Documents, or in connection with the Facility, whether direct or indirect, absolute or contingent, due or not due, contractual or tortious, liquidated or unliquidated, and whether or not evidenced by any note, and whether or not for the payment of money, including without limitation, fees, costs, charges, indemnities and expenses required to be paid or reimbursed pursuant to this Agreement or any of the Loan Documents.

"PBGC" means the Pension Benefit Guaranty Corporation and any entity succeeding to any or all of its functions under ERISA.

"Permitted Liens" means: (a) Liens for Taxes, assessments or governmental charges or levies not yet due and payable or Liens for Taxes, assessments or governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves have been established and which proceedings have the effect of preventing the forfeiture or sale of the property or asset subject to such Lien, (b) Liens in respect of property or assets of the Borrower arising by operation of law, which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's and mechanics' Liens and other similar Liens arising in the ordinary course of business which in each such circumstance (i) do not individually or in the aggregate materially detract from the value of the property or assets of the Borrower and do not materially impair the use thereof in the operation of the business of the Borrower or (ii) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or asset subject to such Lien and for which adequate reserves have been established Liens consisting of deposits or pledges made in the ordinary course of business in connection with, or to secure payment of, obligations under workers' compensation, unemployment insurance or similar legislation or under payment or performance bonds, (c) other Liens on real property owned by Borrower in the nature of zoning restrictions, easements, and rights or restrictions of record on the use of real property, which do not materially detract from the value of such property or impair the use thereof in the business of Borrower, (d) purchase money Liens, (e) customary banker's and similar Liens in respect to Deposit Accounts, and (g) Prepetition Liens.

"Permitted Variance" has the meaning specified in Section 6.13.

"<u>Person</u>" means any individual, limited liability company, corporation, partnership, association, trust or unincorporated organization, or a government or any agency or political subdivision thereof.

"<u>Petition Date</u>" has the meaning specified in the preliminary statements hereto.

"<u>PIK Interest</u>" has the meaning specified in <u>Section 2.3(b)</u>.

"<u>Plan of Reorganization</u>" means a Chapter 11 plan of reorganization submitted by the Borrower to the Bankruptcy Court in connection with the Chapter 11 Case, and as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"<u>Prepetition Collateral</u>" means any and all "Collateral" (as defined under the Prepetition Security Documents) that the Borrower has pledged, or purported to have pledged, to secure the Prepetition Obligations.

"<u>Prepetition Liens</u>" means the Liens on the Prepetition Collateral securing the Prepetition Obligations pursuant to the Prepetition Security Documents as in effect prior to the Petition Date.

"<u>Prepetition Note Purchase Agreement</u>" has the meaning specified in the preliminary statements hereto.

"<u>Prepetition Note Documents</u>" means the Prepetition Note Purchase Agreement, the Prepetition Secured Note, the Prepetition Security Documents, and all other documents, notes, agreements and instruments entered into in connection therewith, as any of the same have been amended, restated, supplemented or otherwise modified on or before the Petition Date, as in effect on such date.

"<u>Prepetition Obligations</u>" means all of the indebtedness and obligations due and owing by the Borrower and/or any other obligor to the Lender under the Prepetition Note Documents as of the Petition Date, whether direct or indirect, absolute or contingent, primary or secondary, due or to be come due, including all interest thereon accruing after the Petition Date and all reasonable legal fees and collection expenses heretofore incurred by the Lender in collecting any of such indebtedness, liabilities or obligations, as reduced by payments applied thereto after the Petition Date.

"<u>Prepetition Priority Liens</u>" means any perfected, senior, valid, prior and unavoidable Liens on the assets of the Borrower that are validly existing immediately prior to the Petition Date which were as a matter of law, senior to the Prepetition Liens pursuant to the DIP Orders and expressly indicated as "Prepetition Priority Liens" on <u>Schedule 5.6(a)</u> hereto.

"<u>Prepetition Secured Note</u>" has the meaning specified in the preliminary statements hereto.

"<u>Prepetition Security Documents</u>" means (a) that certain Security Agreement, dated as of July 23, 2024, by and between the Borrower and the Lender, (b) that certain Patent Security Agreement, dated as of July 23, 204, made by the Borrower in favor of the Lender, (c) that certain Trademark Security Agreement, dated as of July 23, 2024, made by the Borrower in favor of the Lender, and (d) any and all other pledge agreements, account control agreements, mortgages, deeds of trust, assignments, financing statements, continuation statements, extension agreements, and other documents, instruments or agreements now, hereafter or heretofore delivered by the Borrower or any other obligor granting (or purporting to grant) a Lien in favor of the Lender to secure the Prepetition Obligations.

"<u>Proposed Budget</u>" has the meaning specified in <u>Section 6.1</u>.

"<u>Proprietary Rights</u>" means all of the Borrower's now owned and hereafter arising or acquired patents, patent applications, inventions and improvements, copyrights, copyright applications, literary rights, trademarks, trademark applications, trade names, trade secrets, service marks, data bases, computer software and software systems, including the source and object codes, information systems, discs, tapes, customer lists, telephone numbers, credit memoranda, goodwill, licenses, and other intangible property, and all other rights under any of the foregoing, all extensions, renewals, reissues, divisions, continuations, and continuations-in-part of any of the foregoing, all income, royalties, damages, claims and payments now or hereafter due and/or payable under or with respect thereto, including without limitation, damages and payments for past and future infringement thereof, and all rights to sue for past, present and future infringement of any of the foregoing.

"<u>Receivable</u>" means and includes (a) any and all rights to the payment of money or other forms of consideration of any kind (whether classified under the UCC as Accounts, Contract Rights, Chattel Paper, General Intangibles, or otherwise) including, but not limited to, Accounts, Letters-of-Credit rights, Chattel Paper, tax refunds, insurance proceeds, Contract Rights, notes, drafts, Instruments, Documents, acceptances, and all other debts, obligations and liabilities in whatever form from any Person, (b) all guarantees, security and Liens for payment thereof, (c) all goods, whether now owned or hereafter acquired, and whether sold, delivered, undelivered, in transit or returned, which may be represented by, or the sale or lease of which may have given rise to, any such right to payment or other debt, obligation or liability, and (d) all proceeds of any of the foregoing.

"<u>Roll-Up</u>" means the substitution and exchange of Prepetition Obligations (including all unpaid and accrued interest, fees, expenses and other obligations owing under the Prepetition Note Documents) as of each of the Interim Order Entry Date and the Final Order Entry Date for post-petition Obligations through the deemed incurrence by the Borrower of Roll-Up Loans on each such date, in each case, as set forth in <u>Section 2.1(c)</u> and in the Interim Order and the Final Order, as applicable.

"<u>Roll-Up Loans</u>" has the meaning specified in <u>Section 2.1(c)</u>.

"<u>Sale Motion</u>" means a motion, in form and substance acceptable to the Lender, for authority to sell all or substantially all of the assets of the Borrower to the highest bidder (or to a stalking horse bidder subject to higher and better offers) pursuant to the Sale Process, which motion shall acknowledge the Lender's right to credit bid with respect to any bulk or piecemeal sale of all or any portion of the Borrower's assets and seek approval of the Lender's credit bid as the stalking horse bid in connection with the Sale Process.

"<u>Sale Order</u>" means an order, in form and substance satisfactory to the Lender, which approves the sale of all or substantially all of the Borrower's assets  to the stalking horse bidder or the highest bidder following an auction in accordance with the approved bidding procedures.

"<u>Sale Process</u>" means the implementation of bidding and sale procedures in respect of all or substantially all of the Borrower's assets and property, approved by one or more orders of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order), each in form and substance satisfactory to the Lender.

"<u>Security Documents</u>" means, collectively, all security agreements, pledge agreements, account control agreements, mortgages, deeds of trust, assignments, financing statements, continuation statements, extension agreements, and other documents, instruments or agreements now, hereafter or heretofore delivered by any Person to Lender securing the payment of any part of the Obligations or the performance of the Borrower's duties and obligations under the Loan Documents, including, without limitation, the

Prepetition Security Documents.  For purposes of clarification it is noted that all of the Prepetition Security Documents shall continue to effectively secure the Prepetition Obligations in addition to the Obligations.

"<u>Security Interest</u>" means the Liens of Lender on and in the Collateral created or effected hereby or by any of the Security Documents, the DIP Orders or pursuant to the terms hereof or thereof.

"<u>Termination Date</u>" means the date on which each of the following has occurred: (a) all of the Obligations have been indefeasibly paid in full by the Borrower, (b) the Commitment of the Lender has been terminated and Lender shall have no further obligations to make any Loans or other financial accommodations to the Borrower under this Agreement, (c) unless the Challenge Period (as defined in the DIP Orders) has expired or been terminated by all applicable parties in writing with no asserted Challenge (as defined in the DIP Orders) having been brought or threated against the Lender with respect to the Prepetition Debt, the Prepetition Loan Documents, the Prepetition Liens or otherwise, the Borrower shall have deposited with the Lender cash collateral in an amount required by the Lender in its discretion to secure the Borrower's continued indemnification obligations under this Agreement and the other Loan Documents, and (d) the Borrower shall have released the Lender from all claims and liabilities pursuant to a release in form and substance satisfactory to the Lender.

"<u>UCC</u>" means the Uniform Commercial Code as in effect from time to time in the state of New York; <u>provided</u> that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "<u>UCC</u>" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"<u>Variance Report</u>" has the meaning specified in <u>Section 6.1(c)</u>.

"<u>Weekly Lender Call Date</u>" has the meaning specified in <u>Section 6.11(b)</u>.

1.2    <u>Other Interpretive Provisions</u>.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any organization document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, preliminary statements, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and preliminary statements, Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law or regulation shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "<u>asset</u>" and "<u>property</u>"

11

shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)     Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

## ARTICLE II LOANS

2.1     Loans.

(a)     Subject to the terms and conditions set forth herein or in any DIP Order, the Lender agrees to make advances (each such advance, a "Loan") to the Borrower, as follows:  (i) on the Closing Date, one (1) Borrowing in an amount equal to the Interim Commitment Amount, and (ii) on the Final Order Entry Date one (1) additional Borrowing in an amount not to exceed the remaining amount of the Commitment.  The Loans extended on the applicable Borrowing date shall be used solely in accordance with the Approved Budget.  Notwithstanding anything to the contrary set forth herein, the principal amount of the Loans to be made by the Lender shall be subject to reduction (but not increase) to any lesser such amount approved by the Bankruptcy Court pursuant to the Interim DIP Order and/or the Final DIP Order, as applicable.

(b)     Upon the making of each Loan hereunder a portion of the Commitment in the amount of such Loan shall be automatically extinguished. Amounts borrowed under Section 2.1(a) and repaid or prepaid may not be reborrowed.

(c)     Subject to the terms and conditions set forth herein and in any DIP Order, (i) upon entry of the Interim DIP Order, a portion of the Prepetition Obligations shall be automatically substituted and exchanged for (and repaid by) Loans hereunder in an amount equal to $1.00 of Prepetition Obligations for each $1.00 of Loans funded pursuant to Section 2.1(a)(i) above (the "Interim Roll-Up Loans"), which Interim Roll-Up Loans shall be deemed funded on the Closing Date, and shall constitute and be deemed to be Loans hereunder as of such date, and (ii) upon the Final Order Entry Date, the entire remaining amount of the Prepetition Obligations shall be automatically substituted and exchanged for (and repaid by) Loans hereunder (the "Final Roll-Up Loans" and, together with the Interim Roll-Up Loans, collectively, the "Roll-Up Loans"), which Final Roll-Up Loans shall be deemed funded on the Final Order Entry Date, and shall constitute and shall be deemed to be Loans for all purposes hereunder and under the other Loan Documents as of such date.  Upon entry of each of the Interim DIP Order and the Final DIP Order and the exchange of Prepetition Obligations for Roll-Up Loans hereunder on the Closing Date and the Final Order Entry Date, as applicable, that portion of the Prepetition Obligations so exchanged shall (A) no longer constitute Prepetition Obligations under the Prepetition Note Documents and (B) deemed Loans and Obligations hereunder.

2.2     Borrowing Procedures.

(a)     Each Borrowing shall be made upon the Borrower's delivery to the Lender of a Notice of Borrowing signed by an authorized officer of the Borrower.  Each Notice of Borrowing shall be irrevocable upon delivery and must be received by the Lender no later than 1:00 p.m. three

(3) Business Days (or such shorter period as shall be acceptable to the Lender) prior to the date of any requested Borrowing; *provided* that no such notice shall be required for the deemed funding of Roll-Up Loans pursuant to <u>Section 2.1(c)</u>. Each Notice of Borrowing shall specify (i) the requested date of the Borrowing (which shall be a Business Day) and (ii) the principal amount of Loans to be borrowed (excluding any resulting Roll-up Loans).

(b)     Upon satisfaction of the applicable conditions set forth in <u>Section 8.2</u> (and, if such Borrowing is on the Closing Date, <u>Section 8.1</u>), the Lender shall make funds available to the Borrower by wire transfer of such funds in accordance with instructions provided to (and reasonably acceptable to) the Lender by the Borrower.

2.3     <u>Interest</u>.

(a)     Interest shall accrue on the outstanding principal balance of the Loans at the Interest Rate until paid in full. All interest accrued on the outstanding principal balance of the Loans shall be calculated on the basis of a year of three hundred sixty (360) day year and the actual number of days elapsed in each month.

(b)     Interest on each Loan shall be due and payable in arrears on each Interest Payment Date and shall be paid by the Borrower by capitalizing such accrued interest on such Interest Payment Date and adding it to (and thereby increasing) the outstanding principal amount of the Loans on such Interest Payment Date ("<u>PIK Interest</u>"); provided, however, that PIK Interest shall not be included in the determination of the amount of Loans available hereunder.

(c)     The Lender does not intend to charge interest at a rate in excess of the highest rate permitted by Applicable Law. Any excess interest charges paid by the Borrower to the Lender shall be applied to reduce the outstanding principal balance of the Obligations.

2.4     <u>Charges to Loan Account</u>. At the Lender's option, exercised in the Lender's sole discretion, the Lender may (a) treat fees, costs, expenses, and other charges and amounts provided for in this Agreement or in any other Loan Documents as a Loan or (b) disburse such amount by way of direct payment, which such disbursement shall be deemed to be a Loan. Loans made under this <u>Section 2.4</u> shall reduce the Commitment and shall not reduce the aggregate amount of Loans available to the Borrower hereunder.

2.5     <u>Prepayments</u>.

(a)     <u>Optional</u>. The Borrower, may, upon notice to the Lender, at any time or from time to time voluntarily prepay the Loans in whole or in part, provided that (i) such notice must be received by the Lender not later than 11:00 a.m. three (3) Business Days prior to any date of prepayment of Loans; and (ii) any prepayment of Loans shall be in a principal amount of $250,000 or a whole multiple of $50,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment. Each notice of prepayment delivered by the Borrower pursuant to this <u>Section 2.5(a)</u> shall be irrevocable, and if such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.

(b)     <u>Mandatory</u>.

(i)       If the Borrower consummates any Asset Disposition (other than such dispositions expressly permitted by Section 7.1), the Borrower shall prepay the Loans in an amount equal to 100% of the Net Proceeds resulting therefrom, within two (2) Business Days upon receipt thereof by the Borrower.

(ii)      Upon receipt by the Borrower of any cash capital contribution to the Borrower or of the proceeds of the issuance of equity interests by the Borrower, the Borrower shall prepay the Loans in an amount equal to 100% of the Net Proceeds received therefrom, within two (2) Business Days upon receipt thereof by the Borrower.

(iii)     Upon the incurrence or issuance by the Borrower of any Indebtedness (other than Indebtedness expressly permitted to be incurred or issued pursuant to Section 7.10), the Borrower shall prepay the Loans in an amount equal to 100% of the Net Proceeds received therefrom within two (2) Business Days upon receipt thereof by the Borrower.

(iv)      Upon any Extraordinary Receipt received by or paid to or for the account of the Borrower, the Borrower shall prepay the Loans in an amount equal to 100% of the Net Proceeds received therefrom within two (2) Business Days upon receipt thereof by the Borrower.

2.6      Repayment of the Loans.  The Borrower shall repay to the Lender the entire principal amount of the Loans and all other outstanding Obligations (other than contingent indemnification obligations for which no claim shall have then been asserted) on the Maturity Date.

2.7      Termination or Reduction of the Commitment.

(i)       The Commitment, if not sooner terminated, shall terminate on the earlier to occur of the Maturity Date and the last day of the Availability Period.

(ii)      Upon the Borrowing of a Loan, the amount of the Commitment outstanding at the time of such Borrowing shall be reduced by the aggregate amount of the Loans funded (or, in the case of Roll-up Loans, deemed funded) on the date of such Borrowing.

2.8      Priority of All Advances and Loans.  All advances and loans made hereunder by the Lender to the Borrower shall constitute and be deemed a cost and expense of administration in the Chapter 11 Case and shall be entitled to priority under Section 364(c)(1) of the Bankruptcy Code ahead of all other costs and expenses of administration of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 of the Bankruptcy Code, except as may be otherwise provided in the DIP Orders.

2.9      Use of Company Cash.  For all purposes of the Loan Documents and otherwise, all cash disbursements made by the Borrower on and after the Petition Date are deemed to have been funded with cash on hand in the Borrower's deposit accounts as of the Petition Date, to the extent of the full amount of such cash balances on such date, before any cash proceeds of Loans are expended.  All cash proceeds of Loans shall be deemed to be Cash Collateral (as defined in the DIP Orders) of the DIP Lender for all purposes of the Loan Documents and the DIP Orders.

## ARTICLE III FEES, COSTS AND EXPENSES

3.1      Fees, Costs and Expenses.

(a)  <u>Fees</u>.  In consideration of the Lender making the Facility hereunder available to the Borrower, the Borrower agrees to pay the following fees to the Lender:

(i)  <u>Closing Fee</u>.  A closing fee (the "<u>Closing Fee</u>") in an amount equal to $133,000.  The entire amount of the Closing Fee shall be fully earned, due and owing on the Closing Date and shall be payable in cash on the Maturity Date.

(ii)  <u>Exit Fee</u>.  An exit fee (the "<u>Exit Fee</u>") in an amount equal to $133,000.  The entire amount of the Exit Fee shall be fully earned, due and owing on the Closing Date and shall be payable in cash on the earlier of (x) the date on which the Borrower repays the Obligations in full hereunder or (y) the Maturity Date.

(b)  <u>Lender Expenses; Fees Generally</u>.  The Borrower agrees to reimburse the Lender for all reasonable out-of-pocket expenses incurred by the Lender in connection with the Facility established by this Agreement, any and/or all of the Loan Documents, the Loans, including, but not limited to, filing fees, tax, lien and judgment search fees, fees of outside auditors, consultants, attorneys' fees, and any other reasonable fees or expenses, and further including all such fees, costs and expenses incurred for periods prior to the Petition Date.  All fees payable hereunder will be payable in Dollars in immediately available funds to the Lender, free and clear of, and without deduction for, any and all present or future applicable taxes, levies, imposts, deductions, charges or withholdings and all liabilities with respect thereto.  Once paid, no fee will be refundable under any circumstances and will not be subject to counterclaim setoff or otherwise affected.

**ARTICLE IV GRANT OF SECURITY INTEREST**

4.1  <u>Grant of Security Interest</u>.  To secure the payment, performance and observance of the Obligations, the Borrower hereby grants and assigns, mortgages, hypothecates and pledges, to Lender all of the Collateral, and grants to Lender a continuing security interest in, and a Lien upon, and a right of set off against, all of the Collateral.  The Borrower acknowledges that the Security Interest granted to the Lender pursuant to this Article IV and the DIP Orders is and continues to be a valid and perfected, first priority security interest and Lien upon the Collateral.  This Agreement is intended to create a new lending relationship between the Lender and the Borrower, in addition to the pre-petition lending relationship.

4.2  <u>Continued Priority of Security Interest</u>.

(a)  The Security Interest granted by the Borrower shall at all times be valid, perfected and enforceable against the Borrower and all third parties in accordance with the terms of this Agreement, as security for the Obligations, and the Collateral shall not be at any time subject to any Liens that are prior to, or on parity with or junior to the Security Interest, other than Permitted Liens or as may be provided in the DIP Orders.  The Borrower represents and warrants to the Lender that no Person holding a Permitted Lien has a security interest in the Collateral superior in priority to the Security Interest granted under this Agreement.

(b)  The Borrower shall, at its sole cost and expense, take all action that may be necessary or desirable, or that the Lender may reasonably request, so as at all times to maintain the validity, perfection, enforceability and rank of the Security Interest in the Collateral in conformity with the requirements of <u>Section 4.2(a)</u>, or to enable the Lender to exercise or enforce its rights hereunder.

(c)  The Borrower covenants and agrees with Lender that from and after the Agreement Date and until the Termination Date:

(i)        In the event that any Collateral, including proceeds, is evidenced by or consists of negotiable collateral (including without limitation letters of credit, Letter-of-Credit rights, instruments, promissory notes, draft documents or chattel paper (including electronic and tangible chattel paper)), and if  and to the extent that perfection or priority of the Lender's Security Interest is dependent on or enhanced by possession, the Borrower shall endorse and deliver physical possession of such negotiable collateral or chattel paper to the Lender.

(ii)        The Borrower shall take all steps reasonably necessary to grant the Lender control of all electronic chattel paper in accordance with the UCC and all "transferable records" as defined in each of the Uniform Electronic Transaction Act and the Electronic Signatures in Global and National Commerce Act; and

(iii)        If the Borrower retains possession of any chattel paper or instruments with the Lender's consent, such chattel paper and instruments shall be marked with the following legend:  "This writing and the obligations evidenced or secured thereby are subject to the security interest of BREAKTHROUGH ENERGY VENTURES II, L.P..."

(d)        At any time upon the request of the Lender, the Borrower shall execute (or cause to be executed) and deliver to the Lender, any and all financing statements, original financing statements in lieu of continuation statements, fixture filings, security agreements, pledges, assignments, endorsements of certificates of title, and all other documents (the "Additional Documents") that the Lender may request in its discretion, in form and substance satisfactory to the Lender, to perfect and continue the perfection of or better perfect the Lender's Security Interest in the Collateral (whether now owned or hereafter arising or acquired), and in order to consummate fully all of the transactions contemplated hereby and under the other Loan Documents.  To the maximum extent permitted by Applicable Law, the Borrower authorizes the Lender to execute any such Additional Documents in the Borrower's name and authorizes the Lender to file such executed Additional Documents in any appropriate filing office.  The Borrower authorizes the Lender to transmit, communicate or, as applicable, file any financing statement under the UCC, record, in-lieu financing statement, amendment, correction statement, continuation statement, termination statement or other instrument describing the Collateral as defined herein, as "all personal property of Debtor" or "all assets of Debtor" or words of similar effect in such jurisdictions and in such filing offices as the Lender may deem necessary or desirable in order to perfect any security interest granted by the Borrower under this Agreement and the other Loan Documents without signature. The Borrower hereby ratifies, to the extent necessary, the Lender's authorization to file a financing statement, if such financing statement has been pre-filed by the Lender prior to the Agreement Date.  Prior to repayment in full and final discharge of the Obligations, the Borrower shall not terminate, amend or file a correction statement with respect to any financing statement filed pursuant to this Section 4.2(d) without the Lender's prior written consent.

(e)        Set forth on Schedule 4.2(e) are all of the Commercial Torts Claims (as that term is defined in the UCC) owned by the Borrower as of the Closing Date.  The Borrower shall promptly notify the Lender in writing upon incurring or otherwise obtaining a Commercial Tort Claim after the date hereof against any third party and, upon request of the Lender, promptly amend Schedule 4.2(e), authorize the filing of additional or amendments to existing financing statements and do such other acts or things deemed necessary or desirable by the Lender to give the Lender a security interest in any such Commercial Tort Claim.

(f)     The Borrower shall mark its books and records as directed by the Lender and as may be necessary or appropriate to evidence, protect and perfect the Security Interest and shall cause its financial statements to reflect the Security Interest.

(g)     The Lender shall not be required to (but may, in its discretion) file any UCC-1 financing statements, mortgages or any other document, obtain deposit account or security account control agreements, or take any other action (including possession of any of the Pre-Petition Collateral or Post-Petition Collateral) in order to validate or perfect the Liens and security interests granted to the Lender hereunder or under any of the other Loan Documents, as all such Liens and security interests shall be deemed automatically perfected as of the date of the Interim DIP Order. If the Lender shall, in its discretion, choose to file such UCC-1 financing statements (or amendments to or continuations of any existing financing statements), mortgages and otherwise confirm perfection of such Liens, all such financing statements, mortgages or similar instruments shall be deemed to have been filed or recorded at the time and on the date of entry of the Interim DIP Order. The Lender may, in its discretion, file a certified copy of the Interim DIP Order or the Final DIP Order in any filing or recording office in any jurisdiction in which the Borrower (a) has or maintains any Collateral; (b) has or maintains any office; or (c) is organized.

4.3     Liens Under DIP Orders.  The Liens and security interests granted to the Lender pursuant to the provisions of this Agreement and pursuant to any of the other Loan Documents shall be in addition to all Liens conferred upon the Lender by the Bankruptcy Court pursuant to the terms of the DIP Orders. Anything contained in this Agreement or any other Loan Document to the contrary notwithstanding, except as specifically permitted herein, the Borrower has no authority, express or implied, to dispose of any item or portion of the Collateral.

4.4     Priority of Liens; Further Assistance.

(a)     The Liens granted pursuant to the terms of this Agreement and the other Loan Documents, and the Liens conferred upon Lender pursuant to the DIP Orders, shall constitute (i) pursuant to Section 364(c)(2) of the Bankruptcy Code, a first priority Lien, subject and subordinate only to the Carve-Out and Prepetition Priority Liens, upon and security interest in all of the Collateral that is not otherwise encumbered by a validly perfected security interest or Lien in existence on the Petition Date that has not been primed; (ii) pursuant to Section 364(d)(1) of the Bankruptcy Code, a first priority, subject and subordinate only to the Carve-Out and Prepetition Priority Liens, upon and security interest in all of the Collateral in existence on the Petition Date and the proceeds thereof; and (iii) pursuant to Section 364(c)(3) of the Bankruptcy Code, a second priority Lien upon and security interest in all of the Collateral that was in existence on the Petition Date and subject to a validly perfected and unavoidable security interest or Lien that has not been primed and which has not been subordinated to the Liens in favor of Lender in its capacity as a pre-petition lender.

(b)     Subject to the entry of the Final DIP Order, except as expressly provided in the DIP Orders, no expenses, costs or charges in connection with the Chapter 11 Case shall be charged against the Collateral or Lender under Section 506(c) of the Bankruptcy Code and Borrower hereby waives any rights it has to seek such charges under Section 506(c) of the Bankruptcy Code.

4.5     Credit Bid.  The Borrower hereby acknowledges and agrees that the Lender has the absolute right to credit bid any and/or all the Obligations and/or any and/or all of the Pre-Petition Debt at any sale or Asset Disposition of all or any portion of the Collateral and/or any other asset of the Debtor and to assign such credit bid to any third party designated by the Lender.  The Borrower agrees not to object or

otherwise take any action that would prevent the Lender from credit bidding or dispute any credit bid of Lender and further agrees to support and assert the Lender's right to credit bid.

## ARTICLE V REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lender, as of the date of this Agreement and at all times that the Lender makes Loans to the Borrower, as follows:

5.1     Existence, Qualification and Power.  The Borrower (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, (b) has all requisite corporate power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents and consummate the Transactions, subject to the entry of the DIP Orders, and (c) is duly qualified and is licensed and in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license, except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

5.2     Authorization; No Contravention.  Subject to the entry of the DIP Orders, the execution, delivery and performance by the Borrower of each Loan Document to which it is or is to be a party have been duly authorized by all necessary corporate action, and do not and will not (a) contravene the terms of the Borrower's organization documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any contractual obligation (other than any applicable anti-assignment provisions in effect as of the Petition Date) to which the Borrower is a party or affecting the Borrower or its properties, or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which the Borrower or its property is subject; or (c) violate any Applicable Law.

5.3     Governmental Authorization.  Subject to the entry of the DIP Orders, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with (other than the filings required by the Loan Documents and the DIP Orders), any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, the Borrower of this Agreement or any other Loan Document or for the consummation of the Transactions, (b) the grant by the Borrower of the Security Interest pursuant to Article IV hereof, (c) the perfection or maintenance of the Security Interest created pursuant to Article IV hereof (including the first priority nature thereof, subject only to the Carve-Out and the Prepetition Priority Liens) or (d) the exercise by the Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to Article IX hereof.

5.4     Binding Obligation.  This Agreement is, and each of the other Loan Documents to which the Borrower is or will be a party, when delivered hereunder or thereunder, will be, a legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms and the DIP Orders, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

5.5     Financial Statements; No Material Adverse Effect.

(a)     Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or reasonably could be expected to have a Material Adverse Effect.

(b)      Each Budget was prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair in light of the conditions existing at the time of delivery of such Budget, and represented, at the time of delivery, the Borrower's good faith estimate of its future financial condition and performance.

(c)      Any financial statements delivered pursuant to this Agreement or the other Loan Documents, taken as a whole and in light of the circumstance in which made, contain no untrue statement of a material fact and do not omit to state a material fact necessary to make such statements not misleading.

5.6      Lien Priority and Nature of Certain Collateral.

(a)      Liens.  The Lender has a perfected first priority security interest in the Collateral and, except for the Liens described on Schedule 5.6(a) (which includes the Prepetition Priority Liens) and the other Permitted Liens, none of the properties and assets of the Borrower is subject to any Lien.  Other than the Financing Statements of the Lender pursuant to this Agreement, no financing statement under the Uniform Commercial Code of any state or other instrument evidencing a Lien that names the Borrower as debtor has been filed (and has not been terminated) in any state or other jurisdiction, and the Borrower has not signed any such financing statement or other instrument or any security agreement authorizing any secured party thereunder to file any such financing statement or instrument, except to perfect the Liens listed on Schedule 5.6(a) and the other Permitted Liens.

(b)      Title.  Except as set forth on Schedule 5.6(b), the Borrower has valid and legal title to or leasehold interest in all personal property, real property, and other assets used in its business.

(c)      [Reserved].

(d)      Equipment.  All Equipment is in good order and repair in all material respects and is located on the premises set forth on Schedule 5.6(d).  The Borrower has not, within the twelve-(12) months preceding the date of this Agreement, located any Equipment at premises other than those set forth on Schedule 5.6(d).

(e)      Real Estate.  The Borrower owns or leases no real property other than that described on Schedule 5.6(e).

5.7      Proprietary Rights.  A correct and complete schedule of all of the Borrower's Proprietary Rights is set forth in Schedule 5.7 and none of the Proprietary Rights is subject to any licensing agreement or similar arrangement, except as set forth on Schedule 5.7 or as entered into in the ordinary course of the Borrower's business.  To the best knowledge of the Borrower none of the Proprietary Rights infringe on the valid trademark, trade name, copyright, or patent right of any other person or entity, and no other person's or entity's property infringes on the Proprietary Rights, in any material respect.  The Proprietary Rights described on Schedule 5.7 constitute all of the property of such type necessary to the current and anticipated future conduct of the business of the Borrower.

5.8      Trade Names.  All trade names or styles under which the Borrower conducts business are listed on Schedule 5.8.

5.9      Bank Accounts.  The information on Schedule 5.9 is a complete and correct list of all checking accounts, deposit accounts, and other bank accounts maintained by the Borrower.

5.10    Insurance.  All policies of insurance of any kind or nature owned by or issued to the Borrower, including, without limitation, policies of life, fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation, employee health and welfare, title, property and liability insurance, are in full force and effect and are of a nature and provide such coverage as in the reasonable opinion of the Borrower, is sufficient and as is customarily carried by companies of the size and character of the Borrower.

5.11    Taxes.  The Borrower has filed all tax returns that are required to have been filed in any jurisdiction, and, other than as set forth on Schedule 5.11 which amounts are included for payment in the Budget, have paid all taxes shown to be due and payable on such returns and all other taxes and assessments levied upon the Borrower or its properties, assets, income or franchises, to the extent such taxes and assessments have become due and payable and before they have become delinquent, except for any taxes and assessments the amount, applicability or validity of which is currently being contested in good faith by appropriate proceedings without thereby incurring any material risk of the imposition or enforcement of any Lien and with respect to which the Borrower has established adequate reserves in accordance with GAAP.  The Borrower knows of no basis for any other tax or assessment or has received written notice from a taxing authority or other Governmental Authority regarding a proposed assessment of taxes against the Borrower that could reasonably be expected to have a Material Adverse Effect.

5.12    Litigation.  Except for the Chapter 11 Case and as disclosed on Schedule 5.12 hereto: (a) there is no litigation, arbitration, legal or administrative proceeding, tax audit, investigation, or other action or proceeding of any nature pending against the Borrower or any of the Collateral, and (b) to the best of the Borrower's knowledge, information, and belief, there is no litigation, arbitration, legal or administrative proceeding, tax audit, investigation, complaint, or other action or proceeding of any nature threatened against the Borrower.  The Borrower is not subject to any outstanding court, arbitration, or administrative order, writ, or injunction.

5.13    ERISA.  The Borrower is in compliance in all material respects with all applicable provisions of ERISA.  No ERISA Event has occurred with respect to any ERISA Plan or is reasonably expected to occur with respect to any ERISA Plan.

5.14    Survival of Warranties; Cumulative.  All representations and warranties contained in this Agreement or any of the other Loan Documents shall survive the execution and delivery of this Agreement, any investigation made by or on behalf of Lender, or any Borrowing hereunder, and shall be deemed to have been made again to the Lender on the date of each additional Borrowing or other credit accommodation under this Agreement, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall have been true and accurate on and as of such earlier date), and shall be conclusively presumed to have been relied on by the Lender regardless of any investigation made or information possessed by the Lender.  The representations and warranties set forth in this Agreement and in the other Loan Documents shall be cumulative and shall be in addition to any other representations or warranties which the Borrower shall now or hereafter give, or cause to be given, to the Lender.

5.15    Prepetition Obligations and Liens.

(a)    The Borrower represents, acknowledges and agrees that as of the Petition Date, the total sum owed to the Lender under the Prepetition Note Documents is $2,402,000, plus (i) all interest as it continues to accrue, and (ii) all fees and costs incurred by the Lender including any out-of-pocket fees and expenses of counsel or other professionals retained by or on behalf of the Lender in connection with its efforts to collect the amounts owed by Borrower under the Prepetition Note Documents.

20

(b)　　The Borrower represents, acknowledges and agrees that the Lender's prepetition Liens represent valid and perfected first priority liens upon and security interests in all of the Borrower's property to the extent and amount of the indebtedness set forth in Section 5.15(a) (as such continues to accrue).

5.16　　Organization and Ownership of Interests in the Borrower.

(a)　　Set forth on Schedule 5.16(a) is a complete and accurate list of the Borrower's jurisdiction of incorporation, the address of its principal place of business and its U.S. taxpayer identification number.

(b)　　Set forth on Schedule 5.16(b) is a complete and accurate list of all the equity interests owned by the Borrower in any subsidiary.

## ARTICLE VI AFFIRMATIVE COVENANTS

Until the Termination Date has occurred, the Borrower covenants and agrees with the Lender as follows:

6.1　　Budget Reporting.  On a semi-weekly basis, no later than 5:00 p.m. on Wednesday of each second week (commencing on the second Wednesday following the Petition Date, the Borrower shall deliver to the Lender a proposed Budget for the following rolling 13-week period (the "Proposed Budget"), which shall be consistent in form and subject (other than dollar amounts) with the initial Approved Budget, and that shall be subject to the approval of the Lender in its sole discretion.  If such Proposed Budget is approved then it shall then become the "Approved Budget" then in effect; provided, however, that if such Proposed Budget is not approved by the Lender, then the last Approved Budget will be rolled forward on a week-to-week basis.  Such Proposed Budget shall be certified by an authorized officer of the Borrower as being accurate in all material respects and shall include:

(a)　　an updated thirteen week cash flow forecast setting forth all sources and uses of cash and beginning and ending cash balances, and with a reasonable disclosure of the key assumptions and drivers with respect to such forecast, and a written update regarding material operational, business and financial developments relating to the Borrower,

(b)　　a cash balance report showing the aggregate cash balance amount held in all accounts of the Borrower as of close of business on Friday of the prior week (such report as of any date, the "Cash Balance Report"),

(c)　　a variance report reconciling the most recent Approved Budget for the prior two-week period  to the actual sources and uses of cash for such prior two-week period on an aggregate basis, along with a line-by-line reconciliation and detailed explanation of variances in excess of the greater of 10% and $20,000 from such Approved Budget (the "Variance Report"), in each case, in form and detail acceptable to the Lender and certified by an authorized officer of the Borrower and that the Variance Report is in compliance with Section 7.13; and

(d)　　such other information as the Lender may reasonably request.

6.2　　Books and Records.  The Borrower shall keep accurate and complete records of the Collateral and permit the Lender to: (a) visit the Borrower's business locations at intervals to be determined by the Lender; and (b) inspect, audit and make extracts from or copies of the Borrower's books, records, journals, receipts, computer tapes and disks.  All governmental authorities are authorized to furnish the

Lender with copies of reports of examinations of the Borrower made by such parties. Banks, account debtors and other third parties (without waiving any attorney-client privilege) with whom the Borrower has contractual relationships pertaining to the Collateral or the Loan Documents, are authorized to furnish the Lender with copies of such contracts and related materials.

6.3    Additional Documentation. The Borrower shall execute and deliver, or cause to be delivered, to the Lender all additional documents that the Lender may, from time to time, reasonably determine are necessary or appropriate to evidence the Loans or to continue or perfect the Lender's Security Interest in the Collateral.

6.4    Certificates; Notices; Other Information. The Borrower shall deliver to the Lender, in form and substance satisfactory to the Lender:

(a)    promptly, and in any event within two (2) Business Days after an authorized officer of the Borrower becoming aware of the existence of any Default or Event of Default or that any Person has given any notice or taken any action with respect to a claimed default hereunder or that any Person has given any notice or taken any action with respect to a claimed default or event of default under a Material Contract or with respect to any Material Indebtedness, a written notice specifying the nature and period of existence thereof and what action the Borrower is taking or proposes to take with respect thereto;

(b)    promptly, and in any event within five (5) days of receipt thereof, copies of any material notice to the Borrower from any federal or State Governmental Authority;

(c)    promptly, and in any event within two (2) Business Days after any delivery thereof, copies of all material written reports and presentations delivered by or on behalf of the Borrower to a Committee, if any, or any other party in interest in the Chapter 11 Case that has not been filed publicly on the Bankruptcy Court's docket within such period;

(d)    notice of any material pending or threatened adversarial or contested proceeding of or before the Bankruptcy Court or any other Governmental Authority and any correspondence and documentation related thereto; and

(e)    notice of the occurrence of any condition or event that could reasonably result in a Material Adverse Effect.

6.5    Payment of the Obligations. Subject to the DIP Orders, pay and discharge as the same shall become due and payable, all its obligations and liabilities constituting post-petition obligations that constitute administrative expenses in the Chapter 11 Case under the Bankruptcy Code or otherwise permitted to be paid (whether as ordinary course obligations or otherwise) or required to be paid pursuant to an effective order issued by the Bankruptcy Court, including (a) all tax liabilities (including sales tax), assessments and governmental charges or levies upon it or its properties or assets; (b) all lawful claims which, if unpaid, would by law become a Lien upon its property; and (c) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness; unless, in the case of clause (a) above or mechanics' liens, materialmen's liens or other similar liens in the case of clause (b) above, the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Borrower.

6.6    Compliance with Laws. The Borrower shall comply in all material respects with all laws, ordinances or governmental rules or regulations to which it is subject.

6.7    Maintenance of Assets; Preservation of Existence.

(a)    The Borrower shall maintain all of its real and personal property in good repair, working order and condition, shall make all necessary replacements to such property so that the value and the operating efficiency of such property will be preserved, and shall prevent any personal property from becoming a fixture to real estate (unless owned by the Borrower and encumbered by a mortgage, deed of trust, security deed or similar agreement in favor of the Lender).

(b)    The Borrower shall preserve and keep in full force and effect its corporate existence and maintain all rights, privileges and franchises necessary in the normal conduct of its business.

6.8    Insurance.  The Borrower shall procure and continuously maintain: (a) "All Risk Extended Coverage" property insurance covering the Borrower's tangible personal property for the full replacement value thereof; (b) "All Risk Extended Coverage" business interruption insurance in an amount acceptable to the Lender; (c) liability insurance in an amount acceptable to the Lender; and (d) such other customary insurance coverages as are reasonably specified by the Lender from time to time.  Each property and business interruption insurance policy shall contain a standard Lender's Loss Payable Endorsement in favor of the Lender, providing for, among other things, thirty (30) days prior written notice to the Lender of any cancellation, non-renewal or modification of such coverage.  The Borrower shall deliver, or cause to be delivered, to the Lender certified copies of such policies and all required endorsements, or other evidence of such insurance acceptable to the Lender.  All amounts received by the Lender from any such insurance policies may be applied by the Lender to the Obligations.  If the Borrower fails to procure required insurance or such insurance is canceled or otherwise lapses, the Lender may procure such insurance and add the cost of such insurance to the principal balance of the Loans.

6.9    Use of Proceeds.  Subject to the DIP Orders, the Borrower shall use the proceeds of the Loans, and all other loans or accommodations made by Lender for Borrower for only those purposes, and in those amounts (subject to the Permitted Variance) described in the Approved Budget, and not for any purpose prohibited by law or by the terms and conditions of this Agreement or any of the Loan Documents or of the DIP Orders; and except as expressly set forth in the DIP Orders, expressly excluding the investigation or prosecution of any claim and/or cause of action against the Lender, including but not limited to any and/or all claims and causes of action arising under Sections 542, 544, 547, 548, 549 and/or 550 of the Bankruptcy Code; under a theory of equitable subordination or recharacterization; or that challenges to the Lender's prepetition Liens, the Security Interest, the Prepetition Obligations or the Obligations.

6.10    Further Assurances.  The Borrower will promptly cure, or cause to be cured, any defects in the execution and delivery of the Loan Documents (including this Agreement), resulting from any act or failure to act by the Borrower or any of the employees or officers thereof.  The Borrower, at its expense, will promptly execute and deliver to the Lender, or cause to be executed and delivered to the Lender, all such other and further documents, agreements, and instruments in compliance with or accomplishment of the covenants and agreements of the Borrower in the Loan Documents, including this Agreement, or to correct any technical omissions in the Loan Documents, or to obtain any consents that are necessary in connection with or in accomplishment of the covenants and agreements of the Borrower, all as may be necessary or appropriate in connection therewith as may be requested by the Lender.

6.11    Access to Advisors; Weekly Lender Calls.

(a)    The Borrower shall make its financial advisor (or chief restructuring officer), if any, available to the Lender to discuss (i) the status of discussions and negotiations for any sale or other disposition of the Borrower's assets, as applicable, and (ii) the operations, financial

23

performance, expense reduction program and cash flow reports, as applicable, of the Borrower and such other matters as the Lender may reasonably request, subject to any applicable privileges or confidentiality agreements.

(b)    On a date to be mutually agreed upon by the Borrower and the Lender (a "Weekly Lender Call Date"), commencing with the first full calendar week ending after the Closing Date, the Borrower will hold a conference call (at a time mutually agreed upon by the Borrower and the Lender) with the Lender, during which conference call the Borrower shall discuss, subject to any applicable privileges or confidentiality agreements, the Chapter 11 Case, the Sale Process, the financial condition and results of operations of the Borrower, including the Budget and the Variance Reports.

6.12    Compliance with the DIP Orders.  The Borrower shall, at all times, comply with all terms, conditions and provisions of the DIP Orders.

6.13    Cash Management; Payment of Professional Fees.  The Borrower shall (a) maintain all deposit accounts and securities accounts as Controlled Accounts, (b) deposit all collections, securities, cash and Cash Equivalents into a Controlled Account, and (c) otherwise maintain a cash management system as satisfactory to the Lender.  Upon the occurrence and during the continuation of an Event of Default, upon written notice by Lender to Borrower, all deposits in such Controlled Account(s) shall be transferred to an account designated by the Lender on each Business Day and applied to repay the outstanding Obligations. All professional fees at any time paid by the Borrower shall be paid by the Borrower pursuant to one or more orders of the Bankruptcy Court, including, without limitation the DIP Orders and pursuant to the Approved Budget.

6.14    Milestones.  The Borrower shall comply with each of the Milestones contained on Schedule 6.14 upon the terms and at the times provided for therein (as such times may be extended by the Lender in its sole discretion).


## ARTICLE VII NEGATIVE COVENANTS

The Borrower covenants and agrees with the Lender as follows:

7.1    Liens; Disposition of Assets.  The Borrower shall not: (a) encumber the Collateral in favor of any party other than the Lender, whether voluntarily or involuntarily, other than (i) the Permitted Liens, (ii) Prepetition Priority Liens, and (iii) Adequate Protection Liens, provided, that all Liens under this Section 7.1 (other than the Prepetition Priority Liens), while any portion of the Obligations remain outstanding, shall at all times be junior and subordinate to the Liens granted under the Loan Documents and the DIP Orders; or (b) sell, consign, lease or remove from Borrower's business locations any of Borrower's assets.

7.2    Consent to Amendment of DIP Orders.  Borrower shall not seek to amend, supplement or modify any of the terms of the Interim DIP Order or the Final DIP Order without the written consent of the Lender.

7.3    Other Court Filings and Applications.  The Borrower shall not apply to the Bankruptcy Court for authority to use "cash collateral" or to take any action that is prohibited by the terms of any of the Loan Documents or otherwise refrain from taking any action that is required to be taken by the terms of any of the Loan Documents or permit any debt or claim to be pari passu with or senior to any of the

Obligations, except as provided by this Agreement or the DIP Orders or as otherwise consented to by the Lender.

7.4     <u>Limitation on Investments, Loans and Advances</u>.  The Borrower shall not make any advance, loan, extension of credit or capital contribution to, or purchase any stock, bonds, notes, debentures or other securities of or any assets constituting a business unit of or make any other investment (each, an "<u>Investment</u>") in, any entity, except:

(a)     Investments in cash equivalents;

(b)     Investments existing on the Petition Date and described on <u>Schedule 6.4</u>;

(c)     extensions of trade credit and prepaid expenses made in the ordinary course of business; and

(d)     Investments received in connection with the creation and collection of Accounts in the ordinary course of business.

7.5     <u>Transactions with Affiliates</u>.  The Borrower shall not sell or transfer any Collateral or assets to, or otherwise engage in any other transactions with, any of its Affiliates (as defined in the Bankruptcy Code), except that the Borrower may engage in any such transaction which is otherwise permitted under this Agreement, is consistent with past practices, or otherwise in the ordinary course of business at prices and on terms and conditions not less favorable than could be obtained in a comparable arm's-length transaction from unrelated third parties.

7.6     <u>Lines of Business</u>.  The Borrower shall not engage to any substantial extent in any line or lines of business activity other than businesses of the same general type as those in which the Borrower is engaged on the date of this Agreement or which are related thereto.

7.7     <u>Chapter 11 Claims; Payment of Prepetition Claims</u>.  The Borrower shall not incur, create, assume, suffer to exist or permit any other superpriority claim or Lien which is pari passu with or senior to the claims of the Lender granted pursuant to this Agreement and the DIP Orders, or make any payments of obligations incurred prior to the Petition Date other than (a) as permitted under the DIP Orders, (b) as permitted under any "first day orders" and (c) as otherwise permitted or required under this Agreement.

7.8     <u>Capital Expenditures</u>.  The Borrower shall not make or commit to make any capital expenditure in excess of $10,000 that is not approved by the Lender in writing.

7.9     <u>Use of Proceeds</u>.  The Borrower shall not use the proceeds of the Loans or the Collateral (a) to commence or prosecute any investigation, action or objection with respect to the superpriority claims or Liens granted to the Lender pursuant to this Agreement and the DIP Orders or any other claims of any kind against Lender, or (b) for any purpose or expenditure that is not consistent with the Approved Budget.

7.10     <u>Limitation on Indebtedness</u>.  The Borrower shall not create, incur, assume or suffer to exist any Indebtedness, except:

(a)     Indebtedness in favor of the Lender under this Agreement and the other Loan Documents;

(b)     Indebtedness outstanding on the Petition Date and described on <u>Schedule 7.10</u> attached hereto; and

(c)        Indebtedness first incurred after the Petition Date in respect of the Permitted Liens.

7.11    <u>Prohibition on Fundamental Changes</u>.  The Borrower shall not enter into any acquisition, merger, consolidation or amalgamation, or liquidate, wind up or dissolve (or suffer any liquidation or dissolution), or make any material change in their present methods of conducting business or create or acquire any new subsidiary.

7.12    <u>Chapter 11 Case Matters</u>.  The Borrower shall not, nor shall support any other Person, in any of the following:

(a)        assert, file or seek, or consent to the filing or the assertion of or joinder in, or use any portion of the proceeds of the Loans, the Collateral, the Carve-Out or cash collateral to compensate services rendered or expenses incurred in connection with, any claim, counterclaim, action, proceeding, order, application, pleading, motion, objection, any other papers or documents, defense (including offsets and counterclaims of any nature of kind), or other contested matter (including any of the foregoing the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration or similar relief) for the purpose of:

(i)        avoiding, re-characterizing, recovering, reducing, subordinating (except pursuant to the DIP Orders), disallowing, or otherwise challenging (under Sections 105, 506(c), 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), or 553 of the Bankruptcy Code or applicable non-bankruptcy law), in each case, in whole or in part, of the Obligations, the DIP Liens (as defined in the DIP Orders), the Loan Documents, the Prepetition Obligations, the Prepetition Note Documents or the Prepetition Liens; or reversing, modifying, amending, staying, or vacating the DIP Orders, without the prior written consent of the Lender;

(ii)        granting priority for any administrative expense, secured claim or unsecured claim against the Borrower (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 331, 503(b)m 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code) equal or superior to the priority of the Lender in respect of the Obligations and the Prepetition Obligations, except with respect to the Carve-Out or to the extent expressly permitted under the DIP Orders;

(iii)        granting or imposing under Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, any additional financing under such sections or any Lien equal or superior to the priority of the Loans, the DIP Liens and the Adequate Protection Liens, except to the extent expressly permitted under the DIP Orders;

(iv)        permitting the use of cash collateral as defined in Section 363 of the Bankruptcy Code, except as expressly permitted by the DIP Orders and this Agreement or as otherwise consented by the Lender in its sole discretion; or

(v)        modifying, altering or impairing in any manner any part of the DIP Liens, the Adequate Protection Liens or the Prepetition Liens, or any of the Lender's rights or remedies under the DIP Orders, any of the Loan Documents, or any of the Prepetition Note Documents or any documents related thereto (including the right to demand payment of all Obligations and to enforce is Liens and security interests in the Collateral and the Prepetition Collateral, as applicable), whether by plan of reorganization or liquidation,

order of confirmation or any financings of, extensions of credit to, or incurring of debt by the Borrower or otherwise, whether pursuant to Section 364 of the Bankruptcy Code or otherwise;

(b)     without the prior written consent of the Lender, seek or consent to any order (i) dismissing the Chapter 11 Case under Sections 105, 305 or 1112 of the Bankruptcy Code or otherwise; (ii) converting the Chapter 11 Case to cases under Chapter 7 of the Bankruptcy Code; (iii) appointing a Chapter 11 trustee in the Chapter 11 Case; (iv) appointing an examiner with enlarged powers beyond those set forth in sections 1104(d) and 1106(a)(3) and (4) of the Bankruptcy Code in the Chapter 11 Case; or (v) granting a change of venue with respect to the Chapter 11 Case or any related adversary proceeding;

(c)     make any payments or transfer any property on account of claims asserted by any vendors of the Borrower for reclamation in accordance with Section 2-702 of any applicable UCC and Section 546(c) of the Bankruptcy Code, or make payment of any pre-petition claims against the Borrower (other than in respect of the Prepetition Obligations or as otherwise set forth in the Budget), in each case, unless otherwise ordered by the Bankruptcy Court upon prior notice to the Lender or unless otherwise consented to by the Lender;

(d)     return any inventory or other property to any vendor pursuant to Section 546(g) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court in accordance with Section 546(g) of the Bankruptcy Code upon prior notice to the Lender or unless otherwise consented to by the Lender;

(e)     propose to the Bankruptcy Court, or otherwise, any Plan of Reorganization that does not provide for the indefeasible payment in full in cash of the Obligations and the obligations in connection with the Prepetition Note Documents on the effective date of such Plan of Reorganization and is otherwise acceptable to the Lender; and

(f)     propose to Bankruptcy Court, or otherwise, a sale of all or substantially all of the Collateral, other than in accordance with the Sale Process.

7.13    Budget Variance.  On a semi-weekly basis, as of the Wednesday of every second calendar week after the Closing Date (or, if such day is not a Business Day, on the immediately succeeding Business Day; each such date, a "Test Date"), with the first Test Date being the Wednesday of the second full calendar week after the Closing Date, cause or permit the actual amount of cash disbursements of the Borrower for the preceding Measurement Period (with each weekly period ending on the preceding Sunday), to be on an aggregate basis, more than 110% of the aggregate projected disbursements for the corresponding Measurement Period set forth in the Approved Budget (such permitted variance, the "Permitted Variance"). As used in this Section 7.13, "Measurement Period" shall mean with respect to each Test Date, the two-week cumulative period most recently ended prior to such Test Date.

## ARTICLE VIII CONDITIONS PRECEDENT

8.1    Initial Loan.  Notwithstanding any other provision of this Agreement or any of the other Loan Documents and without affecting in any manner the rights of the Lender under other Sections of this Agreement, it is understood and agreed that the establishment of the Facility and any obligation of Lender to make the initial Loan hereunder, including the funding of the Roll-Up Loans pursuant to Section 2.1(c), is subject to the satisfaction of the following conditions precedent:

(a) the Interim DIP Order, in form and substance satisfactory to the Lender, shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been vacated, reversed, modified, appealed stayed or subject to any motion to reconsider in any respect;

(b) all requisite corporate action and proceedings in connection with this Agreement and the other Loan Documents shall be satisfactory in form and substance to the Lender, and the Lender shall have received all information and copies of all documents, including records of requisite corporate action and proceedings which the Lender may have requested in connection therewith, such documents where requested by the Lender  or its counsel to be certified by appropriate corporate officers;

(c) the Lender shall have received and approved the initial Budget;

(d) the Lender shall have received this Agreement and all other Loan Documents and all instruments and documents to be delivered hereunder and thereunder by the date hereof, each of which shall have been duly executed by all respective parties thereto and each of which shall be in full force and effect and in form and substance satisfactory to Lender;

(e) the Borrower shall pay all fees required to be paid to the Lender on or before the Closing Date;

(f) the Lender shall have (i) received such information (financial or otherwise) as requested from the Borrower, (ii) discussed the Budget with officers and representatives of the Borrower, and (iii) been satisfied with the nature and substance of such discussions;

(g) the Borrower shall have filed one or motion motions, each in form and substance satisfactory to the Lender, seeking approval of the Sale Order and the Bidding Procedures Order.

8.2     Conditions to each Loan.  Notwithstanding any other provision of this Agreement or any of the other Loan Documents and without affecting in any manner the rights of the Lender under other Sections of this Agreement, it is understood and agreed that the establishment of the Facility and any obligation of the Lender making the Loans hereunder (including the initial Loan to be made on or about the Closing Date) is subject to the satisfaction of all of conditions set forth in Section 8.1 and each of the following conditions:

(a) the representations and warranties contained in this Agreement and in each of the other Loan Documents shall be true and correct on and as of the date of the signing of this Agreement and on the date of the Borrowing of any Loan pursuant to this Agreement, with the same effect as though such representations and warranties had been made on and as of each such date, and on each such date, no Event of Default, and no condition, event or act which with the giving of notice or the passage of time or both would constitute an Event of Default, shall have occurred and be continuing or shall exist;

(b) there shall be no material adverse change, as determined by the Lender in its discretion, in the financial condition or business of the Borrower, nor any material decline, as determined by the Lender in its sole discretion, in the market value of any Collateral or a substantial or material portion of the assets of the Borrower, and no change or event shall have occurred which would impair the ability of the Borrower to perform its obligations hereunder or under any of the other Loan Documents to which it is a party or of the Lender to enforce the Obligations or realize upon the Collateral, other than the filing of the Chapter 11 Case and the financial history described in any motion to approve the DIP Orders;

(c)       the Lender shall have received an executed Notice of Borrowing;

(d)       each advance shall be for the purpose of funding the items set forth in the Approved Budget to the extent authorized by the DIP Orders;

(e)       the Borrower shall demonstrate with respect to each Borrowing pro forma compliance with the Budget for such period (subject to any Permitted Variance) after giving effect to such Borrowing; and

(f)       except to the extent consented to by the Lender in writing, the Sale Process shall not have been terminated or abandoned by the Borrower and the Bidding Procedures Order shall been approved by the Bankruptcy Court and shall be in full force and effect and shall not have been vacated, reversed, modified, appealed stayed or subject to any motion to reconsider in any respect; and

(g)       with respect to each Borrowing hereunder after the date 35 days following the Interim Order Entry Date, the Final DIP Order, in form and substance satisfactory to the Lender, shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been vacated, reversed, modified, appealed stayed or subject to any motion to reconsider in any respect and shall approve the Roll-Up Loans.

## ARTICLE IX EVENTS OF DEFAULT; REMEDIES

9.1       <u>Events of Default</u>.  The occurrence or existence of any one or more of the following events or conditions, whether voluntary or involuntary, shall constitute an Event of Default.

(a)       the Borrower fails to pay when due (whether due at stated maturity, on demand, upon acceleration or otherwise) any installment of principal, interest, premium, if any, and fees on any of the Loans, or otherwise owing under this Agreement;

(b)       the Borrower fails to pay any of the other Obligations on the due date thereof (whether due at stated maturity, on demand, upon acceleration or otherwise) and such failure shall continue for a period of five (5) days after the Lender's giving the Borrower written notice thereof;

(c)       the Borrower fails or neglects to perform, keep or observe any covenant contained in this Agreement or the other Loan Documents (other than a covenant which is dealt with specifically elsewhere in this <u>Section 9.1</u>);

(d)       any representation or warranty made by or on behalf of the Borrower, or other information provided by or on behalf of the Borrower to the Lender, was incorrect or misleading in any material respect at the time it was made or provided;

(e)       any Loan Document is terminated other than as provided for in this Agreement or becomes void or unenforceable, or any Security Interest ceases to be a valid and perfected first priority security interest in any portion of the Collateral, other than as a result of the Permitted Liens;

(f)       except for defaults existing prior to or occasioned by the filing of the Chapter 11 Case and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits the Borrower from complying or permits the Borrower not to comply, a default or breach occurs under any (i) Prepetition Note Document, or (ii) any other document instrument or agreement

entered into by the Borrower post-petition that is not cured within any applicable grace period therefore, and such default or breach (1) involves the failure to make any payment when due in respect of any Indebtedness (other than the Obligations) of Borrower in excess of $50,000 in the aggregate, or (2) causes, or permits any holder of such Indebtedness or a trustee to cause, such Indebtedness or a portion thereof in excess of $50,000 in the aggregate to become due prior to its stated maturity or prior to its regularly scheduled dates of payment, or cash collateral in respect thereof to be demanded, in each case, regardless of whether such default is waived, or such right is exercised, by such holder or trustee;

(g)     the bringing of a motion by the Borrower in the Chapter 11 Case to obtain additional financing from a party other than Lender under Section 364 of the Bankruptcy Code unless the proceeds from such financing are used to immediately repay in cash all Obligations under this Agreement and the Prepetition Obligations or to use "cash collateral" of the Lender under Section 363(c) of the Bankruptcy Code in a manner and to the extent not otherwise consented to by the Lender;

(h)     a trustee shall be appointed in the Chapter 11 Case or a responsible officer or an examiner with expanded powers shall be appointed in the Chapter 11 Case (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code and the order appointing such trustee, responsible officer, or examiner shall not have been stayed, reversed or vacated within thirty (30) days after the entry thereof; the Borrower shall seek confirmation by the Bankruptcy Court of or the Bankruptcy Court shall confirm any Plan of Reorganization that proposes to treat the Obligations in any manner other than payment-in-full in cash on the date of confirmation, other than a Plan of Reorganization proposed or accepted in writing by the Lender; the Borrower shall file any motion or the Bankruptcy Court shall approve any motion to alter, amend, vacate, supplement, modify, or reconsider, in any respect, any DIP Order, without the Lender's prior written consent; the Bankruptcy Court shall grant in the Chapter 11 Case super-priority claim status pursuant to Section 364(c)(1) of the Bankruptcy Code to any Person other than to the Lender; or the Borrower shall challenge the validity, extent, priority or enforceability of any of the Prepetition Note Documents, the Prepetition Obligations or the Lender's Prepetition Liens;

(i)     the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code;

(j)     the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay imposed under Section 362 of the Bankruptcy Code (1) to allow any creditor (other than the Lender and other than a holder of a Permitted Lien as to property in which such holder's Lien is superior to the Lien therein of the Lender) to execute upon or enforce a Lien on any Collateral, or (2) with respect to any Lien of or to permit the granting of any Lien on any Collateral to any State or local environmental or regulatory agency or authority;

(k)     the entry any judgment or order pursuant or as a result of any suit or action against the Lender filed by or on behalf of the Borrower, any federal or state environmental protection or health and safety agency or any official Committee, any creditor, or any other party-in-interest in the Chapter 11 Case, that asserts any claim or legal or equitable remedy which seeks the avoidance or subordination of the Obligations, the Security Interest, the Prepetition Obligations and/or the Lender's Prepetition Lien;

(l)     the Final DIP Order, in form and substance acceptable to the Lender, is not entered on or before the date that is 35 days after the entry of the Interim DIP Order;

30

(m)      if Borrower makes any payment on account of any debt or claim, or on account of any interest, principal, premium or otherwise, except (i) as expressly permitted by this Agreement or by the DIP Orders, or (ii) as set forth in the Approved Budget;

(n)      subject to Section 365 of the Bankruptcy Code, the Borrower shall fail to obtain, maintain or comply in all material respects with any order, consent, approval, license, authorization, or validation of, or filing, recording or registration with, or exemption by, any Governmental Authority and such failure could reasonably be expected to have a Material Adverse Effect;

(o)      the Borrower, without the prior written consent of the Lender, shall (i) determine to suspend the operation of its business in the ordinary course or liquidate all or substantially all of its assets, or (ii) file a motion or other application in the Chapter 11 Case seeking authority to do any of the foregoing;

(p)      there exists at any time a variance of more than one hundred and ten percent (110%) between the actual disbursements of Borrower for any Measurement Period versus the projected disbursements for the same period with respect to each expense line item described in the Budget or with respect to the aggregate amounts set forth for expenses and disbursements; and

(q)      any covenant, agreement or obligation of the Borrower contained in or evidenced by any of the Loan Documents shall cease to be enforceable or shall be determined by a court of competent jurisdiction to be unenforceable in accordance with its terms or the Borrower shall file a pleading with the Bankruptcy Court asserting the same; the Borrower shall deny or disaffirm their obligations under any of the Loan Documents or Security Interest granted in connection therewith or ratified or reaffirmed thereby; or the Security Interest in any of the Collateral granted under the Loan Documents shall be determined by a court of competent jurisdiction to be voidable, invalid or unperfected, or subordinated or not given the priority contemplated by this Agreement.

9.2      <u>Lender's Remedies</u>.  In addition to any other rights and remedies that the Lender may have, whether under Applicable Law or by virtue of any agreement between the Borrower and the Lender, upon the occurrence and during the continuance of an Event of Default, subject to the terms of the DIP Orders, the Lender may:

(a)      Without notice to, or demand upon, the Borrower:

(i)      discontinue making any further Loans and terminate the Commitment;

(ii)      terminate this Agreement;

(iii)      declare all Obligations to be immediately due and payable;

(iv)      take possession of all or any portion of the Collateral, wherever located, and enter on any of the premises where any of the Collateral may be and remove, repair and store any of the Collateral until it is sold or otherwise disposed of (the Lender shall have the right to store, without charge, all or any portion of the Collateral at any of Borrower's business locations);

(v)      use, without charge, the Borrower's Proprietary Rights, advertising materials, or any property of a similar nature, in advertising for sale and selling any of the Collateral; and

(vi)    renew, modify or extend any Receivable, grant waivers or indulgences with respect to any Receivable, accept partial payments on any Receivable, release, surrender or substitute any security for payment of any Receivable, or compromise with, or release, any party liable on any Receivable in such a manner as Lender may, in its sole discretion deem advisable, all without affecting or diminishing Borrower's Obligations to Lender.

(b)    With notice to the Borrower:

(i)    require the Borrower, at the Borrower's expense, to assemble the Collateral and make the Collateral available to the Lender at locations reasonably convenient to the Lender and the Borrower; and

(ii)    sell or otherwise dispose of all or any portion of the Collateral at public or private sale for cash or credit, with such notice as may be required by law (in the absence of any contrary requirement, the Borrower agrees that ten (10) days prior notice of a public or private sale of the Collateral is reasonable), in lots or in bulk, all as the Lender, in its sole discretion, may deem advisable. The Lender shall have the right to conduct any such sales, without charge, at the Borrower's business locations. The Lender may purchase all or any portion of the Collateral at public sale and, if permitted by law, at private sale and, in lieu of actual payment of the purchase price, may offset the amount of such price against the outstanding amount of the Loans and any other amounts owing from the Borrower to the Lender. Proceeds realized from the sale of any Collateral will be applied in the following order: (a) to the reasonable costs, expenses and attorneys' fees incurred by the Lender in connection with the collection, acquisition, protection and sale of the Collateral; (b) to any accrued and unpaid interest owing from the Borrower to the Lender; and (c) to any other amounts owing from the Borrower to the Lender. The Borrower agrees that the Borrower will remain fully liable for any deficiency owing to the Lender after the proceeds of the Collateral have been applied to the Loans and all other amounts owing from the Borrower to the Lender.

(c)    If any of the Collateral shall require repair, maintenance, preparation, or the like, or is in process or other unfinished state, the Lender shall have the right, but not the obligation, to repair or perform such maintenance, preparation, processing or completion of manufacturing to place the same in such saleable condition as the Lender shall deem appropriate, but the Lender shall have the right to sell or dispose of such Collateral with or without such processing.

(d)    If an Event of Default has occurred and is continuing, the Borrower hereby irrevocably waives any right it may have to use cash collateral under Section 363 of the Bankruptcy Code without the Lender's written consent, except as expressly set forth in any DIP Order.

(e)    The Borrower hereby waives application of the automatic stay to the Lender and, as to the Lender, any of the Collateral so that the Lender may exercise any and/or all of it remedies hereunder or under Applicable Law.

(f)    Each and every right, power and remedy hereby specifically given to the Lender shall be in addition to every other right power and remedy specifically given under this Agreement, the other Loan Documents, the DIP Orders or now or hereafter existing at law or in equity, or by statute and each and every right, power and remedy whether specifically herein given or otherwise existing may be exercised from time to time or simultaneously and as often and in such order as may be deemed expedient by Lender. All such rights, powers and remedies shall be cumulative

and the exercise or the beginning of exercise of one shall not be deemed a waiver of the right to exercise of any other or others. No delay or omission of Lender in the exercise of any such right, power or remedy and no renewal or extension of any of the Obligations shall impair any such right, power or remedy or shall be construed to be a waiver of any Default or Event of Default or an acquiescence therein. In the event that Lender shall bring any suit to enforce any of its rights hereunder and shall be entitled to judgment, then, in such suit, Lender may recover reasonable expenses, including attorney fees, and the amounts thereof shall be included in such judgment.

(g)     In case the Lender shall have instituted any proceeding to enforce any right, power or remedy under this Agreement by foreclosure, sale, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Lender, then, and in every such case, the Borrower and the Lender shall be restored to their former positions and rights hereunder with respect to the Collateral subject to the Liens granted under this Agreement and the DIP Orders, and all rights, remedies and powers of the Lender shall continue as if no such proceeding had been instituted.

## ARTICLE X JURY TRIAL WAIVER; OTHER WAIVERS AND CONSENTS; AND GOVERNING LAW

10.1    Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver.

(a)     The provisions of this Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to applicable conflict of law principles.

(b)     The Borrower and the Lender irrevocably consent to the nonexclusive jurisdiction of the Bankruptcy Court, to the nonexclusive jurisdiction of the state courts of Delaware and to the nonexclusive jurisdiction of the United States District Court for the District of Delaware if the Chapter 11 Case is dismissed or relief from the Automatic Stay is obtained for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement or any of the Loan Documents or the subject matter hereof.

(c)     The Borrower and the Lender waive, to the extent not prohibited by Applicable Law that cannot be waived, and agree not to assert, by way of motion, as a defense or otherwise, in any such proceeding brought in any of the above-named courts, any claim that it is not subject personally to the jurisdiction of such court, that its property is exempt or immune from attachment or execution, that such proceeding is brought in an inconvenient forum, that the venue of such proceeding is improper, or that this Agreement or any of the Loan Documents, or the subject matter hereof or thereof, may not be enforced in or by such court.

(d)     The Borrower and the Lender consent to service of process in any such proceeding in any manner at the time permitted by the Bankruptcy Code or the laws of the State of New York and agree that service of process by registered or certified mail, return receipt requested, at its address specified herein is reasonably calculated to give actual notice.

(e)     The Borrower and the Lender waive, to the extent not prohibited by Applicable Law that cannot be waived, any right either may have to claim or recover in any such proceeding any special, exemplary, punitive or consequential damages.

(f)     The Borrower hereby releases and exculpates the Lender, its officers, directors, members, managers, agents, attorneys, employees and designees (collectively, with the Lender, the

"<u>Lender Released Parties</u>"), and none of the Lender Released Parties shall have any liability to the Borrower (whether in contract, tort, equity or otherwise) for losses suffered by the Borrower in connection with, arising out of, or in any way related to the transactions or relationships contemplated by this Agreement, or any act, omission or event occurring in connection herewith, unless it is determined by a final and non-appealable judgment or court order binding on the Lender, that the losses were the result of acts or omissions constituting gross negligence or willful misconduct.  In any such litigation, the Lender shall be entitled to the benefit of the rebuttable presumption that it acted at all times in good faith and with the exercise of ordinary care in the performance by it of the terms of this Agreement.

10.2     <u>Waiver of Claims and Counterclaims</u>.  In no event shall the Lender have any liability to the Borrower for lost profits or other special, consequential, incidental, exemplary or punitive damages in connection with this Agreement or any of the other Loan Documents or the transactions contemplated hereby or thereby, and the Borrower expressly waives any and all right to assert any such claims.  The Borrower further waives all rights to interpose any claims, deductions, setoffs, recoupment, or counterclaims of any nature (other than compulsory counterclaims) in any action or proceeding with respect to this Agreement, the Obligations, the Collateral or any matter arising therefrom or relating hereto or thereto.  No officer of the Lender has any authority to waive, condition, or modify the provisions of this section.

10.3     <u>Indemnification</u>.  The Borrower agrees to indemnify, save and hold harmless the Lender and all other Lender Released Parties from and against:  (i) the use or contemplated use of the proceeds of any of the Loans, any transaction contemplated by this Agreement or the other Loan Documents; (ii) any administrative or investigative proceeding by any governmental agency arising out of or related to a claim, demand, action or cause of action described in clause (i) above; and (iii) any and all liabilities, losses, costs or expenses (including reasonable attorneys' fees and disbursements and other professional services) that any party indemnified hereunder suffers or incurs as a result of any foregoing claim, demand, action or cause of action; provided, however, that no such indemnitee shall be entitled to indemnification for any loss caused by its own gross negligence or willful misconduct.  Any obligation or liability of the Borrower to any such indemnitee under this Section shall survive the expiration or termination of this Agreement and the repayment of the Loans and performance of all Obligations.

10.4     <u>Waiver of Marshalling Rights</u>.  The Borrower waives any right of marshalling of assets of the Borrower, including without limitation, any such right with respect to the Collateral.

## ARTICLE XI MISCELLANEOUS

11.1     <u>Power of Attorney</u>.  The Borrower irrevocably appoints the Lender, and any person designated by the Lender, as the Borrower's true and lawful attorney-in-fact to:  (a) endorse for the Borrower, in the Lender's or Borrower's name, any draft or other order for the payment of money payable to the Borrower; and (b) execute and file or submit for recording, in the Lender's or the Borrower's name, financing statements describing the Collateral.  The Lender shall not be liable to the Borrower for any action taken by the Lender or its designee under this power of attorney, except to the extent that such action was taken by the Lender in bad faith or with willful misconduct.  The Borrower agrees that a carbon, photographic or other reproduction of a financing statement or this Agreement may be filed by the Lender as a financing statement.

11.2     <u>Outstanding Loan Balance</u>.  The outstanding principal amount of, and accrued interest on, the Loans, the amount of interest accrued thereon (including the amount of all PIK Interest), and all other Obligations shall be, at all times, ascertained from the records of the Lender and shall be conclusive absent manifest error.

11.3     Modifications and Course of Dealing.  This Agreement constitutes the entire agreement of the Borrower and the Lender relative to the subject matter hereof.  No modification of or supplement to this Agreement shall bind the Lender unless in writing and signed by an authorized officer of the Lender.  The enumeration in this Agreement of the Lender's rights and remedies is not intended to be exclusive, and such rights and remedies are in addition to and not by way of limitation of any other rights or remedies that Lender may have under the Uniform Commercial Code or other Applicable Law.  No course of dealing and no delay or failure of the Lender to exercise any right, power or privilege under any of the Loan Documents will affect any other or future exercise of such right, power or privilege.  The exercise of any one right, power or privilege shall not preclude the exercise of any others, all of which shall be cumulative.

11.4     Assignment and Participation.  The Borrower may not assign or transfer any of its rights or delegate any of its obligations under this Agreement or any of the other Loan Documents.  The Lender shall have the right, from time to time, without notice to the Borrower, to sell, assign or otherwise transfer all or any part of its interest in this Agreement, the other Loan Documents, and the Loans to any other party, or enter into participation arrangements with any other party.  The Borrower authorizes the Lender to deliver to potential assignees or participants the Borrower's financial information and all other information delivered to the Lender in furtherance of or pursuant to the terms of this Agreement, subject to the recipient's execution of a confidentiality agreement.

11.5     Reserved.

11.6     Notices.  Except as otherwise provided herein, whenever any notice, demand, request or other communication shall or may be given to or served upon any party by any other party, or whenever any party desires to give or serve upon any other party any communication with respect to this Agreement, each such communication shall be in writing and shall be deemed to have been validly served, given or delivered (a) upon the earlier of actual receipt and five (5) Business Days after deposit in the United States mail, registered or certified mail, return receipt requested, with proper postage prepaid, (b) upon transmission, when sent by telecopy or other similar facsimile transmission (with such telecopy or facsimile promptly confirmed by delivery of a copy by personal delivery or United States mail as otherwise provided in this Section 11.6), (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid or (d) when hand-delivered, all of which shall be addressed to the party to be notified and sent to the address or facsimile number indicated in the signature page to this Agreement or to such other address (or facsimile number) as may be substituted by the giving of notice of such substitution.  Delivery of a copy of any notice under this Section 11.6 to an individual designated on the signature page as "with a copy to" shall not be deemed notice to a party.

11.7     Expenses.  The Borrower agrees to pay, and to hold the Lender harmless from and against, all reasonable out-of-pocket expenses incurred by the Lender (including allocated costs of staff counsel) in connection with the preparation of, and any amendments, waivers or consents relating to, this Agreement and/or any of the other Loan Documents.  The Borrower further agrees to pay any fees, costs, or expenses incurred by the Lender arising in connection with the Lender's enforcement or preservation of its rights under this Agreement or any other Loan Document, or in the collection of any of the Loans, or otherwise incurred in connection with the Chapter 11 Case, including without limitation, attorneys' fees, expert fees, and legal costs.

11.8     Binding Effect; Severability.  This Agreement shall not be deemed to create any right in any party except as provided herein and shall inure to the benefit of, and be binding upon, the successors and assigns of the Borrower and the Lender.  All of the Borrower's obligations under this Agreement are absolute and unconditional and shall not be subject to any offset or deduction whatsoever.  The provisions of this Agreement are intended to be severable.  If any provision of this Agreement is held invalid or unenforceable in whole or in part, such provision will be ineffective to the extent of such invalidity or

unenforceability without in any manner effecting the validity or enforceability of the remaining provisions of this Agreement.

11.9    Final Agreement.  This Agreement and the other Loan Documents are intended by the Borrower and the Lender to be the final, complete, and exclusive expression of the agreement between them, except as may be provided in the DIP Orders.  This Agreement supersedes any and all prior oral or written agreements relating to the subject matter hereof.  No modification, rescission, waiver, release, or amendment of any provision of this Agreement or any provision of any of the other Loan Documents shall be made, except by a written agreement signed by the Borrower and a duly authorized officer of the Lender.

11.10    Counterparts.  This Agreement may be executed in any number of counterparts, and by the Lender and the Borrower in separate counterparts, each of which shall be an original, but all of which shall taken together constitute one and the same agreement.  The parties hereby acknowledge and agree that facsimile signatures of this Agreement shall have the same force and effect as original signatures.

11.11    Captions.  The captions contained in this Agreement are for convenience of reference only, are without substantive meaning and should not be construed to modify, enlarge, or restrict any provision.

11.12    RELEASE.   IN CONSIDERATION OF THE LENDER'S EXECUTION AND DELIVERY OF THIS AGREEMENT AND THE LOANS MADE IN CONNECTION HEREWITH, THE BORROWER HEREBY VOLUNTARILY AND KNOWINGLY RELEASES AND FOREVER DISCHARGES LENDER, ITS AGENTS, EMPLOYEES, AFFILIATES, SUCCESSORS AND ASSIGNS, FROM ALL POSSIBLE CLAIMS, DEMANDS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES, AND LIABILITIES WHATSOEVER, KNOWN OR UNKNOWN, ANTICIPATED OR UNANTICIPATED, SUSPECTED OR UNSUSPECTED, FIXED, CONTINGENT, OR CONDITIONAL, AT LAW OR IN EQUITY, ORIGINATING IN WHOLE OR IN PART ON OR BEFORE THE DATE THIS AGREEMENT IS EXECUTED, WHICH SUCH BORROWER MAY NOW OR HEREAFTER HAVE AGAINST LENDER, ITS AGENTS, EMPLOYEES, AFFILIATES, SUCCESSORS AND ASSIGNS, IF ANY, AND IRRESPECTIVE OF WHETHER ANY SUCH CLAIMS ARISE OUT OF CONTRACT, TORT, VIOLATION OF LAW OR REGULATIONS, OR OTHERWISE, AND ARISING FROM ANY LOANS, LETTERS OF CREDIT, OR OTHER OBLIGATIONS OR INDEBTEDNESS, INCLUDING, WITHOUT LIMITATION, ANY CONTRACTING FOR, CHARGING, TAKING, RESERVING, COLLECTING OR RECEIVING INTEREST IN EXCESS OF THE HIGHEST LAWFUL RATE APPLICABLE, OR THE EXERCISE OF ANY RIGHTS AND REMEDIES UNDER THIS AGREEMENT OR THE PREPETITION NOTE PURCHASE AGREEMENT OR THE OTHER LOAN DOCUMENTS OR THE OTHER PREPETITION NOTE DOCUMENTS, AND NEGOTIATION FOR AND EXECUTION OF THIS AGREEMENT.

11.13    DIP Orders Control.  This Agreement and the other Loan Documents are each subject to the terms and provisions contained in the DIP Orders to the same extent and effect as if the DIP Orders were fully set forth herein and therein; and in the event that any term or provision of this Agreement or any other Loan Document conflicts or is inconsistent with any term or provision of any DIP Order, the term and provision of the applicable DIP Order shall control and be given effect.

11.14    Maximum Lawful Rate.  Notwithstanding any provision of this Agreement or the other Loan Documents to the contrary, it is the intent of the Lender and the Borrower, that neither the Lender nor any successor or assign shall be entitled to receive, collect, reserve or apply, as interest, any amount in excess of the amount determined by application of the Maximum Lawful Rate of Interest.  In the event this Agreement or the other Loan Documents calls for an interest payment that exceeds the amount determined by application of the Maximum Lawful Rate of Interest, such interest shall not be received, collected, charged or reserved until such time as that interest together with all other interest then payable, falls within

the amount determined by application of the Maximum Lawful Rate of Interest.  In the event the Lender receives any such interest in excess of the amount determined by the application of the Maximum Lawful Rate of Interest, such amount which would be excessive interest shall be deemed a partial prepayment of principal and treated hereunder as such, or, if the principal indebtedness is paid in full, any remaining excess funds shall immediately be paid to the Borrower.  In determining whether or not the interest paid or payable, under any specific contingency, exceeds the amount determined by application of the Maximum Lawful Rate of Interest, the Borrower and the Lender shall, to the greatest extent permitted under applicable law, (a) exclude voluntary prepayments and the effects thereof, and (b) amortize, prorate, allocate, and spread, in equal parts, the total amount of interest throughout the entire term of the indebtedness; provided, however, that if the indebtedness is paid in full then to the end of the full contemplated term hereof; and if the interest received for the actual period of existence hereof exceeds the amount determined by application of the applicable Maximum Lawful Rate of Interest, the Lender shall refund to the Borrower the amount of such excess or credit the amount of such excess against the principal portion of the indebtedness as of the date it was received, and, in such event, the Lender shall not be subject to any penalties provided by any laws for contracting for, charging, reserving, collecting or receiving interest in excess of the amount determined by the application of the applicable Maximum Lawful Rate of Interest

The undersigned, pursuant to due authority, have caused this Agreement to be executed as of the date set forth above.

BORROWER:

VIRIDOS, INC.

By:_____
Name: _____
Title: _____


Address for Notices:


LENDER:

BREAKTHROUGH ENERGY VENTURES II, L.P.


By:_____
Name: _____
Title: _____


Address for Notices:

**Schedule 4.2(e)**

Commercial Tort Claims

**None.**

## Schedule 5.6(a)

Liens

**See Lien Report attached.**

# Delaware

## The First State

*Page 1*

CERTIFICATE

SEARCHED MARCH 21, 2025 AT 7:05 P.M.
FOR DEBTOR, VIRIDOS INC.

| 1 OF 2 | FINANCING STATEMENT | 20229937954 |

EXPIRATION DATE: 12/01/2027

DEBTOR:       VIRIDOS, INC.

              11149 NORTH TORREY PINES ROAD       ADDED    12-01-22

              LA JOLLA, CA US 92037

SECURED:      EXXONMOBIL LOW CARBON SOLUTIONS HOLDINGS, LLC

              22777 SPRINGWOODS VILLAGE PARKWAY     ADDED    12-01-22

              SPRING, TX US 77389


### F I L I N G   H I S T O R Y

20229937954    FILED 12-01-22    AT 8:17 P.M.    FINANCING STATEMENT

20251287603    FILED 02-25-25    AT 3:13 P.M.    TERMINATION


| 2 OF 2 | FINANCING STATEMENT | 20245654189 |

EXPIRATION DATE: 08/16/2029

DEBTOR:       VIRIDOS, INC.

              11149 NORTH TORREY PINES ROAD       ADDED    08-16-24



_Charuni Patibanda-Sanchez, Secretary of State_

20261112987-UCC11
SR# 20251178960
You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 203240691
Date: 03-21-25



# Delaware

### The First State

LA JOLLA, CA US 92037

SECURED:      BREAKTHROUGH ENERGY VENTURES II, L.P.

250 SUMMER STREET, 4TH FLOOR           ADDED    08-16-24

BOSTON, MA US 02210

*F I L I N G   H I S T O R Y*

*20245654189     FILED 08-16-24    AT 10:05 A.M.   FINANCING STATEMENT*

*E N D   O F   F I L I N G   H I S T O R Y*

*THE UNDERSIGNED FILING OFFICER HEREBY CERTIFIES THAT THE ABOVE LISTING IS A RECORD OF ALL PRESENTLY EFFECTIVE FINANCING STATEMENTS, FEDERAL TAX LIENS AND UTILITY SECURITY INSTRUMENTS FILED IN THIS OFFICE WHICH NAME THE ABOVE DEBTOR, VIRIDOS INC. AS OF MARCH 5, 2025 AT 11:59 P.M.*



C. P. Sanchez

---

Charuni Patibanda-Sanchez, Secretary of State

20261112987-UCC11
SR# 20251178960                                         Authentication: 203240691
                                                        Date: 03-21-25

You may verify this certificate online at corp.delaware.gov/authver.shtml

▬▬▬▬▬▬
▬▬▬▬▬▬
▬▬▬▬▬▬

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Scott F. Yarnell- 908-335-3622

B. E-MAIL CONTACT AT FILER (optional)
scott.f.yarnell@exxonmobil.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

⌐ **Scott F. Yarnell**
**Exxon Mobil Corporation**
**1545 Route 22 East, P.O. Box 900**
**Annandale, NJ 08801-0900** ⌐

Delaware Department of State
U.C.C. Filing Section
Filed: 08:17 PM 12/01/2022
U.C.C. Initial Filing No: 2022 9937954

Service Request No:   20224154560

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| OR | Viridos, Inc. | | | | |
| | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | | |
| 1c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 11149 North Torrey Pines Road | La Jolla | | CA | 92037 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| OR | | | | | |
| | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | | |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| | | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| OR | ExxonMobil Low Carbon Solutions Holdings, LLC | | | | |
| | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | | |
| 3c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 22777 Springwoods Village Parkway | Spring | | TX | 77389 | US |

4. COLLATERAL: This financing statement covers the following collateral:

The Debtor  hereby  grants  to Secured Party a security interest in and to:  (a) all personal property, tangible and intangible, choate and inchoate, and the products and proceeds thereof, and (b) all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing, including proceeds and earnings from investment of the foregoing, proceeds of any insurance policies, claims against third parties, and requisition payments with respect to all or any of the foregoing.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**Delaware Secretary of State**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
**Kirt Shuldberg, Partner**

**B. E-MAIL CONTACT AT FILER (optional)**
**kshuldberg@gunder.com**

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

⌐ **c/o Gunderson Dettmer** ⌐
   **3570 Carmel Mountain Rd, Suite 200**
   **San Diego, CA 92130**
L                                      ⌐

Delaware Department of State
U.C.C. Filing Section
Filed: 03:13 PM 02/25/2025
U.C.C. Initial Filing No: 2022 9937954
Amendment No: 2025 1287603
Service Request No:  20250728122

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
**2022 9937954 – Filed 12/01/2022**

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☑ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:                           AND   Check one of these three boxes to:
☐ This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 7b. INDIVIDUAL'S SURNAME | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral
Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | **ExxonMobil Low Carbon Solutions Holdings, LLC** | | | |
| | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**
**Delaware Secretary of State**

**FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)**

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)
Kirt Shuldberg, Partner

B. E-MAIL CONTACT AT SUBMITTER (optional)
kshuldberg@gunder.com

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

c/o Gunderson Dettmer
3570 Carmel Mountain Rd, Suite 200
San Diego, CA 92130

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

Delaware Department of State
U.C.C. Filing Section
Filed: 10:05 AM 08/16/2024
U.C.C. Initial Filing No: 2024 5654189

Service Request No:  20243436691

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Viridos, Inc. | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 11149 North Torrey Pines Road | La Jolla | CA | 92037 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Breakthrough Energy Ventures II, L.P. | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 250 Summer Street, 4th Floor | Boston | MA | 02210 | |

4. COLLATERAL: This financing statement covers the following collateral:

All of Debtor's, right, title and interest in and to the Collateral set forth on Exhibit A attached hereto and made a part hereof  pursuant to that certain Security Agreement, dated as of July 23, 2024, by and between the Debtor and the Secured Party.

5. Check only if applicable and check only one box:  Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
DE - Secretary of State

FILING OFFICE COPY --- UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)

**EXHIBIT A**

**ATTACHMENT TO FINANCING STATEMENT**

DEBTOR: Viridos, Inc.

SECURED PARTY: Breakthrough Energy Ventures II, L.P.

The collateral consists of all personal property of the Debtor whether presently existing or hereafter created, written, produced or acquired, including, but not limited to:

(i)      all accounts receivable, accounts, chattel paper, contract rights (including, without limitation, royalty agreements, license agreements and distribution agreements), documents, instruments, money, deposit accounts and general intangibles, including, without limitation, payment intangibles, returns, repossessions, books and records relating thereto, and equipment containing said books and records, all financial assets, all investment property, including securities and securities entitlements;

(ii)      all software, computer source codes and other computer programs and supporting information (collectively, the "**Software Products**"), and all common law and statutory copyrights and copyright registrations, applications for registration, now existing or hereafter arising, United States of America and foreign, obtained or to be obtained on or in connection with the Software Products, or any parts thereof or any underlying or component elements of the Software Products together with the right to copyright and all rights to renew or extend such copyrights and the right (but not the obligation) of any Secured Party to sue in its own name and/or the name of the Debtor for past, present and future infringements of copyright;

(iii)      all goods, including, without limitation, equipment and inventory (including, without limitation, all export inventory) and all computer programs embedded in goods and any supporting information;

(iv)      all guarantees and other security therefor;

(v)      all trademarks, service marks, trade names and service names and the goodwill associated therewith;

(vi)      (a) all patents and patent applications filed in the United States Patent and Trademark Office or any similar office of any foreign jurisdiction, and interests under patent license agreements, including, without limitation, the inventions and improvements described and claimed therein, (b) licenses pertaining to any patent whether Debtor is licensor or licensee, (c) all income, royalties, damages, payments, accounts and accounts receivable now or hereafter due and/or payable under and with respect thereto, including, without limitation, damages and payments for past, present or future infringements thereof, (d) the right (but not the obligation) to sue for past, present and future infringements thereof, (e) all rights corresponding thereto throughout the world in all jurisdictions in which such patents have been issued or applied for, and (f) the reissues, divisions, continuations, renewals, extensions and continuations-in-part with any of the foregoing;

(vii)      all letter-of-credit rights and letters of credit; and

(viii)    all products and proceeds, including, without limitation, insurance proceeds, of any of the foregoing.

Notwithstanding the foregoing, no security interest is granted in any contract rights, licenses or intellectual property if such grant causes a default enforceable under applicable law or if a third party has the right enforceable under applicable law to terminate Debtor's rights under or with respect to any such contract, license or intellectual property and such third party has exercised such right of termination.

CT Corporation
® a Wolters Kluwer Business

# Search Results

**CINDY GIOBBE**
**WOMBLE BOND DICKINSON**
**(US) LLP**
**1313 N MARKET ST STE 1200**
**WILMINGTON, DE 19801-6101**

**Date:** 03/24/2025
**Order #:** 103417377
**Customer #:** 50498
**Reference 1: Viridos**
**Reference 2: --**

**Target Name: Synthetic Genomics Vaccines, Inc.**

**Jurisdiction: Secretary of State, Delaware**

| | | |
|---|---|---|
| **Search Type: UCC Lien** | | **Searched Through: 03/05/2025** |
| Results: | No Records Found /See Attached Certified Search | Searched: 5 Years |
| **Search Type: Federal Tax Lien** | | **Searched Through: 03/05/2025** |
| Results: | No Records Found /See Attached Certified Search | Searched: 10 Years |

**JILLIAN CLINT**
**UCC Team 1**
**4400 Easton Commons Way**
**Suite 125**
**Columbus, OH 43219**
**6142803291**
**jillian.clint@wolterskluwer.com**

This report contains information compiled from sources which CT Corporation considers reliable but does not control. The information provided is not a certified record of the applicable jurisdiction unless otherwise indicated. CT Corporation does not (i) warrant or guarantee the accuracy, completion or timeliness of the information provided or (ii) accept any liability for delays, errors or omissions in the information provided. CT Corporation is not an insurer with regard to this information or these services. Under no circumstances shall CT Corporation be liable for any loss of underlying collateral or loss (or decreased priority) of security interest in connection with this information or these services. Any categorization of search results is provided for convenience only and is not to be construed as a legal opinion concerning the status of filings .



# Delaware

## The First State

*CERTIFICATE*

*SEARCHED MARCH 21, 2025 AT 7:06 P.M.*
*FOR DEBTOR, SYNTHETIC GENOMICS VACCINES, INC.*

    *THE UNDERSIGNED FILING OFFICER HEREBY CERTIFIES THAT THERE ARE NO*
*PRESENTLY EFFECTIVE FINANCING STATEMENTS, FEDERAL TAX LIENS OR UTILITY*
*SECURITY INSTRUMENTS FILED IN THIS OFFICE WHICH NAME THE ABOVE DEBTOR,*
*SYNTHETIC GENOMICS VACCINES, INC. AS OF MARCH 5, 2025 AT 11:59 P.M.*



*C. P. Sanchez*

Charuni Patibanda-Sanchez, Secretary of State

20261113029-UCC11
SR# 20251178993

Authentication: 203240705
Date: 03-21-25

You may verify this certificate online at corp.delaware.gov/authver.shtml

**Schedule 5.6(b)**

Title

**None.**

**Schedule 5.6(d)**

Locations of Equipment

| Company | Street Address | City | State | Zip |
|---|---|---|---|---|
| Viridos, Inc. | 11149 N. Torrey Pines Road | San Diego | CA | 92037 |
| | 11095 N. Torrey Pines Road | San Diego | CA | 92121 |
| | 250 W. Schrimpf Road | Calipatria | CA | 92233 |

**Schedule 5.6(e)**

Real Estate

| Company | Address | Lease / Own | Landlord's Lien/ Mortgage (Y/N) | Landlord / Mortgage Holder Name |
|---|---|---|---|---|
| Viridos, Inc. | 11149 N. Torrey Pines Road San Diego, CA 92037 | Lease | N | HCP Life Science REIT, Inc. |
| | 11095 N. Torrey Pines Road, San Diego, CA 92121 | Lease | N | AG/Touchstone TP, LLC |
| | 250 W. Schrimpf Road, Calipatria, CA 92233 | Own | N | N/A |

**Schedule 5.7**

Proprietary Rights

**Patents:**

| Description | Application No. | Application Date | Patent No. | Issue Date |
|---|---|---|---|---|
| Compositions and Methods for High Efficiency in vivo Genome Editing | 14/986,492 | 12/31/2015 | 11,339,399 | 5/24/2022 |
| Compositions and Methods for High Efficiency in vivo Genome Editing | 17/039,839 | 9/30/2020 | 12,043,836 | 7/23/2024 |
| High Efficiency Method for Algal Transformation | 15/048,882 | 2/19/2016 | 10,351,860 | 7/16/2019 |
| Microorganisms Having Increase Lipid Production and Compositions and Methods of Making and Using the Same | 16/518,360 | 7/22/2019 | 11,046,979 | 6/29/2021 |
| Algal Chlorroplastic SRP54 Mutants | 15/130,866 | 4/15/2016 | 10,544,424 | 1/28/2020 |
| High Productivity Algal Mutants Having Reduced Photosynthetic Antenna | 15/859,094 | 12/29/2017 | 10,968,259 | 7/5/2018 |
| High Productivity Algal Mutants Having Reduced Photosynthetic Antenna | 17/178,179 | 2/17/2021 | 11,787,843 | 10/17/2023 |
| High Productivity Algal Mutants Having Reduced Photosynthetic Antenna | 18/475,792 | 9/27/2023 | pending | N/A |
| Genetic Modulation of Photosynthetic Organisms for Improved Growth | 176/234,209 | 12/27/2018 | 11,193,132 | 12/7/2021 |
| Avoiding Epigenetic Silencing of Exogenous Nucleic Acid in Algae | 16/711,944 | 12/12/2019 | 11,578,311 | 2/14/2023 |
| Inducible Expression of Genes in Algae | 16/719,013 | 12/18/2019 | 11,162,106 | 6/24/2020 |
| Recombinant Algae Having High Lipid Productivity | 17/124,348 | 12/16/2020 | 11,859,218 | 1/2/2024 |
| Recombinant Algae Having High Lipid Productivity | 18/339,556 | 12/28/2023 | N/A | N/A |
| Method of Transforming Photosynthetic Organisms | 17/307,824 | 5/4/2021 | allowed | N/A |

| | | | | |
|---|---|---|---|---|
| Vectors and Methods of Expression in Picochlorum | 17/167,921 | 2/4/2021 | 11,434,493 | 9/6/2022 |
| Improving Biomass Productivity in Algae Through Optimizing Their Pigment Content | 17/727,588 | 4/22/2022 | pending | N/A |
| Lipid Producing Algal Mutant | 17/470,925 | 9/9/2021 | allowed | N/A |
| Recombinant Alga Having High Lipid Productivity | 17/519,383 | 11/4/2021 | 11,976,315 | 5/7/2024 |
| Recombinant Alga Having High Lipid Productivity | 18/632,080 | 4/10/2024 | N/A | N/A |
| Recombinant Algae Having High Biomass and Lipid Productivity | 18/386,502 | 11/2/2023 | N/A | N/A |
| Recombinant Algae Having High Biomass and Lipid Productivity | PCT/US2023/036697 | 11/2/2023 | N/A | N/A |
| Methods to Improve Chloroplast Genome Transgenic Organisms | PCT/US2024/040732 | 8/2/2024 | N/A | N/A |
| Methods to Improve Chloroplast Genome Transgenic Organisms | 18/793,396 | 8/2/2024 | N/A | N/A |
| Cryptochrome/photolyase FAD-binding Domain (CRY1) Algal Mutants With High Lipid Productivity | 63/539,076 | 9/18/2023 | N/A | N/A |
| Methods for Increasing Lipid Productivity in Algae | 63/674,152 | 7/22/2024 | N/A | N/A |

**Trademarks:**

| Mark | Application Serial No. | Application Date | Registration No. | Registration Date |
|---|---|---|---|---|
| VIRIDOS | 88/984,228 | 11/25/2019 | 6821700 | August 16, 2022 |
| VIRIDOS | 88/705,882 | 11/25/2019 | 7133502 | August 8, 2023 |

**Copyrights:**

**None.**

## Schedule 5.8

Trade Names

**Synthetics Genomics Inc.**

**Schedule 5.9**

Bank Accounts

| Company | Account Type | Depository Bank | Account No. | Depository Bank Address |
|---------|--------------|-----------------|-------------|--------------------------|
| Viridos, Inc. | Checking | Bank of America | 1459703707 | P.O. Box 15284, Wilmington DE 19850 |
| Viridos, Inc. | Checking | Bank of America | 1459703726 | P.O. Box 15284, Wilmington DE 19850 |
| Viridos, Inc. | Checking | Bank of America | 1459703745 | P.O. Box 15284, Wilmington DE 19850 |
| Viridos, Inc. | Money Market | Bank of America | 1453336857 | P.O. Box 15284, Wilmington DE 19850 |
| Viridos, Inc. | CC Collateral | Bank of America | 1453438520 | P.O. Box 15284, Wilmington DE 19850 |
| Viridos, Inc. | Investment | BOFA Securities, Inc. | 5W101T00 | 620 S Tryon St, Charlotte, NC 28255 |
| Viridos, Inc. | Cash/ML Deposit | Merrill (A BOFA Company) | WCMA 2N7-02319 | Steelman, Aguirre WMG, 6002 El Tordo 2nd Fl PO Box 7297, Rancho Santa Fe, CA 92067 |
| Viridos, Inc. | Investment | Merrill (A BOFA Company) | Armata Pharmaceuticals | Steelman, Aguirre WMG, 6002 El Tordo 2nd Fl PO Box 7297, Rancho Santa Fe, CA 92067 |

**Schedule 5.11**

Taxes

**2024 Form 1120 on extension.**

**Schedule 5.12**

Litigation

**None.**

**Schedule 5.16(b)**

Organization

| Company | Jurisdiction of Incorporation | Principal Place of Business | US TIN |
|---------|-------------------------------|----------------------------|--------|
| Viridos, Inc. | Delaware | 11149 N. Torrey Pines Road La Jolla, CA 92037 | 141923940 |

**Schedule 5.16(c)**

Owned Equity Interests

**See attached organizational chart.**



Note: All subsidiaries are either dormant or have immaterial operations

## Schedule 6.14

Milestones

1. No later than four (4) calendar Days after the Petition Date, entry by the Bankruptcy Court of the Interim DIP Order.

2. No later than twenty-five (25) calendar days after the Petition Date, entry by the Bankruptcy Court of the Bidding Procedures Order.

3. No later than thirty-five (35) calendar days after the Petition Date, entry by the Bankruptcy Court of the Final DIP Order.

4. No later than forty-five (45) calendar days after the Petition Date, the submission deadline for all bids for the sale of the Borrower's assets as set forth in the Bidding Procedures Order.

5. No later than fifty (50) calendar days after the Petition Date, holding an auction (if necessary) for the sale of the Borrower's assets in accordance with the Bidding Procedures Order.

6. No later than fifty-two (52) calendar days after the Petition Date, entry by the Bankruptcy Court of the Sale Order.

7. No later than fifty-five (55) calendar days after the Petition Date, consummation of the sale of the Borrower's assets in accordance with the Bidding Procedures Order.

**Schedule 7.4**

Investments

**None.**

**Schedule 7.10**

Indebtedness

**Indebtedness arising from that certain Amended and Restated Secured Convertible Promissory Note, dated as of April 8, 2025, issued by Viridos, Inc. in the principal amount of $2,750,000 and in favor of Breakthrough Energy Ventures II, L.P.**

**<u>Exhibit 2</u>**

Initial DIP Budget

*DRAFT - Preliminary and For Discussion Purposes Only*

## Viridos, Inc.

Projected Cash Flow Budget

| | 1 Proj. W/E 18-Apr | 2 Proj. W/E 25-Apr | 3 Proj. W/E 2-May | 4 Proj. W/E 9-May | 5 Proj. W/E 16-May | 6 Proj. W/E 23-May | 7 Proj. W/E 30-May | 8 Proj. W/E 6-Jun | 9 Proj. W/E 13-Jun | 10 Proj. W/E 20-Jun | 11 Proj. W/E 27-Jun | 12 Proj. W/E 4-Jul | 13 Proj. W/E 11-Jul |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Book Balance** | | | | | | | | | | | | | |
| Beginning Cash | $ 439,817 | $ 434,817 | $ 1,407,622 | $ 1,240,843 | $ 1,046,861 | $ 933,989 | $ 57,507 | $ 2,192,507 | $ 1,960,525 | $ 1,893,025 | $ 1,878,653 | $ 1,578,653 | $ 749,014 |
| **Receipts** | | | | | | | | | | | | | |
| Bridge Financing | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| DIP Financing | | 1,500,000 | | - | - | - | 2,500,000 | - | - | - | - | - | - |
| Other misc. | | - | 35,000 | - | - | - | - | - | - | - | - | - | - |
| TOTAL | $ - | $ 1,500,000 | $ 35,000 | $ - | $ - | $ - | $ 2,500,000 | $ - | $ - | $ - | $ - | $ - | $ - |
| **Recurring Operating Disbursements** | | | | | | | | | | | | | |
| Payroll | $ - | $ 126,482 | $ 26,157 | $ 126,482 | $ 4,372 | $ 126,482 | $ - | $ 126,482 | $ - | $ 4,372 | $ - | $ 126,482 | $ - |
| Rent (Greenhouse Location) | - | 3,213 | 31,500 | - | - | - | - | 31,500 | - | - | - | 31,500 | - |
| Employee Insurance | - | - | 34,000 | - | - | - | - | 34,000 | - | - | - | - | - |
| Other operating expenses | - | 37,500 | 45,123 | 67,500 | - | - | - | - | - | 67,500 | - | - | 67,500 |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - |
| TOTAL | $ - | $ 167,195 | $ 136,779 | $ 193,982 | $ 4,372 | $ 126,482 | $ - | $ 191,982 | $ 67,500 | $ 4,372 | $ - | $ 225,482 | $ - |
| **One-Time Disbursements** | | | | | | | | | | | | | |
| RIF Payroll / PTO payouts | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 359,075 | $ - |
| Severance | - | - | - | - | - | - | - | - | - | - | - | 215,082 | - |
| Rent (Main Building) | - | - | - | - | 46,000 | 660,000 | - | - | - | - | - | - | - |
| Other operating expenses | - | - | - | - | 62,500 | 80,000 | - | - | - | - | - | - | - |
| CalCompetes Wire | - | - | - | - | - | - | - | - | - | - | - | - | - |
| TOTAL | $ - | $ - | $ - | $ - | $ 108,500 | $ 740,000 | $ - | $ - | $ - | $ - | $ - | $ 574,157 | $ - |
| **Restructuring Disbursements** | | | | | | | | | | | | | |
| DIP Loan (Fees & Interest) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| DIP Lender's Counsel [Greenberg Traurig] | - | 100,000 | - | - | - | - | 100,000 | - | - | - | 100,000 | - | - |
| Debtors' Counsel [WBD] | - | 150,000 | - | - | - | - | 150,000 | - | - | - | 100,000 | - | - |
| Debtors' Financial Advisor [Rock Creek] | - | 100,000 | - | - | - | - | 100,000 | - | - | - | 100,000 | - | - |
| Independent Director | - | - | 20,000 | - | - | - | - | 10,000 | - | - | - | - | - |
| Claims/Noticing Agent | - | - | 30,000 | - | - | - | - | 30,000 | - | - | - | 30,000 | - |
| UST Fees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Committee Professionals / SubV Trustee Fees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| D&O Insurance | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Critical Vendors | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Corporate Counsel [Gunderson] | - | 10,000 | - | - | - | 10,000 | - | - | - | 10,000 | - | - | - |
| IP Counsel [DLA Piper] | - | - | 15,000 | - | - | - | 15,000 | - | - | - | - | - | - |
| Litigation Counsel [Shepherd Mullen] | 5,000 | - | - | - | - | - | - | - | - | - | - | - | - |
| Windown Expenses | - | - | - | - | - | - | - | - | - | - | - | - | - |
| TOTAL | $ 5,000 | $ 360,000 | $ 65,000 | $ - | $ - | $ 10,000 | $ 365,000 | $ 40,000 | $ - | $ 10,000 | $ 300,000 | $ 30,000 | $ - |
| **Ending Book Balance** | | | | | | | | | | | | | |
| Ending Cash | $ 434,817 | $ 1,407,622 | $ 1,240,843 | $ 1,046,861 | $ 933,989 | $ 57,507 | $ 2,192,507 | $ 1,960,525 | $ 1,893,025 | $ 1,878,653 | $ 1,578,653 | $ 749,014 | $ 749,014 |